SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

- - - - - - - - - - - - - - - x
DISTRICT OF COLUMBIA          : Docket Number:  2026 CAB 000985
                              :
                              :
        vs.                   :
                              :
                              :
ALI RAZJOOYAN, ET AL.,        :
                              :
        Defendants.           : Wednesday, March 25, 2026
- - - - - - - - - - - - - - - x Washington, D.C.


        The above-entitled action came on for a motion

hearing before the HONORABLE SHANA FROST MATINI, Associate

Judge, in Courtroom Number 130.


                APPEARANCES:

                On Behalf of the Government:

                MATTHEW W. MEYER, Esquire
                LAURA C. BECKERMAN, Esquire
                KATHRYN L. BLANCO, Esquire
                Assistant Attorney General


                On Behalf of the Industrial Bank:

                LAUREN BAIO PULTRO, Esquire
                Washington, DC


                                            26-02083

 eScribers

1

T A B L E   O F   C O N T E N T S

WITNESSES

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

On Behalf of the Government:

Keith Parsons

   by Ms. Beckerman      27

Cullen Hamilton

   by Mr. Meyer      56

Rebecca Janovich

   by Mr. Meyer      90

Musa Abdul Khalik

   by Mr. Meyer      97

Marcia Browning

   by Ms. Blanco      117

Queshonna Shaw

   by Mr. Meyer      145

E X H I B I T S

| NUMBER | DESCRIPTION | ID'D | REC'D |
|---|---|---|---|

On behalf of the Plaintiff

1A - Notice of revocation, Basic Business License38

1B - Notice to vacate      40     42



1C - Correction order for 2908 Langston Place          42        43

1-IIII - Notice of infraction                          44        47

1-IIIII - Notice of infraction                         44        47

5J thru 5R - Notice of infraction                      48        49

1D thru 1T - Notice of infraction                      50        51

1U thru 1QQ - Notice of infraction                     52

1RR thru 1MMM - Notice of infraction                   53        54

1NNN thru 1HHHH - Notice of infraction                 54        55

2A thru 2Z - Photo, 1035 48th Street NE                58        58

2AA thru 2LLL - Photo, 2844 Langston Place SE                    87

2-MMM thru 2PPP - Photo, 3615 B Street SE                        87

7 - FN-1                                                         94

21 - FN-1, 2844 Langston Place SE                                96

31 - FN-1, 2908 Langston Place SE                                96

36 - FN-1, 3615 B Street SE                                      96

14 - FN-1, 2840 Langston Place SE                                96

26 - FN-1, 2850 Langston Place SE                                96

## M I S C E L L A N Y

OPENING STATEMENT BY PLAINTIFF                                   19

CLOSING STATEMENT BY PLAINTIFF                                   164



P R O C E E D I N G S

THE COURT: Okay. Let's go ahead and call the case.

THE DEPUTY CLERK: Your Honor, I'm calling the matter of the District of Columbia vs. Ali Razjooyan, et al., case number 2026 CAB 985.

Parties present, please state your name for the record.

MR. MEYER: Good morning, Your Honor. Matthew Meyer on behalf of the District.

THE COURT: Good morning.

MS. BECKERMAN: Laura Beckerman on behalf of the District.

THE COURT: Good morning.

MS. BLANCO: Kathryn Blanco on behalf of the District.

THE COURT: Good morning. Okay.

So we are here on the District's motion for a temporary restraining order. Or actually, it's for a --

MR. MEYER: Preliminary injunction.

THE COURT: -- preliminary injunction, which, I guess, given that we do have service, we can proceed on.

Do you want to give an opening statement of some sort, or do you just want to dive right in?

MR. MEYER: We had a couple preliminary matters



4

if you --

THE COURT:  Sure.

MR. MEYER:  So the District filed a motion for judicial notice, which is ripe as of yesterday.

THE COURT:  Uh-hmm.

MR. MEYER:  If you need any further argument on that, we're happy to provide it.  It was unopposed and is now ripe for the Court's ruling.  It pertains to defendants -- certain facts that run to the defendants' ownership of the properties.

THE COURT:  Right.  I mean, I don't -- given that service was just accomplished, I don't think it would -- I could consider it as unopposed right now.  I am just scrolling back here.

The judicial notice issue is of government records, correct?

MR. MEYER:  Correct, Your Honor.

THE COURT:  Well, I can -- why don't I just hear from you on that?

MS. BECKERMAN:  Your Honor, the District -- apologies.  The District requests the Court take judicial notice of the specific facts listed in our motion requesting judicial notice filed on March 10th, which are in publicly available documents, as you mentioned, recorded with the Recorder of Deeds for the District of



5

Columbia.

Specifically, the facts are drawn from deeds, deeds of trust, and screenshots taken by the District, also on March 10th, of the publicly available Recorder of Deeds website.  The facts listed in those documents are eligible for judicial notice under the standard in the District of Columbia, and that the facts are beyond reasonable dispute.  And the documents that they are drawing from, again, are public documents, which -- and D.C. Recorder of Deeds documents have been -- specifically have been judicially noticed in the District previously.

The documents -- or rather, the facts listed, which are in those documents, are relevant to this hearing because they demonstrate -- or rather, support, the District's argument that defendants Ali and Houri Razjooyan owned and controlled the six relevant properties at the -- via the six different LLCs at the time that the CPPA violations we're alleging today occurred and continue to own these properties.

And it also supports the District's contention that intervention by the court is necessary in order to prevent further harm both to the current tenants and to prevent the defendants from acquiring additional properties and potentially causing harm to those future tenants.



So judicially noticing the facts in these public documents would allow the hearing to move on more quickly to the substantive questions at issue today.

THE COURT:  And so these are documents that have been signed by the defendants?

MS. BECKERMAN:  That's correct, Your Honor.

There are notarized signatures by defendants Ali and Houri Razjooyan for most of those documents for the deeds of trust.  For the deeds, I -- they are, rather, deeds of acquisition on the part of the LLCs.

THE COURT:  I guess the only thing that gives me pause is the District has raised concerns about the credibility and the honesty of -- and the accuracy of documents that have been presented by the defendants.

On the one hand, you're saying these can't be seriously disputed because they're filed with the Recorder of Deeds.  But on the other hand, we've -- part of the basis for the District's request here is the fact that this is a -- the District has alleged a scheme of fraud.

And so, I guess, how can you have it both ways?

MS. BECKERMAN:  To clarify, Your Honor, with the District, the facts that the District is asking the Court to judicially notice are that, per the Recorder of Deeds, the defendants have signed -- or the defendants have notarized signatures on these documents.



7

So we're specifically asking for judicial notice that there is a deed of -- you know, for example, there is a deed of trust acquiring, let's say, 1035 48th Street Northeast, in which there is a notarized signature by Mr. Ali Razjooyan.

THE COURT:  And so where does that get you, though, if I acknowledge that fact?  Does that necessarily follow that the entity that Mr. Razjooyan has signed on behalf of is the owner?

MS. BECKERMAN:  I would leave that question for argument, which we will be putting forward.  But I believe the -- or rather, the District asserts that the presence of a signature, specifically a notarized signature, on a recorded deed by defendants Ali and Houri Razjooyan at least supports that argument.

THE COURT:  Except for when it doesn't.  I guess that's what I'm getting at here.

This is just such an unusual case, and I'm not -- I'm just trying to, I guess, probe the extent of what I should be taking judicial notice of.

I can certainly take judicial notice of the fact that there are certain documents at the Recorder of Deeds, but whether or not what's in those documents is accurate or something that the Court should take as true, I think, is a different issue, and the one that we can certainly



8

circle back to, I guess, as the hearing goes on.

And so maybe what I will do is grant in part the request to take judicial notice and take judicial notice of the fact that the District has submitted certain documents that are accepted on file with the Recorder of Deeds and, as such, are publicly available documents and leave it at that.

MS. BECKERMAN:  Your Honor, would it be possible to take judicial notice that those documents with the District, which the District has submitted -- specifically that those documents indicate -- or those documents say that defendants have signed as members of those LLCs, or depending on the content of the document, but have signed those deeds of trust?  Specifically, that the document says that rather than judicially noticing that the defendants signed, if that distinction is clear.

THE COURT:  I don't know if I can draw that distinction at this point.  I think we need to circle back as this hearing goes on.

And generally, this would be the type of thing that I would take judicial notice of.  And generally, it's not something that's in dispute.  And I don't know if it really is or isn't here.

But the lack of the defendants and the nature of the District's arguments to the Court as to these



properties and the transfer of properties and the history that the Court is aware of by virtue of all the cases involving at least one defendant.

And the fact that the District has called into question other deeds and other transfers, I don't believe that one can say this is a fact that cannot reasonably be disputed since the District has disputed very similar facts with respect to the individuals who are the signatories here.

MS. BECKERMAN:  Understood.

Thank you, Your Honor.

MR. MEYER:  One more preliminary matter, Your Honor, that we want to bring to your attention.  One of the properties -- one of the six properties that are relevant --

THE COURT:  Uh-hmm.

MR. MEYER:  -- to the hearing today, 1035 48th Street, there has been a recent suit filed by the note holder, Industrial Bank.

THE COURT:  Uh-hmm.

MR. MEYER:  And so there is another case, Industrial Bank vs. 1035 48th Street Northeast, DE LLC, and Sam Razjooyan also named personally in that lawsuit. The case number is 2026 CAB 001557.  The attorney for Industrial Bank may be on Webex today.



10

THE COURT:  Uh-hmm.

MR. MEYER:  At this time, based on the records that were filed in that case, it appears that the bank is suing for failed payment on that note.  We just wanted to make you aware that that case has been filed.

There is not currently a lender receiver at that property, so it remains in control of defendants.  My understanding is that the lender would be amenable to consolidating that case with the other lender receiver cases.

THE COURT:  Okay.  I think I will hold off on that until those other cases are before the court because we just have 985 before the court today.  And at some point, I know we have a hearing in all the other cases.  And I will -- I appreciate the heads up of the related case, and I can certainly address that.

And I'm just pulling up that other case right now.

MS. PULTRO:  Good morning, Your Honor.  This is Lauren Pultro on behalf of Industrial Bank in the case that was just mentioned.

THE COURT:  All right.  Good morning.

MS. PULTRO:  For what it's worth, we have no issues with the cases being consolidated.

THE COURT:  Okay.  Because there are so many



other parties involved in the consolidated cases, I am going to hold off.

And it looks like this case was filed just a couple of weeks ago. I don't see service yet. And the scheduling conference is not scheduled to -- until June 26th, and I believe I have hearings in the other cases scheduled before June 26th. And I can certainly take it up when those other cases are settled.

Actually, Mr. Meyer, do you know when the next hearing is in the --

MR. MEYER: My understanding is it's Friday.

Is there not one on Friday?

THE COURT: I know we have -- we're seeing some cases on Friday.

MR. MEYER: Oh. Okay.

THE COURT: But perhaps not all of them.

MS. BECKERMAN: Your Honor, I believe the status conference is either May 2nd or May 6th.

THE COURT: That sounds about right. Okay. So we'll take it up at that time.

UNIDENTIFIED SPEAKER: It's May 6th for all the cases. Status hearing.

THE COURT: Thank you, Mr. Bryden (phonetic).

MR. MEYER: That concludes our preliminary matters, Your Honor.



12

I have an opening statement.  I would just rather -- just kind of give you a brief outline of what we plan to --

THE COURT:  Sure.

MR. MEYER:  -- present today.

THE COURT:  That would be helpful.  Thank you.

**OPENING**

MR. MEYER:  Your Honor, so obviously, we're here today on the District's motion for preliminary injunction under the CPPA in the context of this broader lawsuit of the False Claims Act and the Racketeer Influence and Corrupt Organizations Act, where there are broader allegations against the defendants.

But for the matters before the Court today, we're just here on the CPPA claims, and specifically, CPPA claims in regards to six properties that are still owned and controlled by defendants.

And so the District is seeking a more focused relief than the broad fraud allegations in the District's complaint.  Particularly, the District is asking that the defendants be ordered to abate the illegal and dangerous conditions at these six properties.

Second, that the defendants be enjoined from entering into any new leases with tenants, including any new housing assistance program contracts.



And third, that the defendants be enjoined from buying, selling, or refinancing any multifamily, real property in the district without this court's approval.

In order for the Court to issue that relief, the District will put on evidence today that it has met its burden for the preliminary injunction standard, including that this is in the public interest, that there's a cognizable danger of recurrent violation, and that the District is likely to cede on the merits of the CPPA claims. To show that, we're putting forward six witnesses today.

First, you'll hear from Keith Parsons, the strategic enforcement administrator at the Department of Buildings. Mr. Parsons will testify to the thousands of violations that were unabated at defendant's broader portfolio of real estate properties, and particularly, the more than 200 violations that remain unabated at these six properties. Mr. Parsons will testify that, since the District's motion was filed, illegal conditions remain unabated and continue to endanger tenants.

In fact, at 2840 Langston Place Southeast, the Department of Buildings placarded that building and deemed it unsafe for habitation. One of the declarants in the District's motion, Mr. Groves (phonetic), was forced from his apartment with his family. And it's our understanding



14

that that family is currently in a shelter.

Mr. Cullen Hamilton, an investigator at the Office of the Attorney General, will testify that he visited all six properties in January and again in February of 2026 and finding extensive illegal conditions during both of those visits, infestations of mice and roaches, extensive leaks, mountains of trash that, you know, contributed to the infestations, and numerous unlocked front doors that allowed him to access the properties without a key.

Third, you'll hear from Rebecca Janovich, the superintendent of the Corporations Division at the Department of Licensing and Consumer Protection.  Mrs. Janovich is a -- just a government records witness to get into evidence six documents from the Department of Licensing and Consumer Protection which were filed.

These four notices, registrations, other documents filed by foreign corporations to do business in the district and go to demonstrate the lengths to which defendants sought to hide their involvement in these LLCs through foreign LLCs to hide the beneficial owner behind those corporations.

And finally, we'll hear from three tenants who are living in these horrific conditions, tenants who go to work, pay their rent, and come back home to rats, leaks,



sewage leaks in their kitchen, and the mountains of trash and unlocked doors that make their conditions truly, truly horrific.

And so based on the evidence today, the District will prove that the defendants are in violation of the Consumer Protection Procedures Act.  And surely, these awful, illegal conditions make it in the public interest to order the defendants to abate them and allow this court to prevent them from continuing to inflict this harm on other tenants across the district.

And so with that, Your Honor, we would call our first witness, Mr. Parsons.

THE COURT:  May I ask just a couple follow-up questions?

One of the -- so I understand you're asking the Court to enjoin the defendants from buying, selling, refinancing any properties, I believe you said, without the District's approval?

MR. MEYER:  With this court's approval, Your Honor.

THE COURT:  Oh.  The court's approval?

MR. MEYER:  Correct, Your Honor.

THE COURT:  Okay.

And I know that you're seeking sort of prospective relief, insofar as you're asking the Court to



order that they not take certain action in the future.

And it looks like you're just citing to the CPPA generally for this preventive preliminary injunctive relief. Do you have any examples where a judge of this court has entered similar relief?

MR. MEYER: In past cases, Your Honor, and when we bring these cases against one of these properties, we are focused on that one property. You're right, Your Honor. And it's ordering specific actions to be taken at that property.

Here, due to the nature of these violations that are currently present, and of course, the defendants' past practices, we are seeking to go beyond what judges have typically done in these types of housing cases and prevent them from continuing this type of action against other properties.

And so Your Honor, I don't have a case that goes beyond, like, a single property and would prevent them from buying a new one. But I would say is, Your Honor, that this is a broad remedial statute and that the CPPA gives the court leeway to prevent these types of violations.

And I think you'll see on the record with the evidence that we'll put in about the thousands of violations across the portfolio of properties that this



17

court will be on solid, factual grounds to say, we can't allow this person to go out and buy another property because he's just going -- the defendants are just going to do this somewhere else.  And I think the factual record here will support that type of broad remedial measure.

THE COURT:  Okay.

Another form of relief you've requested is that the defendants be prohibited from entering into any new housing assistance program contract with the District of Columbia.  I mean, isn't that something that the District can just control on its own?

MR. MEYER:  You're exactly right, Your Honor.  And it's a little bit redundant with number 5 --

THE COURT:  Uh-hmm.

MR. MEYER:  -- which is entering into -- the defendants will be prohibited from entering into any leases.

I think, because of the amount of fraud the District alleges that the defendants have perpetrated thus far, we just wanted to make sure.  And it really is just a, hey, by the way, no new leases, and that does mean with the District as well.

THE COURT:  I mean, what would happen if the District violated that provision?

MR. MEYER:  Well, the order goes to the



defendants.  And so I think the concern the District has is -- and you'll see this from the the corporate records that they file with the Department of Corporations -- is that the defendants hide their involvement in LLCs.

THE COURT:  Uh-hmm.

MR. MEYER:  And so when they go and they sign a beneficial owner -- you'll see one of these documents -- the beneficial owner listed is the same LLC that -- it's pointing at itself.

And so we -- these district agencies, DHS or the nonprofits that carry out their work, Greater Washington Urban League, you know, can often just not know that the defendants are the ones signing up for these contracts.

And so the idea here is to put the defendants on notice that, no, you cannot continue in that pattern of behavior, where you're hiding your involvement and signing up for new leases despite, you know, a D.C. agency maybe not even knowing that it's the defendants behind that LLC.

THE COURT:  No.  And I understand, and I think that what we've seen here is that there's a lot of potential for improvement on -- from all the entities, including the court, that's -- have been involved over the years in the Tenant Receivership Act cases.

I'm going to ask that everyone that's participating in this hearing remotely, be sure to stay on



mute.  If you do not, I am instructing the courtroom clerk to kick you out of the courtroom.  You would not be able to disrupt a hearing if you were present in the courtroom.  Do not do so by being remote and disruptive.

So I just thought that was -- I found that provision in the proposed order to be a little interesting because it sort of raised the concern that you're asking the Court to enjoin the District from doing something as well, but I certainly understand the concern of -- I mean, that's sort of why we're here.  There's an allegation of, we don't always know what we're dealing with.

Okay.  Those were the only questions I had for now.

MS. BECKERMAN:  Thank you, Your Honor.

The District would like to call Keith Parsons to the stand.  He's in the hallway.  We'll get him.

THE COURT:  Okay.

MS. BECKERMAN:  Your Honor, we do have -- we are primarily going to show the exhibits to recognize for Mr. Parsons, but we also have hard copies.

THE COURT:  Are they the same that came with the motion?

MS. BECKERMAN:  Most of them are, yes.  Yes.  All of the ones that we're going to show with these witnesses are.  We do have a 14 508 set of documents that



20

we will seek to introduce later.

THE COURT:  Okay.  Because I do have everything that you've submitted to chambers.  If you have additional ones, then I'll take those.

Thereupon,

**KEITH PARSONS,**

having been called as a witness for and on behalf of the Plaintiff, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

THE DEPUTY CLERK:  Thank you.  You may have a seat.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

MS. BECKERMAN:  Good morning, Mr. Parsons.  My name is Laura Beckerman.  I represent the District.

**DIRECT EXAMINATION**

BY MS. BECKERMAN:

Q    Could you please state your name and spell your last name for the record?

A    Keith Parsons, P-A-R-S-O-N-S.

Q    And what brings you here today?

A    I'm here to testify about the work I do as DOB's strategic enforcement administrator.

Q    Can you tell us a little bit about your job and role as strategic enforcement administrator?



21

A    Certainly.  So the strategic enforcement administrator is a division-level supervisory position in the District of Columbia Department of Buildings.

It is an appointed position confirmed by the counsel.  And the folks on my team do housing code inspections, property maintenance inspections, vacant building inspections.  And they issue the civil fines and infractions, and they also try to settle them.

Q    And what background and experience do you have that you bring to your job as strategic enforcement administrator?

A    Before I was in the strategic enforcement administrator position, I was an attorney in a variety of roles.  And then I was the enforcement administrator at the Department of Consumer and Regulatory Affairs, which is sort of a similar position that, you know, I moved into when the agency split.

And as I became the strategic enforcement administrator, I also started studying and becoming certified in the International Codes Council, which is the group that promulgates model codes that become the District of Columbia's building codes.

Q    Which codes did you become certified in?

A    The International Property Maintenance Code, which is the -- the same one that serves as the model for



22

our housing and property maintenance inspectors.

Q    What is the relationship between DCRA and the Department of Buildings?

A    DCRA was our parent agency.  In, I guess, 2022, DOB was spun off from the former Department of Consumer and Regulatory Affairs, and the remainder became the Department of Licensing and Consumer Protection.

Q    When did you start working for DCRA?

A    I started working for DCRA in March of 2020.

Q    So in your current role, can you tell us which types of -- for example, whether construction-related infractions come up through your office?

A    Certainly.  So the folks that do the actual construction inspections don't report directly through me, but when they write up a piece of enforcement paperwork, that does go through my division, through the Office of Civil Infractions.

Q    And how about other types of enforcement?  Does that go through your office?

A    That's correct.  It all -- it all goes through my office.

Q    Are you familiar with the defendants, Ali or Sam Razjooyan, Houri Razjooyan, and Eimon or Ray Razjooyan?

A    Yes.

Q    And how so?



23

A    These are folks who are property owners or managers or associates, and they have been involved in buildings -- sort of notable noncompliant buildings since back when I was at DCRA.

Q    Are you aware -- for the buildings that are being focused on in this lawsuit, are you aware of approximately how many there are that are owned, managed, or otherwise controlled by the defendants?

A    My understanding is that there are more than 40 properties that are the focus of the lawsuit and -- and more than 70 buildings on those properties.

Q    And from DOB's perspective, is it the case that one or more of the Razjooyan's own, operate, or otherwise control these properties?

A    It can be -- it is not always easy to tell, but -- but yes, our understanding is that these are properties that were either owned or owned by an LLC that was controlled by or otherwise associated with the Razjooyans. That is correct.

Q    Are you aware of any property management companies that are affiliated or controlled or otherwise owned by the Razjooyans?

A    Yes.  There was a property management company called Masterpiece Property Management that Mr. Razjooyan was operating through back in the DCRA days.



Q    So for the 70 buildings that are at issue here today in the broader complaint, are you aware of approximately how many violations of the housing code and property maintenance code were cited by DOB at those properties?

A    More than 2,300 violations have been cited at those properties.

Q    For the specific number, would it be helpful to refresh your recollection by looking at your declaration?

A    Sure.  What's --

Q    If you take a look at the white binder, the first exhibit is the declaration.  Feel free to just take a look at paragraph 9.

THE COURT:  What exhibit is this?

MS. BECKERMAN:  This is Exhibit 1 to the --

THE COURT:  Exhibit 1 to the motion?  Okay.

MS. BECKERMAN:  We won't be marking it for evidence.

THE WITNESS:  Yes, I am there.  It says 4,300 violations at 40 -- 40 multifamily residential properties, more than 70 buildings, and 4,300 violations.

BY MS. BECKERMAN:

Q    So does this refresh your recollection that there were over 4,300 violations cited by DOB?

A    Yes.



25

Q    And have these code violations been resolved?

A    Not all of them.

Q    How many -- approximately how many have been resolved?

A    About 20 percent of these.

THE COURT:  How many?

THE WITNESS:  About 20 percent.

BY MS. BECKERMAN:

Q    In your experience, is it typical for a landlord to only resolve 20 percent of violations, or is that considered low?

A    No.  That is -- that is a very bad record.

Q    So what is the process that DOB uses to cite code violations?

A    So the -- the process usually starts with a complaint, although sometimes it starts with a proactive inspection, where DOB itself resolves to go out and inspect a property or properties.

But after that decision is made it proceeds roughly the same way.  An inspector goes; they look at the property.  They compare it to the standards in the property maintenance code.  And anything that is broken or noncompliant, they will note; they will try to take a picture of it if -- if it's amenable to being photographed.  And they will enter a whole bunch of data



26

and information into their -- usually, it's an iPad that they're using.

After they have completed their work and result their inspection, all of this data goes into DOBs system, and it gets reviewed by a supervisor and sort of compiled into the notice of infraction that -- that you will see the sort of document.

It is also reviewed by the civil infractions team that I mentioned that -- that helps generate the -- the document.  And they make sure that the service address and such are correct.

And after it goes through all of that QA/QC, it is served on the respondent property owner at their address of record.

Q    How does DOB get a service address for the notices of infraction?

A    Primarily, it is through the property records at the Recorder of Deeds.  That's sort of the backstop. Sometimes, we have other contact information, either from licensing or from direct contact with property owners.

Q    You mentioned earlier that it can be difficult to figure out which properties are affiliated with the Razjooyans.  Do the defendants do anything else to make it more difficult for DOB to do its job in ensuring safe housing in the District?



27

A    Yes.  So the -- the sort of most basic issue is that, when you're registering a -- a LLC to own a property, you are supposed to disclose that it's, you know, you, who you are, who the beneficial owners are. You're supposed to give a lot of information that allows us to reach out to you.  If you don't do that but you register it anyway, then when we go to look for that information, isn't there.

Sometimes, we've seen people registering the beneficial owner as another corporation.  That, of course, doesn't allow us to find someone behind it, especially if it's an out-of-state corporation.

Another practice that was observed with Mr. Razjooyan is, sometimes, when he would acquire property, he would change the address or change the number of units, which are things that are allowed to be done.  And you know, sometimes, they have to be done.

But they're also things that make it harder to connect our records because our records primarily rely on addresses.  And so if you change, you know, 2300 fake street to 2302 fake street, suddenly, all the new records don't connect back to the old ones.

Q    So going back to your time when DOB was still part of DCRA, are you aware of a time when a company owned or affiliated with Mr. Sam Razjooyan had its business



28

license revoked by DCRA?

A    Yes.  The management company I mentioned earlier, Masterpiece Property Management, had its license revoked by DCRA.

MS. BECKERMAN:  Your Honor, I would like to show the witness what's been previously marked as Exhibit 1-A. This was an exhibit to the PI motion.  It is the next one in the white binder, and we'll also be putting it up on the Webex.

BY MS. BECKERMAN:

Q    Mr. Parsons, feel free to take a look at the document.  Are you familiar with this document?

A    Yes.

Q    And what is it?

A    This is the notice to revoke the Basic Business License issued to Masterpiece Property Management, LLC, by DCRA.

Q    Why is it important to have a Basic Business License in the District?

A    To do any sort of business in the District, you're supposed to have some kind of business license, and for most things, especially at this time, it was just a Basic Business License.  So in this case, to be a property management company, that's the one that you needed, was a Basic Business License.



29

Q    And is this letter a record that DCRA made at or near the time of the revocation by someone with knowledge of the issue?

A    Yes.

Q    Is writing these types of letters part of the regular practice of what was then DCRA?

A    Yes, DCRA had authority over licensing at that time.

Q    And was it kept in the regular course of business by the agency?

A    Yes.

MS. BECKERMAN:  Your Honor, the District would like to move Exhibit 1-A into evidence.

THE COURT:  It's admitted.

(Plaintiff's Exhibit Number 1-A was received into evidence.)

BY MS. BECKERMAN:

Q    Mr. Parsons, do you know whether Mr. Razjooyan stopped the conduct associated with Masterpiece Management after his license was revoked?

A    No.  I mean, he didn't really stop any of his conduct.  And every so often, Masterpiece Property Management is still hanging around on documents and such, so -- so no.

Q    Are you familiar with the property at 700 and



704 51st Street Northeast?

A    Yes.

Q    How did you become familiar with this property?

A    This is one of the properties that Mr. Razjooyan was associated with, and it's one that sort of had a particularly unfortunate outcome.

THE COURT:  Sir, can you tell me the address again?

MS. BECKERMAN:  700 and 704 51st Street.  This is one of the properties that is subject to a lender receivership in the consolidated matters.

THE COURT:  Okay.

BY MS. BECKERMAN:

Q    So Mr. Parsons, what happened at the 51st Street property?

A    So at this property -- it's two buildings.  The two addresses are different buildings, and they used to be, when originally built, I want to say two and three stories high.  Mr. Razjooyan came in and attempted to pop them up to, I think, four and five stories.  He did not pull the proper permits.  He exceeded the scope of --

THE COURT:  I'm sorry.  You mentioned Mr. Razjooyan.  We have more than one.

THE WITNESS:  Ah.

THE COURT:  So I just want the record to be



31

clear which one we're speaking about.

THE WITNESS:  Certainly, Your Honor.  I'll clarify.

I mean, the -- the ownership associated with the properties -- I don't have sort of personal knowledge of which Razjooyan defendant.

So the ownership of the properties was attempting to pop them up, add a couple of stories.  The proper permits were not pulled for this work.  What permits were pulled were exceeded in scope.

And so recently, when we went out there and we looked at the properties, we realized that it was not clear, and in fact, it looked like they would not be able to support the extra weight of the stories on top.

And there were still people living in the finished spaces in the bottom.  The upper stories weren't even finished.  They were, like, framed out.  But -- but nothing else had been done.

And so for that -- because of that, we had to placard the properties as dangerous and issue an order to vacate to -- to protect the residents of the properties.

MS. BECKERMAN:  Your Honor, I'd like to show the witness what has been marked as Exhibit 1-B.  This is also 1-B to the motion.

(Plaintiff's Exhibit Number 1-B



32

was marked for identification.)

THE COURT:  Exhibit -- is it coming up on the screen?

MS. BECKERMAN:  Yes, yes.  It will be coming up on the screen.

THE COURT:  And that's the order to vacate?

MS. BECKERMAN:  Yes.

BY MS. BECKERMAN:

Q    Mr. Parsons, are you familiar with this document?

A    Yes, this is the order to vacate for 704 51st Street Northeast.

Q    So after this order was put on the property, what effect did that have on the tenants?

A    So the order to vacate requires the tenants to leave the property within the amount of time that -- that it -- that it allows.

Q    And is this record something that DOB made at or near the time of the issues with the property?

A    Yes.

Q    It's part of the regular practice of DOB to create these types of orders?

A    Yes.

Q    And did DOB keep this order in the regular course of business?



33

A    Yes.

MS. BECKERMAN:  The District moves Exhibit 1-B, the order to vacate, into evidence.

THE COURT:  It's admitted.

(Plaintiff's Exhibit Number 1-B was received into evidence.)

MS. BECKERMAN:  We can take that exhibit down.

BY MS. BECKERMAN:

Q    Mr. Parsons, are you familiar with the property at 4559 Benning Road Northeast?

A    Yes.

Q    And how did you become familiar with that property?

A    This is another property -- I believe there were a couple of different buildings in the whole property. It's another property that's associated with the sort of Razjooyan ownership.

And it was another property where, when we encountered it -- I want to say in summer of 2025 -- it was in -- it was in bad shape.  Non-working fire alarms, gas leak.  Just a -- just a very shabby property, and it was so dangerous that, again, we had to placard it and -- and ask the folks to leave.

Q    I'd like to turn now to one of the six properties at issue in the PI, which is 2908 Langston



34

Place Southeast.  Has DOB had to take any action recently with regard to this property?

    A    Yes.

    Q    And what is that?

    A    So this is another property that we found in trouble.  In this case, it had a bunch of water --

        THE COURT:  I'm sorry.  Can you just repeat the address again?

        MS. BECKERMAN:  Of course.  So this is 2908 Langston.

        THE COURT:  2908 Langston?

        MS. BECKERMAN:  That's right.  Yes.

        THE COURT:  Okay.  So we have a couple Langston, correct?

        MS. BECKERMAN:  Yes.

        THE COURT:  Okay.  2908.  Thank you.

        THE WITNESS:  Yeah.  So this -- this property was in trouble in.

        In this case, it was full of water in the basement.  So this is a -- it's something that happens more often than you might think.  The basement, of course, is sealed to keep groundwater out.  But if you let the pipes deteriorate and break, then sewage or other water will come down and will collect in the basement.  That's what occurred here.



35

And we ordered the ownership to fix it.  We used a correction order.  But they did not do that, so eventually, the Department of Buildings abated that issue itself.

MS. BECKERMAN:  I'd like to show the witness what's been marked as Exhibit C.  It's also Exhibit C to the PI motion.  And we'll pull it up on the screen as well.

(Plaintiff's Exhibit Number C was marked for identification.)

BY MS. BECKERMAN:

Q    Mr. Parsons, are you familiar with this document?

A    Yes.

Q    What is this?

A    This is the correction order that I just mentioned for 2908 Langston Place.

Q    And when was this issued?

A    February 7th, 2026.

Q    Since February 7th, has DOB had to take any other action with regard to this property?

A    Yes.  So in addition to -- you know, this correction order wasn't complied with.  So as I mentioned, we ended up going in and pumping out the flooding for this property.  Even beyond that, this property -- we had to do



36

more abatement to it even more recently, so yes.

Q    Some of this as recent as in the last couple of weeks?

A    That's correct.

Q    At this document, Exhibit C, the correction order, is this something that Department of Buildings creates and maintains in the regular course of business and that someone with knowledge creates?

A    Yes.

MS. BECKERMAN:  Your Honor, we'd like to move Exhibit C into evidence.

THE COURT:  It's admitted.

(Plaintiff's Exhibit Number C was received into evidence.)

BY MS. BECKERMAN:

Q    So staying with 2908 Langston Place Southeast, are you aware of any unabated housing or property maintenance code violations that Department of Buildings has cited at this property?

A    Yes.

Q    And how many -- as of the time of your declaration, how many remain unabated?

A    I -- I don't remember the exact number.

Q    If you could -- to refresh your recollection, you could refer to Exhibit 1, paragraph 14, or 15.



37

Actually, it might be a further paragraph on that same page.

A    And this is 2908 Langston Place?

Q    That's right.

A    Yes, this refreshes my recollection.

Q    How many violations were there?

A    75 unabated violations.

Q    And do you know whether those violations remain unabated today?

A    They remain unabated, as far as I know.

Q    We're going to stick with this property and turn to the violation documents for the property, which are actually in the black binder.

So the beginning of the black binder, I'll ask you to look through what's been the first tab, which contains what's been marked as Exhibits 1-IIII to 1-IIIII -- IIII to IIIII.  These are also Exhibits to the PI motion.

                    (Plaintiff's Exhibit Numbers 1-
                    IIII, 1-IIIII were marked for
                    identification.)

MS. BECKERMAN:  And if we could just bring up the first -- those documents as well on the screen.

BY MS. BECKERMAN:

Q    Mr. Parsons, are you familiar with this group of



38

exhibits?

A    Yes.

Q    And what are they?

A    These are the notices of infraction that I was mentioning earlier that are generated by the Strategic Code Enforcement civil infractions team after the inspector has gone out and documented the violations.

Q    So do these contain specific code cites and explanatory information for the 75 unabated violations at this property?

A    Yes.  So you'll see first page is going to be a Certificate of Service.  Second page is sort of a letter that we try to resolve cases through our alternative resolution team.  Third page, you're going to see the sort of documentation of the location of the violation, the owner's name, and you're going to start seeing numbered as you go down these any of the specific violations.

So sort of below this yellow highlighted band, you see a specific violation cite 12G DCMR 704.3.1.  And there's a lot of information there required by the Civil Infractions Act.  There's notes from the inspector about how to fix it.

Q    And later on in this document, are there also pictures that help to explain and support the infractions that were cited?



39

A    There are usually pictures.  The first NOI in this packet doesn't have a picture.  The pictures aren't legally required by the Civil Infractions Act, but normally, we tell the guys to -- to take a picture, again, to make it very clear what exactly is broken, how do you fix it, what are we -- what are we talking about because we want the property owner to know what to do.  And sometimes, some of the feedback we got from folks was that a picture was helpful.

Q    These are the documents that you were explaining earlier about how they are made and reviewed and kept; isn't that right?

A    Yes.

MS. BECKERMAN:  Your Honor, the District would like to move Exhibits IIII through IIIII into evidence, the notices of infraction with regard to 2908 Langston Place Southeast.

THE COURT:  Let me just make sure I have the correct number.  So this is 4 --

MS. BECKERMAN:  I-I-I-I.

THE COURT:  I.  So it's 1-IIII, okay.

MS. BECKERMAN:  That's right, Your Honor.

THE COURT:  That's what I thought I --

MS. BECKERMAN:  Through 1-I --

THE COURT:  1-IIII



40

MS. BECKERMAN:  The first one is four I and the second one is five I.  And they're both one dash.

THE COURT:  So --

MS. BECKERMAN:  We can --

THE COURT:  -- 1 --

MS. BECKERMAN:  -- dash --

THE COURT:  IIII through?

MS. BECKERMAN:  1-IIIII.

THE COURT:  Got it.

MS. BECKERMAN:  Next time, we will experiment with other naming schemes.

THE COURT:  Okay.  They are admitted.

(Plaintiff's Exhibit Numbers 1-IIII, 1-IIIII were received into evidence.)

MS. BECKERMAN:  Thank you.

BY MS. BECKERMAN:

Q    Sticking with the black binder, let's talk about 3615 B Street Southeast.  If you could go to the next tab, Mr. Parsons, and feel free to refresh your recollection with Exhibit 1.

Do you recall how many code violations are unabated at the B Street property?

A    I will avail myself of refreshing my recollection here.  18 violations unabated at 3615 B



Street Southeast.

Q    And do those remain unabated today?

A    Yes.

THE COURT:  I'm sorry.  What was the number again?

THE WITNESS:  3615 B Street --

THE COURT:  No, the number of unabated violations.

THE WITNESS:  Oh, oh, oh, oh.  18.

THE COURT:  18.  Okay.

MS. BECKERMAN:  So now, we're going to be referring to Exhibits I-5J to I-5R.

(Plaintiff's Exhibit Numbers 1-5J, 1-5K, 1-5L, 1-5M, 1-5N, 1-5O, 1-5P, 1-5Q, 1-5R were marked for identification.)

BY MS. BECKERMAN:

Q    And Mr. Parsons, could you flip through those exhibits and let us know if you recognize them?

A    Yes.  These are more notices of infraction, and I'll -- I'll mention them -- on the very first page, we see Masterpiece Property Management email showing up.  As I -- as I indicated, it's -- it still kind of floats around in the records, but -- but yes, these are more notices of infraction.



Q    So the 18 unabated violations are those documented in these notices?

A    Yes.

Q    And do many of these also have pictures accompanying them?

A    Yes.

MS. BECKERMAN:  Your Honor, the District would like to move exhibit 1-5J to 1-5R into evidence.

THE COURT:  They're admitted.

(Plaintiff's Exhibit Numbers 1-5J, 1-5K, 1-5L, 1-5M, 1-5N, 1-5O, 1-5P, 1-5Q, 1-5R were received into evidence.)

MS. BECKERMAN:  Okay.  We can set the black binder aside for now.

THE COURT:  And can I just -- have you given an exhibit list to the courtroom clerk?

MS. BECKERMAN:  We can certainly do that.  We do have a printout.

THE COURT:  I just want to make sure that she's able to follow along because these -- the numbers are a little confusing.

And perhaps, after the hearing is over, you can spend a few minutes just reviewing with her to make sure that we're all on the same page.



43

MS. BECKERMAN:  Certainly.

THE COURT:  Thank you.

BY MS. BECKERMAN:

Q    So let's move back to the white binder and talk about 1035 48th Street Northeast.  Are you familiar with how many code violations were cited at this property?

A    Yes.

Q    And how many were that?

A    39 unabated violations.  And I'll -- I'll clarify that this is, you know, not fixed.  It's possible -- as I testified, 20 percent of the overall violations were abated of all the things that we've cited. So you know, we would have cited more than the ones that remain unabated.

Q    If you could take a look at Exhibits 1-D through 1-T, please.  What are these documents?

(Plaintiff's Exhibit Numbers 1-D, 1-E, 1-F, 1-G, 1-H, 1-I, 1-J, 1-K, 1-L, 1-M, 1-N, 1-O, 1-P, 1-Q, 1-R, 1-S, 1-T were marked for identification.)

THE WITNESS:  These are -- these are more notices of infraction.  These ones associated with 1035 48th Street Northeast.

MS. BECKERMAN:  Your Honor, we'd like to move



44

Exhibits 1-D through 1-T into evidence.

THE COURT:  They're admitted.

(Plaintiff's Exhibit Numbers 1-D, 1-E, 1-F, 1-G, 1-H, 1-I, 1-J, 1-K, 1-L, 1-M, 1-N, 1-O, 1-P, 1-Q, 1-R, 1-S, 1-T were received into evidence.)

BY MS. BECKERMAN:

Q    Let's move on to the next property.  So now, we're in the other Langston properties.  So this one is 2840 Langston Place Southeast.

And Mr. Parsons, are you aware of whether DOB has had to conduct any activity at 2840 Langston Place Southeast after the time of your declaration in this case?

A    I -- as I recall, we have danger placarded 2840 Langston Place South -- Southeast, subsequent to the declaration, yes.

Q    If you could take a look at Exhibits 1-U to 1-RR, please.  And what are these documents?

A    These are more notices of infraction associated with 2840 Langston Place Southeast.

Q    And how many of these infractions violations remain unabated?

A    28 violations.

MS. BECKERMAN:  Your Honor, the District moves



45

Exhibits 1-U to 1-RR into evidence.

THE COURT:  Okay.  And just to be clear, I think I just have 1-U through 1-QQ.

Is RR is a new one?

MS. BECKERMAN:  No, Your Honor, there was a numbering issue where, in the filing -- so RR is associated with 2840, but I think we had missed --

THE COURT:  Oh --

MS. BECKERMAN:  -- kind of --

THE COURT:  -- because I see RR associated with 2844, and I thought we were talking about 2840?

MS. BECKERMAN:  That's right, yes.

THE COURT:  Okay.

MS. BECKERMAN:  If I might have a moment to look at the exhibit binder.

THE COURT:  Yes, because I'm just looking at this one here, and it seems to be a different property.

(Pause.)

MS. BECKERMAN:  My apologies, Your Honor.  We are looking at 1-U to 1-QQ for 2840 Langston Place.

(Plaintiff's Exhibit Numbers 1-U, 1-V, 1-W, 1-X, 1-Y, 1-Z, 1-AA, 1-BB, 1-CC, 1-DD, 1-EE, 1-FF, 1-GG, 1-HH, 1-II, 1-JJ, 1-KK, 1-LL, 1-MM, 1-NN, 1-OO, 1-PP, 1-QQ were



marked for identification.)

BY MS. BECKERMAN:

Q    Turning now to 2844 Langston Place Southeast, how many code violations are unabated at this property?

A    Refreshing my recollection, 53 violations unabated at 2844 Langston Place Southeast.

Q    And Mr. Parsons, if you could look at the next tab and review Exhibits RR through 1-NNN?

A    Yes, these are more notices of violation for 2844 Langston Place Southeast.

(Plaintiff's Exhibit Numbers 1-RR, 1-SS, 1-TT, 1-UU, 1-VV, 1-WW, 1-XX, 1-YY, 1-ZZ, 1-AAA, 1-BBB, 1-CCC, 1-DDD, 1-EEE, 1-FFF, 1-GGG, 1-HHH, 1-III, 1-JJJ, 1-KKK, 1-LLL, 1-MMM were marked for identification.)

MS. BECKERMAN:  District moves Exhibit 1-RR through 1-NNN into evidence.

THE COURT:  Okay.  Exhibits 1-RR through 1-M, as in Mary, MM --

MS. BECKERMAN:  M?  Okay.

THE COURT:  -- are admitted.

(Plaintiff's Exhibit Numbers 1-RR, 1-SS, 1-TT, 1-UU, 1-VV, 1-WW,



1-XX, 1-YY, 1-ZZ, 1-AAA, 1-BBB, 1-CCC, 1-DDD, 1-EEE, 1-FFF, 1-GGG, 1-HHH, 1-III, 1-JJJ, 1-KKK, 1-LLL, 1-MMM were received into evidence.)

BY MS. BECKERMAN:

Q    Now, moving finally to 2850 Langston Place Southeast.  Mr. Parsons, how many code violations remain unabated at 2850 Langston Place Southeast?

A    Refreshing my recollection, 38 unabated violations.

Q    Now, let's take a look at the DOB notices associated with that property, 1-NNN through 1-HHHH.

A    Yes, these are more notices of infraction associated with 2850 Langston Place Southeast.

(Plaintiff's Exhibit Numbers 1-NNN, 1-OOO, 1-PPP, 1-QQQ, 1-RRR, 1-SSS, 1-TTT, 1-UUU, 1-VVV, 1-WWW, 1-XXX, 1-YYY, 1-ZZZ, 1-AAAA, 1-BBBB, 1-CCCC, 1-DDDD, 1-EEEE, 1-FFFF, 1-GGGG, 1-HHHH were marked for identification.)

MS. BECKERMAN:  Your Honor, the District moves Exhibits 1-NNN through 1-HHHH into evidence.

THE COURT:  Great.  Defendant -- I'm sorry --



48

District Exhibits 1-N, as in Nancy, NN through 1-HHHH are admitted.

                    (Plaintiff's Exhibit Numbers 1-NNN, 1-OOO, 1-PPP, 1-QQQ, 1-RRR, 1-SSS, 1-TTT, 1-UUU, 1-VVV, 1-WWW, 1-XXX, 1-YYY, 1-ZZZ, 1-AAAA, 1-BBBB, 1-CCCC, 1-DDDD, 1-EEEE, 1-FFFF, 1-GGGG, 1-HHHH were received into evidence.)

        MS. BECKERMAN:  Your Honor, the District has nothing further for Mr. Parsons.

        THE COURT:  All right.  Thank you.

        You may step down.

        MR. PARSONS:  Thank you, Your Honor.

        THE COURT:  Just bear with me one second.

        (Pause.)

        THE COURT:  Thank you.

        MR. MEYER:  The District calls next witness Investigator Cullen Hamilton.

        THE DEPUTY CLERK:  Good morning.  State your name for the record.

        MR. HAMILTON:  Cullen Hamilton.

        Thereupon,

                    **CULLEN HAMILTON,**

having been called as a witness for and on behalf of the


escribers

49

Plaintiff, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. MEYER:

Q    Good morning, Mr. Hamilton.  Can you please state and spell your name for the record?

A    Yes.  Cullen Hamilton.  First name spelled C-U-L-L-E-N.  Last name Hamilton, H-A-M-I-L-T-O-N.

Q    Where do you work, Mr. Hamilton?

A    The D.C. Office of the Attorney General.

Q    And what is your role at OAG?

A    I'm an investigator.

Q    And what does an investigator do at the Office of the Attorney General?

A    So when we get complaints regarding housing conditions at properties throughout the City, we go out, and we document those conditions through photographs and video when necessary.  And we also speak and document the conditions through our conversations with tenants at those properties.

Q    Are you familiar with the properties at 1035 48th Street Northeast; 2840, 2844, 2850, and 2908 Langston Place Southeast; and 3615 B Street Southeast?

A    Yes.

Q    How are you familiar with those properties?



50

A    I've visited each of those properties.

Q    Okay.  And when did you visit those properties?

A    I visited those properties in late January 2026 and early February of 2026.

Q    What did you do during your inspections of those properties?

A    At each of those properties, I observed the common areas, both on the interior and exterior of the buildings.

Q    Did you ever gain access to any individual units at those properties?

A    Yes, I did.

Q    So let's start with 1035 48th Street.  You said you inspected that property?

A    Yes.

Q    And you inspected that property both in January and February of 2026?

A    Yes.

Q    All right.  So there's a black binder there in front of you.  If you could turn to the exhibit tab marked Exhibits 2-A through 2-PPP.

Okay.  So can you go through Exhibits A through Z, and just flipping through these exhibits, do you mind just looking through Exhibits A through Z?

(Plaintiff's Exhibit Numbers 2-A,



51

2-B, 2-C, 2-D, 2-E, 2-F, 2-G, 2-H, 2-I, 2-J, 2-K, 2-L, 2-M, 2-N, 2-O, 2-P, 2-Q, 2-R, 2-S, 2-T, 2-U, 2-V, 2-W, 2-X, 2-Y, 2-Z, 2-A, 2-B, 2-C, 2-D, 2-E, 2-F, 2-G, 2-H, 2-I, 2-J, 2-K, 2-L, 2-M, 2-N, 2-O, 2-P, 2-Q, 2-S, 2-T, 2-U, 2-V, 2-W, 2-X, 2-Y, 2-Z were marked for identification.)

THE WITNESS:  Sure.  Okay.

BY MR. MEYER:

Q    What are Exhibits A through Z?

A    These are photographs that I took inside the two units.

Q    Do they also contain pictures of the common areas as well?

A    Yes, they do.

Q    And did you take these pictures?

A    Yes.

Q    Are these pictures true and accurate representations of the conditions at 1035 48th Street when you took them?

A    Yes.

MR. MEYER:  Your Honor.  The District would move Exhibits 2-A through to 2-Z into evidence.



52

THE COURT:  2-A through 2 --

MR. MEYER:  2-Z.

THE COURT:  D as in David?

MR. MEYER:  Z as in zebra.

THE COURT:  Those are admitted.

(Plaintiff's Exhibit Numbers 2-A, 2-B, 2-C, 2-D, 2-E, 2-F, 2-G, 2-H, 2-I, 2-J, 2-K, 2-L, 2-M, 2-N, 2-O, 2-P, 2-Q, 2-S, 2-T, 2-U, 2-V, 2-W, 2-X, 2-Y, 2-Z were received into evidence.)

BY MR. MEYER:

Q    Okay.  Mr. Hamilton, I want to direct your attention to Exhibit 2-A.  Do you have that in front of you?

A    Yes.

Q    Okay.  What is this picture?  Can you describe it for the Court?

A    Yes.  This is the front door of 1035 48th Street Northeast.

Q    Why did you take this picture?

A    Because the front door did not lock, and I was able to gain access without a key.

Q    And was this picture from your January or from your February inspection?



53

A    January.

Q    Can you look at Exhibit 2-B, please?  What is this picture?  Can you describe it for the Court?

A    Yes.  This is the side of the property.  And if you look towards the upper half of the photo into the shade, there is disregarded trash in the lawn on the side of the property.

Q    Let's look at Exhibit 2-D.  Okay.  Can you describe Exhibit 2-D for the Court?

A    Yes.  This is a common area right inside of the front door.  On the ground is trash accumulation, and at the top part of the photo, there are mailboxes that don't seem to properly close.

Q    And when was this?  From your February or from your January inspection?

A    January.

Q    Can you look at Exhibit 2-E, please?  Do you see 2-E in front of you?

A    Yes.

Q    Okay.  Can you describe Exhibit 2-E for the Court?

A    Yes.  This is a common area of fire extinguisher that appears to be outdated.

Q    Why do you say it's outdated?

A    Because it's marked 2024.



54

Q    And you took this a picture in your January 2026 inspection?

A    Yes.

Q    Let's look at picture 2-G -- Exhibit 2-G, please.  Can you describe Exhibit 2-G for the Court?

A    Yes.  Again, this is right inside the front door of the building.  There is a trash accumulation on the floor, and again, some of the mailbox don't seem to properly close.

Q    Now, this looks a lot like Exhibit 2-D.  Is this from the same day or from a different day?

A    This is from a different day.

Q    Okay.  Can you turn to Exhibit 2-H, please?  Can you describe this picture for the Court?

A    Yes.  This is a common area hallway window, and the bottom portion of the window is completely missing.  And there's no screen as well.

Q    And looking into the background, is there snow and icicles behind this window?

A    Yes.

Q    Okay.  Can you describe the temperature when you were doing this inspection in February of 2026?

A    It was very cold.

Q    And what was the temperature of the common areas when you were in them during that day?



A    It was also very cold.

Q    You talked about getting access to some apartments in that building; is that right?

A    Yes.

Q    Okay.  Which units did you inspect during your inspection of 1035 48th Street?

A    Apartment 103 and apartment 203.

Q    Okay.  Let's start with apartment 103.  Can you turn to Exhibit 2-I, please?  Can you describe this picture for the Court?

A    Yes.  This is the unit front door taken from the inside of the unit.  The tenant reported to me that the front door did not lock properly but also did not close fully.  As you can see, vertically, in the middle of the photo, the door is not fully flush to the door frame.

THE COURT:  What unit was this?

THE WITNESS:  Unit 103.

THE COURT:  103.  Okay.

BY MR. MEYER:

Q    Can you turn to Exhibit 2-J.  Can you describe this exhibit for the Court?

A    Yes, in the middle of the photo, this is a wall hole in the bathroom.

Q    Can you turn to Exhibit 2-L, please?  Can you describe Exhibit 2-L for the Court?



A    Yes.  In the middle of the photo, beneath the window frame, there's peeling paint.

Q    And finally, Exhibit 2-M, can you turn the back?

A    You said 2-M?

Q    2-M as in Mary.  Can you describe this exhibit for the Court?

A    Yes.  There is wall damage in two particular places, one on the left-hand side of the photo, beneath the circuit breaker, and on the right-hand side, there's also wall damage.

Q    Now, those conditions -- these pictures that we just -- excuse me.  Sorry.  Strike that.  You also inspected -- you said apartment 203; is that right?

A    Yes.

Q    Okay.  Can you turn to Exhibit 2-N, please?  Can you describe this picture for the Court?

A    Yes.  This is inside one of the bedrooms in the unit.  This is a bucket that the tenants were using to catch leaking water from the ceiling.

THE COURT:  And this is now unit 203?

THE WITNESS:  Yes.

THE COURT:  Okay.

BY MR. MEYERS:

Q    Can you turn to Exhibit 2-O, please?  Do you see -- can you describe this exhibit for the Court?



A    Yes, in the middle of the photo, this is a dead mouse on a trap.

Q    Did you find any other evidence of rodent infestation in apartment 203?

A    Yes, I took another photo of a dead mouse on the trap and also a photo of what I believed to be rodent droppings.

Q    Can you turn to Exhibit 2-P?  Can you describe this exhibit for the Court?

A    Yes.  Again, I'm in the middle of the photo. This is a dead rodent on a trap.

Q    Did you find any other evidence of infestations besides rodents in this apartment?

THE COURT:  Can I just -- it's hard for me to tell where these pictures are taken within.  Is this behind a stove?  Is this in the middle of the floor?

MR. MEYER:  Sure.

THE COURT:  Can you just provide a little more context?

MR. MEYER:  Sure.

BY MR. MEYER:

Q    Mr. Hamilton, in Exhibit 2-P -- do you see Exhibit 2-P in front of you?

A    Yes.

Q    Okay.  Do you recall where you took this picture



from in the context of the apartment?

A    Yes.  I believe this is in the closet across from the kitchen.

Q    And in Exhibit 2-O, the previous picture of the rodent on a trap, do you recall where that picture was taken?

A    I don't recall.

Q    Okay.  Turning to -- Mr. Hamilton, did you find any other evidence of any other infestations outside of rodents or rats in this unit?

A    Yes, I saw evidence of roach infestation.

Q    Okay.  And where at exactly?

A    Specifically in the bathroom.

Q    Okay.  Can you turn to Exhibit 2-Q, please?  Can you describe this picture for the Court?

A    Yes.  This is the vanity cabinet in the bathroom underneath the sink, and the -- the dark pellets that you see are dead roaches.

Q    And you said this was in the bathroom?

A    Yes.

Q    And there was only one bathroom in this unit?

A    Yes.

Q    Did you find any other conditions in the bathroom of this unit?

A    Yes.



59

Q    Can you turn to Exhibit 2-R, please?  Can you describe this picture for the Court?

A    Yes.  This photo is the ceiling above the shower with evidence of water damage, and that can be seen in the middle of the photo.

Q    So this is in the same bathroom where the vanity picture was just taken?

A    Yes.

Q    Let's turn to Exhibit 2-S, please.  Can you describe this picture for the Court?

A    Yes.  On the upper left-hand corner in the -- on the right-hand side and in the middle, there's evidence of water damage as well as ceiling damage on the right-hand side.

Q    Can you turn to Exhibit 2-T, please?  Where was this picture taken?

A    This was also taken in the bathroom.

Q    And can you describe this picture for the Court?

A    Yes.  This is more water damage to the ceiling.

Q    So the water damage in R, S, and T, that's all in the same room; is that right?

A    Yes.

Q    And then, finally, turning to Exhibit 2-U, where was this picture taken?

A    This was also taken in the bathroom.



60

Q    Okay.  Can you describe why you took this picture?

A    Yes.  On the left-hand side, you'll see a bucket that was also used by the tenants to catch leaking water from the ceiling.  And on the right-hand side, you will see -- along the bathtub, you will see more dead roaches.

Q    Was the bathroom actively leaking the day you did your inspection?

A    No.

Q    So all this water damage would have occurred before your February inspection?

A    Yes.

Q    Okay.  Did you find any other evidence of water damage anywhere else in the apartment?

A    Yes, I did.

Q    Where did you find that water damage?

A    In the bedroom.

Q    Can you turn to Exhibit 2-V?  Can you describe Exhibit 2-V for the Court?

A    Yes.  This is water damage to the ceiling of this bedroom.

Q    Can you turn to Exhibit 2-W, please?  And where was this picture taken?

A    This is also in the same bedroom.

Q    So this is the same bedroom as 2-V?



61

A    Yes.

Q    And can you describe this picture for the Court?

A    Yes.  This is more water damage, along the middle portion of the photo where the discoloration is. And there's also a missing smoke alarm that the tenants took down because it was -- it was being damaged by the leaking water.

Q    Can you turn to Exhibit 2-X, please?  Can you describe this picture for the Court?

A    Yes.  This is -- these are -- these pellets are rodent droppings in one of the bedrooms.

Q    Okay.  Is this the same bedroom as the pictures you took in 2-V and 2-W?

A    No.

Q    Okay.  So this was a second bedroom?

A    Yes.

Q    In total, do you recall how many bedrooms were in this unit?

A    There were three.

Q    And finally, turning to Exhibit 2-Y.  Do you see Exhibit 2-Y in front of you?

A    Yes.

Q    Okay.  Can you describe this exhibit for the Court?

A    Yes.  This is the front door to the unit taken



from the inside.  As you can see vertically along the middle of the front door -- excuse me -- vertically along the middle of the photo, the front door is not flush to the door frame.  It doesn't close properly.

Q    And so here in 2-Y, this was as closed as the door -- you had closed the door prior to this.  The door wasn't ajar, or you hadn't pulled it open had you?

A    No, I had not.

Q    And so this is how the door just sits in its closed position?

A    Yes.

Q    Mr. Hamilton, you also talked about inspecting 2840 Langston; is that right?

A    Yes.

Q    Okay.  And did you visit 2840 Langston in both January and February?

A    Yes.

Q    Okay.  All right.  Can we turn to Exhibit 2-AA, please?  Can you describe this picture for the Court?

A    Yes.  So this picture was taken at the front of the property on the street side.  This is an open entryway or a window, and I could hear a sound of rushing water coming out of this open, unsecured entryway.

Q    When you say open, can you describe what you mean by that?  Is this just a window that was ajar, or was



63

it missing, or can you say more?

A    Yes.  Whether it was a window or an entryway, there was no barrier or covering from the outside.

Q    And you said you heard running water?

A    Yes.

Q    Were you able to gain access to the interior of this particular area to confirm the running water or see it in person?

A    No.

Q    Were you able to gain access into 2840?

A    Yes.

Q    Okay.  How were you able to do that?

A    Through the front door because the front door did not lock.

Q     Can you turn to Exhibit 2-BB, please?  Can you describe Exhibit 2-BB for the Court?

A    Yes.  This is trash in the common hallway.

Q    Can you turn to Exhibit 2-CC, please?  Can you describe this exhibit for the Court?

A    Yes.  This is trash in the stairwell.

Q    And Exhibit 2-DD, can you describe this for the Court?

A    Yes.  This is more trash in the stairwell.

Q    And Exhibit 2-EE, can you explain this exhibit for the Court?



64

A    Yes.  Along the left side of the -- this is the unit front door.  Along the left side, there is damage near the locks.

Q    Can you turn to Exhibit 2-FF, please?  Can you describe this exhibit for the Court?

A    Yes.  This is another unit front door, and on the right side, there appears to be damage, or the front door does not close properly.

Q    Can you turn to Exhibit 2-GG, please?  Can you describe this picture?

A    Yes.  This is more trash in the common areas with a needle, or drug paraphernalia, in the middle of the photo.

Q    How about Exhibit 2-HH?  Can you describe this picture?

A    Yes.  This is an unsecured room in the -- in the basement of the property.

Q    And all these pictures that we've talked about thus far at 2840 Langston, when were these taken?

A    They were taken in late January 2026.

Q    All right.  So now, turning to Exhibit 2-II, do you see Exhibit 2-II in front of you?

A    Yes.

Q    Okay.  When did you take this picture?

A    I took this in February 3rd, 2026.



65

Q    Okay.  Can you describe this picture for the Court?

A    Yes.  This is trash in the common areas.

Q    And in comparing your inspections from January 2026 and February 2026, were there any differences in the conditions on the interior of the property between your January and February inspection?

A    No.

Q    Mr. Hamilton, did you take the pictures in District's Exhibits AA through II?  Did you personally take these pictures?

A    Yes.

Q    And are these pictures a true and accurate representation of the conditions you saw on the day that you took them?

A    Yes.

MR. MEYER:  The District -- oh, yes.  The District would move Exhibits -- we already did this.  I'm sorry, Your Honor.  We did all of them already right off the bat.  Thank you.

BY MR. MEYER:

Q    Mr. Hamilton, can you move to the next exhibit that we have?  Exhibit JJ?

A    Okay.

Q    Do you see that exhibit in front of you?



A    Yes.

Q    Okay.  And why did you take this picture?

A    This is the front of 2844 Langston Place.  I took this photo because the front door was not secured, and there are windows on the front of the building that do not -- that are open and don't have screens.

THE COURT:  Okay.  So just so the record's clear, we're now moving on to a different property.  We were talking about 2840 Langston Southeast, and we're now talking about 2844 Langston?

MR. MEYER:  Thank you, Your Honor.

THE COURT:  Okay, thanks.

BY MR. MEYER:

Q    So at 2844 in January, were you able to gain access to the interior of that building?

A    Yes.

Q    And how were you able to do that?

A    Through the front door because it did not lock.

Q    All right.  Let's turn to Exhibit 2-KK.  Do you see that in front of you?

A    Yes.

Q    And can you describe this picture for the Court?

A    Yes.  This is on the interior of the property. There are two units that are not secured, and there is a microwave sitting in the hallway.



67

Q    Turning to Exhibit 2-MM.  Can you look at 2-MM for me?

A    Okay.

Q    Can you describe that picture for the Court?

A    Yes.  This is in the parking lot behind the building, and this is trash accumulation.

Q    Can you turn to Exhibit 2-NN, please?  Can you describe this picture for the Court?

A    Yes.  This is the same parking lot with trash accumulation just taken from a different angle.

Q    How about Exhibit 2-OO?  Can you describe this picture for the Court?

A    Yes.  This is the front of the property.  And there's -- this is more trash or debris at the front of the property.

Q    What does this appear to be to you?

A    Maybe a piece of the roof.

Q    Can you turn to Exhibit 2-PP, please?  Can you describe these conditions for the Court?

A    Yes.  Again, this is the rear of the property. This is the parking lot with trash accumulation.

Q    Okay.  And finally, Exhibit 2-QQ, where was this picture taken?

A    This is taken on the front side of the building on the left-hand side.



68

Q    So this is still 2844 Langston?

A    Yes.

Q    Okay.  Why did you take this picture?

A    I took this picture because there are open windows with no screens.  And you can also still see that debris on the left-hand side of the photo.

Q    And you testified that might be part of the roof?

A    Yes.

Q    Now, were all these pictures taken during your January inspection?

A    Yes.

Q    Did you return to that property in February as well?

A    I did.

Q    Okay.  And what were the conditions when you returned to the property in February?

A    I was not able to enter because the building was secured with metal barriers.

Q    And as far as the exterior of the property, were the conditions the same?  Changed?  Can you describe the different conditions?

A    Well, it was boarded up with the metal barriers. So in terms of the windows and things, they were -- they were covered.



69

Q    How about the trash outside?

A    The trash outside, I don't recall at 2844.

Q    All right.  Let's move to 2850 Langston.  Did you also inspect 2850 Langston in January and February?

A    Yes.

Q    Okay.  Can you turn to Exhibit 2-RR, please?

A    Okay.

Q    Can you describe this picture for the Court?

A    Yes.  This is the front of 2850 Langston Place on the second floor.  There is a missing window altogether, no screen.  On the third floor, there is a missing screen.  And on the bottom half of the photo, we have overgrown grass and debris.

Q    Can you go to Exhibit 2-SS, please?

A    Okay.

Q    And can you describe this picture for the Court?

A    Yes.  This is also the front of the property, just taken at a different angle with a different angle of the debris in the front lawn.

Q    Can you share Exhibit 2-TT, please?  And can you describe this exhibit for the Court?

A    Yes.  This is right outside of the front door of 2850, and this is debris along that lawn.

Q    Okay.  Can you go to Exhibit 2-UU?  Can you tell the Court why you took this picture?



70

A    Yes.  Because -- because this ground level window was open and not secured.  And the plywood was also not secured to the window.

Q    Were you able to gain entry into the interior of 2850 Langston?

A    I didn't attempt to go inside.

Q    Why not?

A    Given the conditions at 2840 and 2844, I thought it was best to not go in for personal safety.

Q    And can you explain what you mean by personal safety?

A    Yes.  So the front door is somewhat secluded from the street side, and from the outside of the property, you really can't see inside based on just the makeup of the door.  So I didn't know what or who might be inside.

Q    Did you also try to gain entry during your February inspection as well?

A    I -- I was not able to.

Q    Okay.  And why not?

A    Because this was after the snowstorm, and there was a sheet of ice that hadn't been plowed.  There wasn't a suitable walkway to get to the front door.

Q    Did you also inspect 2908 Langston?

A    Yes.



Q    Okay.  And did you do so both in January and February of 2026?

A    Yes.

Q    Can you turn to Exhibit 2-VV.  Do you see Exhibit 2-VV in front of you?

A    Yes.

Q    Okay.  And can you describe this picture for the Court?

A    Yes.  This is the front of the property above the front door.  There is an open window with no screen.

Q    Were you able to gain access to the interior of 2908?

A    Yes, I was.

Q    How did you do so?

A    Through the front door because the front door did not lock.

Q    Can you turn to Exhibit 2-WW?  Can you describe this picture for the Court?

A    Yes.  This is trash on the front lawn outside of 2908 Langston Street Place.

Q    Okay.  Can you turn to Exhibit 2-XX?  Can you describe this picture to the Court?

A    Yes.  This is more debris -- or trash out front of 2908 Langston Place.

Q    Okay.  And do you see at the top of this



picture, the stairwell here on top?

A Yes.

Q Okay. Were you able -- did you go down that stairwell?

A Yes.

Q Why did you do that?

A I went down that stairwell because I could hear running water, and the -- the doorway was ajar.

Q Okay. Were you able to document that running water with a video?

A Yes.

MR. MEYER: Okay. Your Honor, we're going to attempt to play the video here, Exhibit 2-YY.

(Thereupon, the visual recording played for the Court was reported, but is not transcribed herein.)

BY MR. MEYER:

Q Okay. Mr. Hamilton, that video that you took, can you describe why -- what the basement -- when you got down to the bottom, what you saw inside when you got down to the bottom of that stairwell?

A At the very bottom of the stairwell, there was standing water.

Q Okay. And the noise that we heard there on the video, was that the running water that you were talking about?

escribers

A    Yes.

Q    Okay.  Were you able, during your January inspection, to see the source of that running water?

A    In January, no.

Q    Okay.  Let's look at Exhibit 2-ZZ.  And can you describe this picture?

A    Yes.  This is the -- you said 2-ZZ?

Q    Uh-hmm

A    Yes.  This is the open entryway.

Q    Okay.  And this is the same stairwell and basement door that we were discussing in 2-YY?

A    Yes.

Q    Okay.  Let's look at the interior of this building.  Can you look at the Exhibit 2-BBB?

A    Okay.

Q    And can you describe this picture for the Court?

A    Yes.  On the -- well, on the left-hand side, there is trash right there at the stairwell, and at the bottom of the stairwell, there is an open unit and a missing fire extinguisher.

Q    Can you turn to Exhibit 2-CCC?  Can you describe this picture for the Court?

A    Yes.  This is the same stairwell in the same unit on the right-hand side of the previous photo.  And this is the same missing fire extinguisher in the unit on



74

the left-hand side is open, and I could see debris on the inside.

Q   How about Exhibit 2-DDD?  Can you describe this picture for the Court?

A   Yes.  This is an unsecured unit with broken plywood.

Q   Okay.  And finally, Exhibit 2-EEE, where was this picture taken?

A   This picture was taken in the same room as the running water from that rear basement room.

Q   Was it taken the same day as video Exhibit 2-YY?

A   No.  It wasn't.

Q   Okay.  So when was this picture taken?

A   This picture was taken in early February 2026.

Q   Okay.  And can you describe the conditions then when you visited the Court saw the Exhibit YY, which was the video you took in January.  Can you describe the -- can you describe the conditions when you visited in February?

A   Yes.  When I approached this room from the outside, I could continue to hear running water.  When I walked inside, I saw icicles forming on the pipes above.  In the room also had a strong odor of gas.

Q   Okay.  Let's look at Exhibit 2-FFF.  Can you describe this picture for the Court?



A    Yes.  This photo was taken from the inside of the property.  This is a common hallway window with broken and missing glass and no window screen.

Q    And again, can you describe the temperatures when you were out there in February?

A    Yes.  It was very cold.

Q    Can you please turn to Exhibit 2-HHH.  Where was this picture taken?

A    This picture was taken inside of 2908.  This is an unsecured unit with the missing front door actually inside the unit on the left-hand side of the photo.  And there's trash inside of the unit.

Q    So this is inside of an apartment?

A    Yes.

Q    Okay.  And you were able to gain access how?

A    There was no front door to the unit.

Q    Let's go to Exhibit 2-III.  Okay.  Can you describe this picture for the Court?

A    Yes.  This is another unit on the inside of 2908.  There's a missing door on the right-hand side of the photo and trash on the inside of the unit.

Q    Generally speaking, between your visits in January and February of 2908 Langston, were the conditions substantially similar between those two inspections?

A    Yes, they were.



76

Q    Is there anything else that we missed that was not in any of these pictures?

A    No.

Q    Let's move to 3615 B Street Southeast.

THE COURT:  Can I just ask --

THE WITNESS:  Yeah.

THE COURT:  Did you see -- was 2908 occupied by tenants?

THE WITNESS:  I saw people inside.  I don't know if they were tenants or not.

THE COURT:  Okay.  Thank you.

BY MR. MEYER:

Q    3615 B Street Southeast, did you conduct inspections of that property?

A    Yes.

Q    Did you go to that property both in January and February?

A    Yes.

Q    Okay.  Let's start with a picture.  Well, what were the conditions of when you visited in January of 2026?

A    There was overflowing trash at the dumpster area in the parking lot.

Q    And were you able to gain access to that property?



A    Not in January, no.

Q    Okay.  So let's look at Exhibit 2-MMM.  Do you see this picture in front of you?

A    Yes.

Q    Okay.  Can you describe this picture for the Court?

A    Yes.  This is the parking lot and overflowing trash area that I was referring to.

Q    So the overflowing trash between January and February, was it substantially similar between those two inspection dates?

A    Yes.

Q    And were you able to gain access to the interior of the property during your February inspection?

A    Yes.

Q    Okay.  And how did you do that?

A    Through the front door.

Q    Okay.  And was that door -- did the tenant let you in, or were you able to -- was the door unlocked?

A    At that point, the door was just -- was just open.

Q    Okay.  Looking at Exhibit 2-NNN.  Can you describe this picture for the Court?

A    Yes.  This is a missing fire extinguisher.

Q    And where was this picture taken?



A    In the interior of the property.

Q    In particular on the interior, do you remember where?

A    Oh, in the basement.  My apologies.

Q    And then Exhibit 2-OOO.  Do you see that picture?

A    Yes.

Q    Okay.  Can you describe that picture for the Court?

A    Yes.  If you look vertically, in the middle of the photo, this brown stain coming down, the wall is water-damaged.

Q    Mr. Hamilton, we talked today about these six properties that you inspected.  Have you ever conducted other inspections of properties owned by Mr. Ali Razjooyan?

A    Yes.

Q    Okay.  Do you recall the addresses of those properties or at least the streets they were on?

A    Yes.

Q    Okay.  What were those properties?

A    W Street Southeast, Benning Road, Minnesota Avenue, and 17th Street Northwest.

Q    And do you remember about the time range that you've conducted those inspections?  Was it last year,



2024?  Do you remember about when you would have conducted those inspections?

A    They were -- they've all been since 2023.

Q    Okay.  Now, the conditions that you observed in those other four properties, can you -- can you describe those generally?

A    Yes.  The properties were unsecured.  Many times, we were able to gain entry.  Windows were -- well, at least window frames were missing windows altogether; sometimes had broken windows and were missing window screens.  And we saw an accumulation of trash in many of those properties.

Q    Did you ever observe issues with infestations?

A    At those other properties --

Q    Right.

A    -- yes.

Q    Did you ever observe issues with water damage or leaks at those other properties?

A    Yes.

MR. MEYER:  Court's indulgence, Your Honor.

(Counsel confer.)

MR. MEYER:  Thank you, Your Honor.

We're just missing -- we've moved for the record, Exhibits 2-A through 2-ZZ into evidence.  I just wanted to make sure that we got all of these in.



80

THE COURT:  You're looking to move everything through to 2-PPP?

MR. MEYER:  Thank you, Your Honor.

THE COURT:  They're admitted.

(Plaintiff's Exhibit Numbers 2-AA, 2-BB, 2-CC, 2-DD, 2-EE, 2-FF, 2-GG, 2-HH, 2-II, 2-JJ, 2-KK, 2-LL, 2-MM, 2-NN, 2-OO, 2-PP, 2-QQ, 2-RR, 2-SS, 2-TT, 2-UU, 2-VV, 2-WW, 2-XX, 2-YY, 2-ZZ, 2-AAA, 2-BBB, 2-CCC, 2-DDD, 2-EEE, 2-FFF, 2-GGG, 2-HHH, 2-III, 2-JJJ, 2-KKK, 2-LLL, 2-MMM, 2-NNN, 2-OOO, 2-PPP were received into evidence.)

MR. MEYER:  No further questions for the witness, Your Honor.

THE COURT:  Okay.  Thank you, sir.  You can step down.

Can we take about a 15-minute break?  How many other witnesses do you have?

MR. MEYER:  So here now is our DLCP witness.  In addition, there's another tenant.  And we have two other tenants who are on call.

THE COURT:  Okay.



81

MR. MEYER:  So we can just -- I think, if you don't mind talking scheduling, so we can figure out what this is.

THE COURT:  Sure.  That's what I wanted to bring up with you.  I have a 1 o'clock meeting that -- sorry.

I was going to take a lunch break around 1:00 to 1:45.

MR. MEYER:  1:00 to 1:45?

THE COURT:  Yeah.

MR. MEYER:  Understood, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  So let's take a break now until 12:05.

(Recess from 11:48 a.m. until 12:06 p.m.)

THE DEPUTY CLERK:  Your Honor, calling the matter of the District of Columbia v. Ali Razjooyan, et al., case 2026 CAB 985.

Parties present, please state your name for the record.

MS. BECKERMAN:  Good morning -- afternoon, Your Honor.  I'm Laura Beckerman for the District.

MS. BLANCO:  I'm Kathryn Blanco for the District.

THE COURT:  Good afternoon.

MS. BECKERMAN:  Thank you.

Mr. Meyer went out to confirm that our witness



-- I'll let him know that we're ready to start.

THE COURT:  All right.  Thank you.

(Pause.)

MR. MEYER:  Apologies, Your Honor.

As an update, we have another tenant outside, so there'll be two witnesses.  We'll probably be -- we probably -- the two other witnesses probably won't be here before 1:00.

THE COURT:  Okay.

MR. MEYER:  So we'll just have those other two tenants go at 1:45.

Is that okay?

THE COURT:  All right.  Thank you.

MR. MEYER:  Okay.  The District will call Rebecca Janovich to the stand.

THE DEPUTY CLERK:  Remain standing and raise your right hand.

State your name for the record.

MS. JANOVICH:  Rebecca Janovich.

Thereupon,

**REBECCA JANOVICH,**

having been called as a witness for and on behalf of the Plaintiff, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

THE DEPUTY CLERK:  Thank you.



**DIRECT EXAMINATION**

BY MR. MEYER:

Q    Good morning, Mr. Janovich.  Can you please state and spell your name for the record?

A    Yes.  It's Rebecca Janovich, R-E-B-E-C-C-A J-A-N-O-V-I-C-H.

Q    Where do you work?

A    I work at the Department of Licensing and Consumer Protection.

Q    And what is your role at the Department of Licensing and Consumer Protection?

A    I am the Superintendent of Corporations Division.

Q    Okay.  And what does that mean?

A    I oversee the program that creates and registers businesses wanting to do business in the District of Columbia.

Q    And is part of that work accepting and maintaining filings by businesses?

A    Yes.  We accept and review the filings involved in -- we call it, you know, birth and death of an entity from creation or registration to when they dissolve or withdraw.

Q    Can you give the Court some examples of what those types of filings entail with the Department of



84

Corporations?

A    Yeah.  So if you're creating an entity, we're reviewing your articles of organization, articles of incorporation, et cetera.  If you're a foreign entity, we're reviewing your foreign registration statement, which is the first thing you register to give to us to come on record.

Then you might want to file things like amendments, your periodic biannual reports to update your information, keep it updated, and then eventually, you might want to dissolve your entity.  So you would file a dissolution.  Or if you're a foreign entity, you would withdraw.

Q    You mentioned a foreign registration form.  Did I hear that correctly?

A    Uh-hmm.

Q    Okay.  What is that?

A    So a foreign registration statement, also called an FN-1 -- that's the form number we give it -- if you're an entity that has been created in another jurisdiction -- for instance, another state or another country, but you want to do business in the District, you fill out the FN-1.

We ask for information for your entity name, the jurisdiction that organized it, the date you organized it,



the date you intend to commence business in the District, your principal office address, your beneficial owners, your purpose, and then of course needs to be signed by an authorized person.

Q    Great.  And so does the DLCP -- do you mind if I call your agency DLCP?

A    Please.

Q    Okay.  Does DLCP maintain copies of these foreign registration forms in its files as a matter of normal course of business?

A    Yes, we do.  We keep them forever.

Q    And do you recall -- have you reviewed any FN-1s that pertain to this case?

A    I have.

Q    I'm going to show you some of these documents. We'll start with the Exhibit 7 as a part of the District's motion for preliminary injunction.

MR. MEYER:  I have an extra copy, Your Honor, if you're looking for it.

THE COURT:  Okay.  Is this --

MR. MEYER:  Yeah.  I mean, this is the filing, but I have extra copies if you want to just take a peek, and I can take it back.

THE COURT:  I have plenty of paper.

MR. MEYER:  You don't want any more.  All right.



BY MR. MEYER:

Q    Okay.  Ms. Janovich, do you see Exhibit 7 in front of you?

A    I do.

Q    Okay.  Do you see the top of this page where it says DCRA?

A    I do.

Q    Okay.  And can you explain what was -- how's DCRA's relationship to DLCP?

A    Uh-hmm.  DCRA is the Department of Consumer and Regulatory Affairs.  In October of 2022, that agency split into the Department of Licensing and Consumer Protection, which corporations division went to.  And then the other side of that was the Department of Buildings.

Q    And so below it, it says District County Government Corporations Division.  That's the division that you now run for DLCP, right?

A    Correct.

Q    Okay.  And below that on Exhibit 7, it says foreign registration form statement, FN-1.  Do you see that?

A    I do.

Q    And so those were the documents you were just testifying about?

A    Yeah.



Q    Okay.  And so is Exhibit 1 here an example of the type of foreign registration statements that the Department of Licensing and Consumer protection keeps as a normal course of business and maintains in perpetuity?

A    It is.

MR. MEYER:  Okay.  Your Honor, I move the Exhibit 7 into evidence.

THE COURT:  It's admitted.

(Plaintiff's Exhibit Number 7 was received into evidence.)

BY MR. MEYER:

Q    Ms. Janovich, Exhibit 14, is this another example of a foreign registration statement, FN-1, that the Department -- DLCP maintains in perpetuity as a matter of normal course of business?

A    It is.

MR. MEYER:  Okay.  Your Honor, I would move Exhibit 14 to evidence.

THE COURT:  It's admitted.

BY MR. MEYER:

Q    Ms. Janovich, I'm going to approach and hand you Exhibits 21, 26, and 36.

A    Thank you.

THE COURT:  And what were the exhibit numbers again?



MR. MEYER: Okay. For the record, this is Exhibits 21, 26, 31, and 36.

BY MR. MEYER:

Q    Ms. Janovich, do you see these four exhibits in front of you?

A    I do.

Q    Okay. And are these four exhibits all copies of foreign registration form statements FN-1 that the Department -- the DLCP maintains in a normal course of business in perpetuity?

A    They are. Yes.

MR. MEYER: Now, I move these four exhibits into evidence.

THE COURT: Why don't we make the record a little bit clearer?

MR. MEYER: All right.

THE COURT: I understand that Exhibit 14 is the FN-1 for 2840 Langston Place. Exhibit 21 is the FN-1 for 2844 Langston Place.

And Exhibit 26 is what?

MR. MEYER: Exhibit 26 is the FN-1 for 2850 Langston Place.

THE COURT: Okay.

MR. MEYER: Exhibit 31 is the FN-1 for 2908 Langston Place. And Exhibit 36 is the FN-1 for 3615 B



89

Street Southeast.

THE COURT:  All right.  They're admitted.

(Plaintiff's Exhibit Numbers 21, 31, 36, 14, 26 were received into evidence.)

MR. MEYER:  Thank you, Ms. Janovich.  I have nothing further.

MS. JANOVICH:  Thank you.

THE COURT:  Thank you.

(Pause.)

THE COURT:  All right.  Sir, come on up to the witness stand, please.

THE DEPUTY CLERK:  Good afternoon, sir.

MR. KHALIK:  Hello.

THE DEPUTY CLERK:  Please raise your right hand and state your name for the record.

MR. KHALIK:  Musa Abdul Khaliq.

THE DEPUTY CLERK:  Thank you.

Thereupon,

**MUSA ABDUL KHALIQ,**

having been called as a witness for and on behalf of the Plaintiff, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

THE DEPUTY CLERK:  Thank you.  You may sit.

THE COURT:  Good afternoon.



**DIRECT EXAMINATION**

BY MR. MEYER:

Q    Good afternoon, Mr. Khaliq.

A    Hi.

Q    Could you please state and spell your name for the record?

A    Sure.  Musa, M-U-S-A.  Abdul, A-B-D-U-L.  Khaliq, K-H-A-L-I-Q.

Q    Thank you, sir.  And where do you live, Mr. Khaliq?

A    1636 B Street Southeast.

Q    Is it possible that you live at 3615 B Street?

A    Yes.  Yes.

Q    No worries.  No worries.  And how long have you lived at 3615 B Street?

A    It's getting -- it's getting close to a year because I think I moved in around the summer time last year.

Q    Okay.  And what unit do you live in?

A    Apartment B in the basement.

Q    You live in the basement of the building?

A    Yes, sir.

Q    Okay.  And is that a one-bedroom, two-bedroom studio?

A    It's efficiency.  It's like -- it has a kitchen,



91

a bathroom, and a little small area.  It's like a box.

Q    And who lives with you?

A    No one.  Me and my dog.

Q    Got you.  And I hope you don't mind me asking. What do you pay -- what do you pay in rent?

A    It was 800.

Q    Okay.  And how did you come to find out about 3615 B Street.  How did you end up living there last year?

A    I met Theresa.  She, I guess, used to work for Ms. -- for the people, and she -- I told her that I was, like, homeless at the time.  And I told her that I needed a home, and she said she could help me out.  And she did in turn got me that place.

Q    And did you tour the apartment or, like, look at it before you moved in?

A    Yeah, I went to -- I walked through, and everything was all right.  But as I stayed the first night, there were rats.  Like, I mean, like, that plays a whole different effect on me.

You got rodents running over top of your head, and then they're attacking you from -- you know, they're coming in.  You know, I got a lot -- there's a lot of rats there.

And then with the kitchen ceiling has real bad leaks, where is those -- sewage draining from the top



92

floor.  I think it may be maybe three floors, and it's draining down to the basement.

Q    Well, let me ask you about that.  First, so you said the first night you had rats.  Is that true?

A    Yeah.  Yeah, that's when I knew I had the rats.  Like, I moved in.  I'm in there for the night, and next thing, you know, like my dog, she going crazy, like, oh, what were you doing, what were you doing.  But we done got ourselves into because there's a lot of rats.  I mean, like, rats as big as puppies.

Q    But you didn't notice that when you toured the apartment?

A    No, I didn't.  I didn't like -- I paid my rent, you know, paid the security deposit.  The night I got in there is when I started hearing them, like, actually sitting down, you know, watching the TV.  And you're hearing scurry, scurry, scurry, scurry.  It's -- it's a bit much.

Q    Are they just in the ceiling, or do you ever see them?

A    They were -- yeah.  They -- they were all over -- like, on the other side of my drywall.  They're getting in there from -- I don't know how, but they're getting in there.  And they're fighting.  You can hear the fights and the squeaking and the loud -- it's annoying.



93

Q    So are they just in the walls, or do they ever come into your unit?

A    Yeah, they come in my unit.  I -- yeah.  Yeah.

Q    So the first night you heard the rats, did you call anybody at management, or?

A    Yeah.  I let them know.  They sent exterminator, I want to say, twice.  The exterminator came in, thought he had the job done, so I needed to call him back because the job wasn't done.

Then it got to the point where they was like, we can't put it -- I don't know if they say we're going to -- we're not going to put out for it, or whatever, but it stopped.  They didn't -- they stopped coming to fix the problem.  And like, I had to go buy big rat traps.  I got -- I'm living around rat traps.  It ain't right.

Q    How many times -- so you said you moved in in the summer of 2025, right?

A    Yes.

Q    Okay.  How many times total, in the time that you've lived at the property, would you say an exterminator has come to your unit?  .

A    Definitely two to -- I want to say two or three times.

Q    Okay.

A    They -- they sent the exterminator out.



94

Q    And did that fix the problem?

A    No, I'm still having that problem.  Like, I -- I'd like to show you pictures of what's going on.

Q    When's the last time you caught a rat in your apartment?

A    Not that long ago.  It was maybe about a week ago or so.  I sent -- like, every time I -- at first, it got to the point where I got discouraged.  I just wanted to get them out of the house.  So I just would just get -- they just get in the trap, and I just throw him out.

But I started recording it more, so you know, that's my proof that you're not trying to do anything to fix the problem.  And because you say, I've got to pay my rent, then you want to kick me out like -- like if you don't pay, you know -- and you don't want to help out. You don't want to fix your problems.  Like, I don't deserve that.

Q    Mr. Khaliq, you said these were -- I mean, are these -- you said the size of dogs.  Can you -- I mean, like, how big are these rats?

A    The second time the guys came to pull the ceiling out of the wall because it was literally changing -- instead of fixing the pipes, they were changing the drywall.  And that's all you're doing is trying to put a band aid over a major problem.  So the lease still was



95

coming.  So the guy pulled down the drywall, and he showed me a picture.  No, I actually seen on the drywall, the poop was as big as puppy dog's poop.

Q    How about the rats that you see inside your unit?  Are they --

A    Yeah.  They eventually got big, but I think I patched up a hole where as though the big ones can't come in now.  It's just the little ones.  But they're like -- they're, like, maybe, like, that size.

Q    You said the last time you caught one was about a week ago?

A    Yeah.  I want to say -- I want to say it was, like, a week ago.  It -- it fell into threes.  It was one, two, and three, I think it --

Q    Now, you were talking about a leak.  I want to -- I want to kind of drill down on that.  When did you first notice any sort of leak in your apartment?

A    The first week I had -- I started seeing major, like, water coming -- running down the wall.  And I reported it to Theresa because I -- because that's who all I was dealing with at the time.

I wasn't dealing with -- I -- I didn't even know anything about the other guy until I stopped paying my rent, and then he came and asked me what's going on.  And I'm like, I have problems that needs to be fixed, and



you're neglecting it.

Q    Okay.  Well, let's pause on the leaks and talk about who these people you're talking about.  You mentioned Theresa.

A    Yes.

Q    Who is Theresa?  You said she saw you on the street.  And that's how --

A    I met her on the street.

Q    Uh-hmm.

A    And because someone told me that she could possibly help me get a place.  And -- I'm sorry that -- the guy in question his name is Sam.  And I've never met Sam.  I always paid my rent with Theresa.  I don't know if they will, you know, pull it -- they will pull my income off my check -- off my card, and that'd be it, you know.  But I also had a problem with not getting a receipt.

Q    Right.  So Theresa, she's the one you pay your rent to?

A    Yeah.  She would -- I would -- they would make the -- the conversation on the phone and say, okay, you can get the rent, and she would pull it off my car.

Q    And Theresa is the one that you would call to report repair issues, right?

A    Yes.  That's all I was dealing with.  I didn't knew -- I didn't even know Sam.



Q    And so who's -- you said -- you testified earlier that after you stopped paying your rent, you met another gentleman.  Was that your testimony earlier?

A    Are you saying -- I'm sorry.  Say that again?

Q    You said you only had dealt with Theresa, right?

A    Uh-hmm.  Uh-hmm.

Q    And then just --

A    There was a guy that worked for -- I guess, did maintenance --

Q    Okay.

A    -- the maintenance work.  And the guy that did the maintenance work pulled down the -- the drywall and showed me what was going on.  And he showed me the corrosion in the pipes, and the pipes are pretty much gone.

Q    And so the only person that you've met from your -- whoever owns your building would be Theresa?

A    Yes.

Q    Who you pay your rent to?

A    That's all -- that's all I dealt with at the time.

Q    Understood.  And who do you deal with now?

A    No one.

Q    And why is that?

A    Because I still have these issues.  Now, I



98

exchanged numbers with Sam, but it's like, if I don't pay -- I got to get out because he's not doing no work. He's not trying to fix no problems. I have no problem with paying them rent. But come on now. Do what -- like, literally, do I deserve this? It -- it's not good.

Q    When did you exchange numbers with Sam?

A    The day he came to see me about the rent.

Q    Okay. Do you remember what month that was?

A    No.

Q    Was it this year?

A    Yes. No. It was -- how many months are we into this year? I think it was maybe in the beginning of this year.

Q    Okay.

A    Yeah.

Q    And at that point, you exchanged numbers with --

A    Yeah.

Q    -- Sam?

A    Yeah.

Q    Okay.

A    From my understanding, Ms. Theresa doesn't work for him anymore. I'm not sure what's going on with that.

Q    And so after you exchanged numbers with Sam, did the problems get fixed?

A    No, nothing. Nothing got fixed. And that was



my whole problem.  That -- I was told that I could move into an apartment upstairs, but it got flooded the same night I stayed there.  It got flooded to the point where I couldn't stay there.

But instead of fixing the problem, he fixed -- put the drywall up on my apartment and told me to come back down there.  And I'm like, well, what, like, you got this whole problem here.  And I see where the water is coming from because the whole apartment that was above me is flooded.

Q    Yeah.

A    Flooded.

THE COURT:  So wait.

So I understand, so you were in the basement --

THE WITNESS:  Uh-hmm.

THE COURT:  -- and then they moved you upstairs?

THE WITNESS:  Yeah.

THE COURT:  And that apartment flooded?

THE WITNESS:  Yeah.  That apartment flooded

THE COURT:  And that was above your --

THE WITNESS:  Above my apartment.

THE COURT:  So the water from the apartment that you were staying in upstairs went into your apartment in the basement, and then you were told to move back to the basement?



THE WITNESS:  Yes.

THE COURT:  Where the water was coming in?

THE WITNESS:  Yes.

THE COURT:  Okay.

THE WITNESS:  Yes.

THE COURT:  Just want to make sure I understand. Thank you.

THE WITNESS:  And I don't -- I don't like this. This ain't making no sense.  You're not even fixing your problem.  And you want me to sit comfortable with this?

BY MR. MEYER:

Q    When's the last time your apartment flooded?

A    It's been a while now, but I don't think anyone's living above me, even on the third floor.  I think everybody is pretty much -- I'm not sure.  I don't speak -- I'm out of my business, and I come and go as I -- you know.

Q    Has your apartment flooded this year?

A    No.  I haven't had any problems with it flooding this year. Yes.  No.  I'm sorry.  I'm sorry.  Yeah.  I got a major leak in my windows.  I showed you the pictures.  And the kitchen is still leaking.  Hasn't -- hasn't leaked in about a week or so right now, but it's -- the leak, and then my -- the ceiling above my head where I sleep at is rotting out.  It's rotting out.



Q    Okay.  So just so we're all clear.  I want to know exactly where in your apartment the leaks are.  There was a leak last week in your kitchen?

A    Yeah.  Coming from the ceiling.

Q    From the ceiling in the kitchen?

A    Yeah.  Running down -- running down the wall.

Q    Understood.  And then there's a second leak in your bedroom?

A    Bedroom.

Q    Okay.

A    Window.

Q    And you testified that the -- above where you sleep.

A    Yeah.  The window.  There's a -- there's a -- there's a heavy leak.

Q    Okay.

A    And then as it's leaking, it's smelling -- it's nothing but sewage.

Q    Yeah.  Can I ask you about that?  Is this clean water, or?

A    Yeah.  It stinks.  It gives an odor.  It gives an odor.

Q    What kind of odor?

A    Sewage.  Like, it's foul.

Q    Is that the leak in the bedroom or the leaking



102

-- I'm sorry.

A    Put the buckets up.  I'll put the buckets up and just catch it till it stopped.  I ain't got no other choice.

Q    When you're talking about the leak that smells like sewage, are you referring to leak in the bedroom or in the kitchen?

A    Both places.

Q    Both places?

A    Both places.  It's, like, three major leaks.  When it does leak, it's, like, three.  It's one right above the bathroom, two in the kitchen, and one in the window near -- in the area where I sleep.

Q    Okay.

A    It's really a small place.  It's really small.

Q    So four distinct areas where the leaks come through?

A    Yes, sir.

Q    Okay.  But they all smell the same?

A    Yeah.

Q    And earlier, you were talking about maintenance men that came in and replaced drywall.  Is that right?

A    Yes, sir.

Q    Okay.  And when they were replacing the drywall, which leak were they replacing the drywall at?  Was it all



103

four leaks or one specific one?

A    First, it -- the -- the only ones that they tried to put a bandaid over was the kitchen.  It wasn't until the last episode of the leaks where it started draining into the common area, into the area where I sleep at, and then it just got even worse.

Q    And so when someone from management came and replaced the drywall, how many times have they done that?

A    I want to say about three times.  This would -- if they come and do it, it would be the fourth.  I know that for sure to change that drywall for at least about three times since I've been there -- since I've been there.

Q    Got you.  But despite the drywall being replaced, the leaks keep coming back?

A    Yeah.  It's never got fixed.  It's never got fixed.  It's just like you're trying to put a bandaid over a major cut or something.  I don't know.  It's just not right.

Q    When was the first time you had a leak?

A    Oh.  I want to say it started within the week I was there.  My first encounter with that was, like, the first week.

Q    So --

A    Along came the rest to the leaks, the water



running down the ceiling and the kitchen.

Q    So just -- I just want to make sure.  The leak started a week after you moved in?

A    Yes.

Q    And you testified that the leaks -- the most recent leak was last week?

A    Yeah.  I want to say -- I want to say last week or so, I had an episode where the leaks were coming in the window, the -- above the bathroom, and in the kitchen.

Q    Besides the leaks and the infestation, have you had any other problems in your unit that you want to tell the Court about?

A    No.

Q    Okay.

A    I don't think it's even big enough to get any more problems.  I pray not.

Q    Mr. Khaliq, we talked a little bit about Sam.  And when you exchanged numbers with him, was that -- did he come to the property in person?  Is that how you met him --

A    Yes.

Q    -- and exchanged numbers?

A    Yes.  Because I was getting ready to go out to the store or something, and he bumped into me.

Q    Got you.  Do you recall what this Sam gentleman



105

looks like?

A    Kind of fuzzy hair.  I want to say Caucasian, lack of better words, I guess.  Yeah.  That's the only one I've met.  Like I said, I didn't even know him until the rent was due.

Q    Sure.  Sure.  And do you have approximate age?  Do you remember what he was looking younger or older?

A    Well, I'm not good at that.  I'm not good at that.

Q    Oh, no worries.

A    I'll be finding it hard sometimes to remember my own age.

Q    That's quite all right, sir.

A    I want to say about 40s maybe.

Q    Okay.

A    Look about it -- it's 40.

Q    That's fine.

A    I'm not sure.  I'm not good at that.

MR. MEYER:  That's quite all right.  I really appreciate you taking the time out of your day and coming to testify.

Unless there's any other -- the Judge has any other questions, I don't have any more questions for you.

THE WITNESS:  Okay.

THE COURT:  No.  Thank you, sir.



MR. KHALIQ:  All right.

THE COURT:  Have a good day.

MR. KHALIQ:  You have a good day, too.

MS. BECKERMAN:  Your Honor, before lunch, we can turn to the documents that we'd like to produce under DC code 14508.

THE COURT:  Okay.

MS. BECKERMAN:  So we provided notice with the certificate.  And all the documents that were received pursuant to the subpoena, we provided those to defendants by email and by mailing it to their addresses.  The email was sent last Tuesday, the 17th, and it was mailed out either that day or the next day.

We can pull it up that, Your Honor, has to have a copy.

THE COURT:  Thank you.

MS. BECKERMAN:  The first page is the certificate establishing that the documents that were produced are a business record.  It's signed by Ms. Downward (phonetic), who was a custodian for the company, Vesta Settlements.

And then the subsequent documents are the relevant pages of the subpoena response that they provided.  So if you go to page 2 -- and there are Bates numbers in the bottom right, so this is Vesta_2.  This



page, which starts towards the top with the word loan details, helps to kind of explain what this document is.

So as you read through the emails and document, what becomes clear is that Vesta Settlements was participating in a proposed closing to transfer through a 30-year cash out refi. We see that referred as the loan program in the middle of page 2 to this other individual named Mohammad Jabari (phonetic).

As we've seen from the documents that were admitted into evidence with Ms. Janovich -- and let me just get the exact exhibit number. So if we -- this is referring to 3615 B Street, which is the property where Mr. Khaliq lives.

If we also look at what was admitted as Exhibit 36, we'll see the current listed beneficial owner of the property.

THE COURT:  Okay.

MS. BECKERMAN:  So I believe it's listed as Houri Razjooyan.

And so the documents from the settlement basically show what kind of an intended loan transaction to transfer the property to this other individual through a cash out refi.

As you kind of go through the documents, particularly, the one that's essentially the fourth page.



It's Vesta_00020, you see a payoff from the mortgage holder --

THE COURT:  Uh-hmm.

MS. BECKERMAN:  -- which evidences a balance of about 1.25 million.  The page we were just looking at before said that the loan was going to be a little over 1.8 million.

Of course, there are other things that are paid off at closing, but taken together, we're seeing that as the -- the loan program is called cashout refi, and this also supports that there would be some substantial amount of cash going to the owner at the closing that is reflected in these documents.

As you look farther into the documents, you'll see that, on February 13th -- and this is Vesta Settlement_23 -- there's an email saying that the loan has been denied, and then they reference an attachment.  And attachment appears to actually be the email from our office, kind of notifying them of the relief that we're seeking from the preliminary injunction that we subsequently sent a subpoena.

So prior to that, it appeared that this loan was at least contemplated.  And as you'll hear in argument, we're going to be referencing these documents as evidence that the defendants were continuing to actively seek to



sell and/or refinance their interest in various properties even as recently as a couple of weeks ago.

THE COURT:  Thank you.

MS. BECKERMAN:  And Your Honor, we have two more witnesses, and they are planning to come after lunch.

THE COURT:  Sure.

Okay.  So let's plan -- it's 12:45 now.  Let's plan on being back at 1:45?

MS. BECKERMAN:  Excellent.  Thank you.

THE COURT:  All right.  Thank you.

(Thereupon, a luncheon recess was taken.)

THE DEPUTY CLERK:  Recalling the matter of District of Columbia v. Ali Razjooyan, the top case number 2026 CAB 985.

Parties present, please restate your name for the record.

MR. MEYER:  Good afternoon, Your Honor.  Matthew Meyer on behalf of the District.

MS. BECKERMAN:  Laura Beckerman on behalf of the District.

MS. BLANCO:  And Kathryn Blanco on behalf of the District.

THE COURT:  All right.  Good afternoon.

Are you ready with your next witness?

MR. MEYER:  Yes, Your Honor.



110

THE COURT:  Okay.

THE DEPUTY CLERK:  Good afternoon.  Please raise your right hand and state your name for the record.

MS. BROWNING:  Snihesha Browning.

Thereupon,

**SNIHESHA BROWNING,**

having been called as a witness for and on behalf of the Plaintiff, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

THE DEPUTY CLERK:  Thank you.  You may seat.

**DIRECT EXAMINATION**

BY MS. BLANCO:

Q    Good afternoon, Ms. Browning.

A    Good afternoon.

Q    Could you please state your name for the record?

A    Snihesha Browning.

Q    And would you be able to spell that, please?

A    Yes.  S-N-I-H-E-S-H-A.  Browning, B-R-O-W-N-I-N-G.

Q    Okay.  Thank you.  And where do you live, Ms. Browning?

A    3615 B Street Southeast, Apartment 201, Washington, D.C.

Q    And when did you move in?

A    I moved in August 1st, 2025.



Q    How many bedrooms does the unit have?

A    Three.

Q    And does anyone live there with you?

A    My two children.

Q    And would you be able to share the ages of your children?

A    I have a 13-year-old daughter and a 7-year-old son.

Q    Do you have a lease?

A    Yes.

Q    Okay.  And did you meet with anyone to sign that lease?

A    Yes, I met with Ms. Fowler.

Q    Do you remember her first name?

A    Oh, my God.  I'm trying to think.

Q    No worries.

A    Theresa.

Q    Okay.

A    Theresa Fowler.

Q    And who do you pay your rent to?

A    I will pay my rent directly to her.

Q    To Ms. Theresa Fowler?

A    Correct.

Q    How do you pay your rent?

A    Originally it was with money orders or -- or



112

like, a bank check.  But then we -- she gave me a portal that I was supposed to send it to, but for some reason, that just never worked.  So I would send it either Cash App or Zelle.

Q    And do you know who those Cash App or Zelle payments went to?

A    To Theresa Fowler.

Q    Thank you.  Now, I'm going to ask you a few conditions -- or a few questions, rather, about the conditions in your apartment.  Have you had any issues with leaks in your unit?

A    With leaks?  Yes, absolutely.  Leaks in the kitchen and bathroom, ongoing leaks that has been continued since, like, the week that I moved in up until recently.

Q    And so you mentioned at least one leak started the week that you moved in.  Could you tell us a bit more about that?

A    That leak started in the kitchen.  We couldn't figure out whether it was coming from under the refrigerator or from under the hot water heater or the washer and dryer that never worked.  But it -- it literally, like, flooded the floors with -- the floors are, like, coming up.

Put in an  order.  And it probably took them



113

about four days to actually come.  When they did come, I'm not -- I wasn't home at the time, but I do have cameras inside my home.  And it just kind of looked like they just cleaned it up.  Like, they never pulled the refrigerator out.  They never, like, inspected anything.  They just kind of cleaned it up.

And then it was fine for, like, a couple of days.  But then it started leaking in the bathroom.  So it kind of been, like, ping ponging back and forth.

Q    And when you mentioned you alerted management about the issue, who did you contact and how?

A    Well, actually, this conversation happened between me and Theresa Fowler.  She was, like, the middleman to whoever the owner is because I never met them.  I've never seen them before.  I don't even know who they are.

Like, she's the only person that I've ever had contact with.  So if I had any issues with appliances or maintenance, I would contact her, and then she would contact them.

Q    Okay.  And you mentioned that was the first time you had a leaking issue in your unit.  Has the issue reoccurred or continued since?

A    It has continued since.  I think I noted the last time that I -- I actually reported that issue was



November the 19th, and I have not reported anything since because nobody would come fix anything.  I would actually, like, get my son's father or somebody else to come over to do whatever, like, plumbing work.

Q    And so you currently still have issues with leaks in your unit?

A    Correct.

Q    And you mentioned in the -- and where are the locations of those current --

A    So the the sink situation in the -- in the kitchen hasn't really been an issue.  It's been more in the bathroom, so it's leaking from under the sink.  And then so it will leak from under the sink.  They'll come out and fix it.  And then the toilet will get backed up, and then they'll fix that.  And then the tub will, like, start -- the water will fill in.  They'll come back, and you know, it's like this back and forth between the sink, the toilet, the sink.  It's like nothing really is getting fixed.  It's just getting pushed around.

Q    And you mentioned an issue with the washer and dryer as well.  Could you tell us a bit more about that?

A    Well, technically, the washer and dryer was supposed to be part of the leasing contract.  It never worked, and I put in a complaint about that.  And technically, they were supposed to, like, come get it.



115

It's still sitting in my house.

And because of, like, the holes where the washer and dryer is, that's where I had noticed mice were coming in it. So it's, like, still there, still holes, still mice.

Q    Okay. We'll get to that in a moment.

In the meantime, how have you been doing your laundry?

A    I've actually had to, you know, like, go to the laundromat, bring it back to the house. Luckily, I do have support from my son's father, so I've actually been using, like, a service to washing clothes because, like, I just don't have the capacity of, like, dragging clothes back and forth. But it's costing me money to do that versus me having -- paying for a washer and dryer that's supposed to be a part of my lease and not being able to use it at all.

Q    And you mentioned something about mice near the washer and dryer. Would you be able to expand on that a bit as well?

A    At the -- the first week of living there, I noticed, like, mice running through the house. I would put down little traps -- traps to catch them. The first week that I lived -- moved there, I caught about six mice. That continued, like, into the next week. I complained to



Ms. Theresa.  She sent someone named Gomez (phonetic) out to -- I don't know -- I don't know what he did.  It wasn't, like, no spray or anything.

He just came in my house and literally set all of these green mice traps all over my counter, in my son's room, all over the house.  Like, it was disgusting.  And I even took pictures of it to send it to her.  Like, what did he do because he's doing the same thing that I'm doing.

And literally, like, the next day, six mice was caught on the -- on the pads that he had put out.  No -- they were not coming out to do anything about it.  And my son has asthma, which is triggered by mice, rats, mold, roaches.  He can't be around that type of stuff.

And ended up getting a cat because, like, it was the only other option.  And that's kind of been working, but you can still hear, like, mice running through the walls.  Mice literally still trying to get into my apartment, but the cat is there, thank God, you know, to kind of, like, help a little bit.  But -- from the first week that I moved in, we caught -- it -- we caught so many mice.  It was, like, insane.  It's a true infection -- infestation.

Q    And have there been any other issues with infestation other than the mice?



A    Roaches.  I noticed the roaches.  They all look different, so it's, like, different species of roaches. Roaches and mice.  That's kind of, like, the -- the big thing.  And I -- now that the season is changing, I'm seeing, like, little -- they're not caterpillars, but it's other little bugs that are starting to, like, show up now.

Q    Okay.  Have there been any issues with infestation in the building outside of your unit, to your knowledge?

A    Rats.  Huge, huge rats.  I was literally just speaking about something that recently happened last Saturday.

So the -- we've been having issues with the trash.  The trash can was literally sitting, like, right in front of the building.  But the trash would never get picked up for weeks -- weeks at a time.  Like, I would never see the trash get picked up, but miraculously, out of, you know, like, one day, it'll just disappear.

And then one day, I noticed, like, this guy with a pickup truck just, like, taking trash out of the trash can.  I asked him what he was doing, and I was wondering, like, why the City wasn't picking up the trash.  Like, I would see the trash trucks riding around in the neighborhood, but they would never come pick up the trash. And he was just like, oh, the owner paid me to come get



118

the trash.

But like, I would come home from work and -- just stressed from work. I'm a teacher, so just, like, trying to decompress, stressed from work, I would sit in my car, like, listen to my little music, and I would just see the biggest rats. I could just see them running back and forth.

Literally holes in the building. It's, like, huge holes surrounding the building. So like, it's, like, I know that they're in the building just running back and forth, running from the trash to the building. One of them literally almost got into the door of the building because the door is always broken. It's literally broken right now. So it literally -- I'm watching it, like, blowing the horn, trying to, like, scare it away.

And right -- shortly after that, I took my car to get a oil change, and the guy was like, you know, it's -- rats have been in your car. We can see, like, they're nesting in your car. Because I was wondering why, like, my heat wouldn't work or my AC wouldn't work. So the whole winter, like, the heat in my car wouldn't work.

I'm a teacher, but I don't make a lot of money, so you know, finances a little strapped. So like, they would -- they literally ate the cords in my car. And I still was, like, driving my car all winter.



119

Up until two Saturdays ago, my daughter had a cheer competition, and before that -- probably, like, two weeks before that, someone came and took the trash can that was on the property. So there's no trash can on the property as of now. So it's -- nowhere for the residents to put the trash, so the trash is just outside. And now, the rats are really going crazy.

So two Saturdays ago when I went to take my daughter to her cheer competition, 7 o'clock in the morning, and we're walking to the car, and she's like, Mom, it's a rat in the car. And I'm like, are you serious, and I look. And I'm, like, kicking the car.

It's, like, four rats literally just running through my car. Bit a huge hole through the trunk in the back seat. Like, I can't even -- I haven't drove my car since last Saturday because they have literally taken over my car. Like, I'm scared to get back into my car, which is crazy.

And the rats are still just out there. It's like you don't see anything out there to -- like, rat -- you know, traps or -- you don't see any type of help to get rid of them. It's just, like, seems to get -- it's getting worse. And even other neighbors were telling me, like, they have had rats in their cars. They're, like, inside biting their, you know, cords and stuff.



So that's a little frustrating because, now, I don't have a car.  And I'm walking past my car, and I just see rats, just, like, literally having a time in my car.

Q    And that was -- this was last Saturday --

A    Yes.  This --

Q    -- that a development --

A    -- was last Saturday.

Q    -- happened?  Okay.

A    Uh-hmm.

Q    Thank you.  And where is that -- where do you park your car?

A    So the way the building is set, it's literally, like, a small parking lot, and maybe four cars fit in it. And I will always park my car, like, the closest to the building because I would have to take groceries in, so I would try to park closer to the building.

And so that's right by the trash -- you know, right by where the trash can was and right by where everybody's kind of dumping their trash now.  So I guess it was easy access for them.  It really -- and my car was really low.  It's a smaller car, a Ford Focus, and it's really low.  So it's probably really easier for them to get in.

But they've been in all the neighbors cars. Like, they're to the point where they're, like, parking on



121

the street now because they see my car, and they're like -- they don't want to take the chance of them, like, taking over their car, too.

Q    And you mentioned something about the front door being open, allowing a rat to get in?

A    Yes.

Q    Does the front door not -- to the building?  Is that the door --

A    To the building --

Q    Okay.

A    -- yes.

Since I -- when -- when I first moved in, the front door was never, like, secured, like, the lock.  The -- it would never, like, turn.  And I had said something to, you know, Ms. Theresa about it, and she did say something to them about it.

And months had went past up until one particular day we had got a notice on the door saying that there was going to be a inspection.  And that particular -- I can't remember.  It was around October, November.  I noticed, like, the maintenance guys was there.  They was, like, in the different apartments.  It was looking like they was fixing stuff.  They had fixed the door, and I was excited about that.  But you know, they never still came to my apartment and fixed anything.  But at least the door was,



like, locked.

And shortly after, probably about a week, the door was back not working again.  It actually had looked like somebody had, like, pried into it because you could see, like, where it's separating from the -- you know, the base of the door.

And at that time, I started noticing, like, random people in the building.  They were, like, smoking.  And I had called Theresa.  I'm like, you know, this is making me feel unsafe.  It's -- and I noticed there was cameras in the building, but it just -- I just felt like they weren't working because they weren't even turned, like, a way that would be watching something safe, you know.

And I called her, and I said, I noticed people are in the building; they're smoking.  And she would call them.  And shortly after that, maybe, like, two days after that, someone had came in the building and, like, took a crap down in the basement of the building.  And it took, like, days for them to come clean it up.  So the whole building was, like, really, really funky for days.

And -- and I told her -- I'm like, this is not making me feel safe.  You know, like, random people is able to come into this building.  Me and my children are here.  And they came and fixed the door again.  And from



that time, which was around, like, November, the door has not been fixed at all.  I mean, it's still been broken.

Like today, when my daughter tried to close the door, the whole handle came off.  When we were leaving out -- to get in a Uber, literally the whole handle came off, like, the whole thing.

Q    The handle to the front door --

A    Uh-hmm.

Q    -- of the building came off --

A    I should --

Q    -- when your daughter --

A    -- have took a picture of it --

Q    -- tried to close the door today?

A    -- but I -- I was -- but like, the whole thing came apart.  So it was, like, a hole -- just a hole in the door.

Q    Okay.

A    But I had noticed over the last couple of weeks, days, like, it was getting looser and looser and looser. And I noticed it wasn't even, like, a -- it seemed like screws were missing out of it.  So like, the whole thing just literally fell apart.  And I'm walking out the door like, this is why I'm going to court because this is crazy.

Q    Yeah.  And you mentioned that -- just to clarify



124

really quickly, you mentioned the second attempt to fix the door was in November. That was 2025?

A    Correct.

Q    Okay. And that first time that maintenance came by, do you remember approximately when that was, if I --

A    That was -- it was -- it had to be around the -- the last week of October or the first week of November.

Q    Okay. Also 2025?

A    2025.

Q    Okay.

A    Correct.

Q    Thanks. You mentioned the cameras don't appear to be facing outwards?

A    Right. They're facing, like, up towards the ceiling. So it's like, how are you seeing anything? How are -- how are anything being secured? And who's watching the cameras and not noticing that they're not, like, facing the stairwell, you know, or facing the door? You don't even see, like, a light on it to indicate that it's on. Like, it's not -- it just appears not to be working at all.

Q    Okay. And have you had any issues with the fire alarm system in your building?

A    Yes, ma'am.

Q    Okay. Could you tell us a bit about those?



125

A    So my apartment is so small, and it is really hot in my apartment.  When I cook, I literally have to turn everything off.  Even the wintertime, I have to turn the whole heat off, everything off, to turn the stove on because, if I don't, the fire alarms will start to go off.

I noticed that one day in October, I came home from work, and like, the building alarm was just going off -- going on and on and on.  And I had asked one of the neighbors like, how long has this been happening?  And she was like, well, it's been going on all day.  And she said that she had contacted the owner -- she had -- somehow had contact with him.  I have never seen him before, never had contact.

But she said that she had contacted him, and he told her that they'll deal with it the next day.  But I'm like, I'm not going to sit here and listen to this all day, all night.  Like, something really could be going on.  And I called the fire department.

At that time, me and her were, like, in the hallway, and she called him on the speakerphone and was like, hey, a neighbor called the fire department.  And I could hear him.  Like, he's highly upset.  Like, why would she do that?

And the fire department is there at the time, too, like, telling him, like, they're about to go into



this apartment because they had figured out which apartment the alarm was coming from. And he was like, no, somebody's going to come tomorrow. And they're like, no, we're going to go into this apartment today because they were calling like something was really happening.

And he was like, really? He did that -- I called the fire department, but luckily I did, because when they finally got into the door, the whole -- and it was just literally, like, a flood of water coming through the ceiling of the apartment. And that's what was causing the alarm to go off. And like, literally flooding the entire apartment.

This was a vacant apartment, to be exact, actually. And there was literally water just pouring out of the ceiling of the apartment. The whole ceiling looked like it was about to fall in because this had been going on all day, like, literally all day. Probably shortly after I left for work. And she had been off that day, so she said it started around, like, 8, 9 o'clock. And I get off at 4:00, so this had been going on all day. The water had literally been pouring into this apartment the entire day.

And she had already called him and told him that the alarm in the whole building was going off, and it's almost like he just brushed it off, oh, we'll deal with it



127

tomorrow.  But I'm like, yeah, I'm not about to listen to this all night.  Like, I -- I have to go to work.  It was really loud, and it was just -- would not stop, so.

And it's been like that -- it's always alarms going off.  Like, you can hear -- it's almost like every time somebody is cooking in the building, you can hear their alarms going off.

Q    And you mentioned something about the heat in your unit, as well.  Would you be able to expand a bit on that?

A    Yes.  So -- well, actually, when I moved in, in August, the AC was not working.  I noticed that, like, two days after I moved in.  It -- it was really hot, and I would look at my thermometer.  It's, like, 90 degrees.

I called Theresa, and I'm like, hey, the AC's not working.  It took about three or four days for Gomez -- I think that's his name -- would -- to come out.  He came out four or -- three or four different times.  I want to say four.  Every time he came out, he's like, I fixed it.  He's texting her, telling her, I fixed it.  She's telling me like, oh, it's fixed.

I would get home, and my house is still burning up.  After the, like, fourth time -- this went on for, like, six weeks, though.  This is, like, a -- over a six weeks' period after I first moved in.  It's August, so



128

it's -- it's hot.

After the last time that he came, he finally was like, the AC needed some type of piece or device that, like, they weren't going to buy.  So they brought these units to put inside the window -- brought two units to put inside the window.  And that was fine with me.  Like, as long as, you know, my house cooled down.  It was super hot.

But once the winter came, I requested them -- to get them out the window because, now, it's getting really cold in my house because the breeze from around the windows.  And they're still in there.  I had to literally keep my heat on 90 to keep my house warm because of the breeze that's coming through where the AC units are.

And it literally has skyrocketed my electric bill because I've had to run my heat on 90 all -- I mean, it wasn't on auto.  Like, on.  Because the minute I would turn it down, it would get so cold.  And the -- like, thinking about the week that we were snowed in, I literally had to keep my heat on 90 because it would get so cold in my apartment, like, freezing cold.  So that was, like, an inconvenience.  And I even asked them -- because my daughter room for some reason gets even hotter. Her room is like the -- it's like the heat goes directly to her room.



And I asked him, like, well, can you take the heater -- the AC out and put it in her room?  At least then it'd be more convenient because it would cool her room down.  And here we are in March, and they are still in the same place.  And like I said, nine -- November the 19th was the very last time that I even contacted them about any maintenance things because nothing was getting done.

Q    And those window units you mentioned, sounds like those got put in about six weeks after the issue started when you moved in?

A    Correct.

Q    And which windows did the units get placed in?

A    One in the living room and one in my room.

Q    And you mentioned a breeze coming through.  Was there something to seal the gap in the windows around --

A    Absolutely --

Q    -- the AC unit?

A    -- not.  And now, I'm concerned about, like, bugs coming through because it's not even -- it's -- you can see the -- you can see outside.  Like, you -- I could put my finger through.  I know bugs can actually -- spiders and stuff can walk through -- walk through that window -- both of those windows.

Like, it's not -- it's not put in properly where



130

it would be sealed.  I probably would've saved money over the winter if they did it that way, but no, it's not.

Q    And you mentioned being snowed in.  When did that occur?

A    That was January -- between -- the second week of January.

Q    Okay.  And during that week, was snow removed from the property?

A    No.

Q    Were you able to leave the building?

A    At one point, we were actually snowed in the building.  The door -- the snow had came up to the front door.  We could not get out.  I had to call my son's father and one of the other residents that was able to get out the back of the building.  They came and removed the snow from the door so that we could actually get out of the building because we couldn't get out of the building.

They never came to, like, treat the property prior to the snow.  They never came after the snow.  Like, it took weeks for the -- probably more -- almost a month for -- for the parking lot to even get clear enough for us to, like, really get out the parking lot.

It was -- it -- like, my son's father and, like I said, one of the other neighbors, they were out there, like, shoveling the snow with, like, brooms and -- and



like, household stuff just to, like, make a path for the -- the four cars that did park in the parking lot.

And at that point, trash was everywhere. Like, nobody definitely wasn't coming to get the trash then. So it was trash on top of snow on top of ice and then trash on top of that. So it was just building up.

Q    And so when did -- you mentioned your husband's father and another -- or I'm sorry -- your children's father and another resident came by to clear the snow. Do you remember about how long after that snow first fell that they came by to do that?

A    That -- it was four days.

Q    Okay.

A    It was about four days. I think in the first couple of days, nobody was really concerned about going anywhere. But then, you know, we had to get back to work, and we had to -- and then we really realized that we could not get out the door.

And it wasn't until my son's father -- like, yeah, the snow was piled up, like, near where the door was; no way for us to get out if we tried. Like, that was dangerous. If there was a fire or something, we would have never even been able to get out that building.

Q    Have there been -- moving on from that for a moment. Have there been any issues with mold in your



132

unit, Ms. Browning?

A    Yes.  So when I first moved in -- like I said, the first week is kind of, like, when I really started noticing a lot of stuff.  And I -- I put in tickets for, like, every single thing that I noticed, which mold was one of them.  Around all the windows in the apartment -- there's four windows -- each window has mold on it.

And I explained to Theresa, like, my son has severe asthma and allergies year-round.  And at that point, before I moved into that apartment, we had been fine for, like, three years because we -- he wasn't around that type of environment.  And moving into this apartment, like, he's currently still having -- he's having, like, asthma issues right now.

Like, since we moved in, we have been in and out the hospital and back and forth hospital visits.  He's back taking all of his medication.  Even his pulmonary doctor asked me like, what changed, because we were doing so good.

And I told her, I just moved into this apartment.  You know, I really, you know, stuff -- certain stuff, I can't afford.  So I just kind of had to move into an apartment that I could afford.  And it's not, you know, it's not safe for him.  She was telling me like, it -- that is not safe for him.  And --



133

Q    And you --

A    -- they never -- I told Theresa about it.

And like I said, every time they would come, I would be at work.  But I can see them on the cameras.  They never even, like, attempted to do nothing about the mold.  The mold is literally still there.

Q    And you mentioned that mold being around all four windows in the apartment.  Where are those windows located?

A    There's a window in my daughter's room, a window in my son's room, the window in the living room, and a window in my room.

Q    And --

A    I --

Q    -- you mentioned --

A    -- even bought, like, a snake plant to, like, clear the air as much as possible, trying to help the -- the situation, but yeah.

Q    Have you experienced any issues with the running water in your apartment, Ms. Browning?

A    Yes.  There would be days when we would come home, and there's no hot water, or there's no water at -- at all.  I've had to keep my kids home from school because, like, I didn't want them to go home -- I mean, go to school dirty.  I would call Theresa like, there's --



there's no water.

It may take a day or two.  It will get cut back on.  I don't really be knowing, like, what's the issue with it.  But just last night, the water was off -- not off, but the hot water wasn't working.

Q    Would you like me to take a moment before moving on or --

A    Huh?

Q    Would you like me to, like --

A    No.  I'm good.

Q    -- take a moment --

A    I'm good.

Q    -- before -- all right.

Do you remember about when the issues first started with the water in your unit?

A    I -- the -- the more I kept thinking about it, like, maybe -- from the time I moved in, I know -- maybe, like, once or twice a month, the water would definitely -- either the hot water would be off, or the water would be completely off.  And there wouldn't be a notice like, oh, we're working on something, so nothing like that.  Just, like, come home; the water is off with no -- no explanation anything.

Q    Do you have a sense of maybe how many times total that's occurred?  It sounds like you've been in the



unit since August 2025.

A     Uh-hmm.

Q     So is it about -- you said about once or twice a month since then?

A     Right.

Q     Okay.

A     Yes.  Correct.  And like I said, just last night, the hot water was off.  My daughter was in the shower and was like, Mom, the hot water is off.  And I'm like, I'm glad you had your shower, both of you guys, so like, we'll be fine.  It came back on this morning, but the water pressure is really low.  So I don't -- I don't really know what's going on with that.

Q     And finally, are there any issues with electrical outlets in your unit, Ms. Browning?

A     Yes.  When I first moved in, I got internet service.  I mean, we need internet service for my cameras, for the TVs, and all of that.  And when they came to install it, two -- two electrical plugs just completely does not work.  The guy told me, like, you need to say something.

It was one in the living room and one by the kitchen that he was trying to hook the internet up to, and he was saying that they were completely not working at all.  And since then, like, we haven't been able to plug



anything into them because they literally don't work.

And I said something to them, of course, and like, it's still not working.  Like, they -- I don't even think they came out to, like, attempt to fix it, actually.

Q    Are there any other issues with your unit or the building that we haven't discussed so far today?

A    Water, heat, AC.  I think we've covered a lot of it.

Q    Okay.

A    I think we kind of covered a lot of it.

Q    And overall --

A    I mean, the --

Q    -- some of this you've covered --

A    Oh, yeah.  Well, as far as, like the inside of my apartment, though, too, because of all of these water issues, my floor is pulling up.  The tile on the floor is pulling up from the front door all the way to the bathroom.  So that's annoying, you know, like -- and it's almost like, well, nobody's coming to fix this, so there's not really nothing I can do about it.

Q    And you've already commented on this to some extent, but if there's anything else you'd like to add, how have the conditions of this property affected yourself and your family?

A    It's frustrating because, even after finding out



137

this case, I've -- I'm finding out, like, I'm probably one of the only ones that pay market rent, and to pay market rent and not get my money's worth, it gets frustrating.

MS. BLANCO:  Well, in that case, no further questions for today, Your Honor.

THE COURT:  Yeah.

MS. BLANCO:  And thank you, Ms. Browning.

THE COURT:  I appreciate you coming in, Ms. Browning.

MS. BROWNING:  Thank you.

MR. MEYER:  There's just one further witness, Your Honor.

THE COURT:  Okay.

Any other witnesses?

MS. BECKERMAN:  Yes, Your Honor.  Mr. Meyer's gone out to get the last witness.

THE COURT:  Okay.

(Pause.)

THE DEPUTY CLERK:  State your name for the record.

MS. SHAW:  Queshonna Shaw.

THE DEPUTY CLERK:  Thank you.

Thereupon,

**QUESHONNA SHAW,**

having been called as a witness for and on behalf of the



138

Government, and having been first duly sworn by the Deputy Clerk, was examined and testified as follows:

THE DEPUTY CLERK:  Thank you.

THE COURT:  Please have a seat.

**DIRECT EXAMINATION**

BY MR. MEYER:

Q    ood afternoon, Ms. Shaw.  Thank you for coming in today.  Could you please state and spell your name for the record?

A    Queshonna Shaw, Q-U-E-S-H-O-N-N-A S-H-A-W.

Q    And where do you live, Ms. Shaw?

A    1035 48th Street Northeast, Apartment 203.

Q    And when did you move into that property?

A    August 29th, 2003 -- '23.

Q    Does anyone else live in the apartment with you?

A    Me and my two kids.

Q    How old are your kids?

A    They're 12 and 9 now.

Q    And how much do you pay in rent?

A    Nothing at the moment.

Q    When you moved in, how much did you pay in rent?

A    I was paying 8 -- 186.

Q    Got you.  And did you have any rental supplement from the D.C. Government?

A    Yes.



Q    Okay.  And do you know how much the D.C. Government was paying in addition to your 186?

A    I believe the total rent was, like, 22-something.

Q    Okay.  And so you said that you're not paying anything right now.  When did the rental payments stop?

A    They stopped paying January of last year.

Q    Okay.  Can you tell me about the conditions when you first moved into the unit?

A    Most likely that -- that Friday after I -- because I moved in -- I believe it was a Wednesday or Thursday, but that -- by that Friday, my refrigerator had stopped working.  So the stuff that I just brought and put in there went bad because the refrigerator stopped working.

And then they came and patchworked it, where it periodically worked.  So I had to put most of my stuff that was in the refrigerator in the top freezer and turn that down because I already had a -- a standalone freezer.  So stuff that was supposed to be in the freezer, I put in my standalone freezer.

Q    So you had your own freezer that you brought with you?

A    Yes.

Q    And you used that as a freezer, right?



A    Uh-hmm.  And used their freezer as the refrigerator.

Q    And is that how you're still working your food storage --

A    No.

Q    -- now or --

A    I believe it was at the beginning of last year or the ending of the year before that they finally replaced the refrigerator because, when they did come and fix it, like I said, they patchworked it, so it was periodically working when it wanted to.

Q    Besides the refrigerator, you have any issues with leaks in your unit?

A    Yes.  I have a leak almost every month now.  So I mean, it started a month after I moved in.  We seen a mushroom growing from the ceiling of our bathroom right above the tub, and then when we told them, no one came out right away.  And then it wasn't until it started showing the watermarks of the leak, and then they said, oh, it's from the people upstairs.  And we'll come back, and we'll fix it.  But it never got fixed.  It just turned into a hole.  A big hole that leaked -- ran water whenever it -- it leaked upstairs.

And then from that -- and they came again when -- around the time that they replaced the



141

refrigerator, they came and patch worked the whole apartments because I guess they was trying to show it off to someone, but all they did was patchwork it to make it look good but didn't fix any of the problems behind it.

Q    Okay.  So the same time that someone came to fix your refrigerator, they also did patchwork repairs on your ceiling?

A    Yes, they replaced the refrigerator.  And they put gunk in my doorway because the whole door frame needs to be replaced, but it keep the door from wiggling.  They put some gunk inside the middle of it.  The holes that was in -- or some of the holes that's in the walls, they put the gunk that they put in the door, they put in the holes.

But none of that, like I said, was a actual fix.  And so the water -- the leak that was in the bathroom has spreaded [sic] to the vent, the door frame of the bathroom, and the outlet where the -- the switching stuff is.  So I've seen leaks come off through there, and then we acquired another new leak in the second bedroom.

Q    So I want to focus on the bathroom leaks that you were just talking about, okay?  You were mentioning that someone came and did a patchwork repair to the bathroom, right?

A    Uh-hmm.

Q    And at that same time, they fixed some of the



142

holes in the walls and the door and the refrigerator, right?

A    Uh-hmm.

Q    Okay.  When was that?

A    About -- like I said, about a year, year and a half ago.

Q    Okay.  And you said they were doing it because they wanted to show the apartment to somebody.  Can you expand on that?

A    They said the building was being inspected, so --

Q    Okay.  Do you know who was inspecting the building?

A    Nope.

Q    But someone told you that the building was being inspected?

A    Yeah.

Q    And that's why they were doing the repairs?

A    Yeah, because they even repaired the stuff that was out in the hallway of the building.

Q    And when they did the repairs, can you explain to the Court what exactly did they do to the ceiling in your bathroom?

A    All they did was just -- where the hole was, they cut it out, and they just put another piece over it



143

and painted it.

Q    Okay.  And so I want to talk about then what your bathroom looks like now after these repairs happened.

A    It grew three more mushrooms afterwards.  And now, the whole ceiling is covered in water stains from the leaks, and it has bubbles in the ceiling paint, whatever you want to call it.  So it's still leaking.

Q    And then you talked about a little bit about a leak in the second bedroom.  Do you recall just testifying about that?

A    Yes.

Q    Okay.  When did that leak start?

A    That started last year.

Q    Okay.  And --

A    About -- let's say, about March -- February or March of last year.

Q    Of 2025?

A    Yes.

Q    Okay.  So about a year ago?

A    Uh-hmm.

Q    Can you describe what that leak looked like?

A    It started, and it first was coming through the smoke detector and one of the light fixtures.  And then as it got worse, I had to unplug the smoke detector because the last time that it came through it, it was just setting



off the smoke detector, and it would not cut off. And in the process of unhooking, it got shocked. So -- and no one came to look at the water damage, the electrical damage, anything.

Q    What was in the second bedroom?

A    My -- that was my kids' room.

Q    Okay. Where do your kids sleep now?

A    They sleep out in the living room or in my room.

Q    Do you ever have any issues with mold?

A    I believe so, within the bathroom. Like I said, it grew mushrooms. And I'm sure that's what the second bedroom looked like. But we don't go in there because of all of the -- the water damage and the rodent and infestations. So --

Q    So have those leaks and mold affected you in any way, in your health or your children's health?

A    I believe so. I know that's why we don't go in that room. That room door stays closed most of the time. And whatever was in there that got damaged, it's still in there damaged.

Q    Have you had any issues with electricity?

A    Yes. And actually, now that you brought it up, my -- my fuse box -- the hot water one is completely off now. And if I keep trying to flick it, it shocks. It makes little electrical shocks in it. My microwave went



off this morning and blew the power.  And so that's what's going on with the power now.  Oh, and my oven doesn't work well either because that went out a few days ago, and then it came back on when it wanted to.

Q    You were talking about issues of electricity that are happening right now.  Is that a new development, or is that something you've had in the past?

A    The hot water going in and out was a problem for about two years now.  But it not coming -- me not being able to switch it back on and then it causing little power strikes, that's -- that's new this year.

Q    So right now, you don't have hot water?

A    Nope.

Q    Any other issues with the electrical system?

A    The garbage disposal don't work for the kitchen.  The dishwasher doesn't work for the kitchen.  I believe the -- the way they hooked up the dishwashers was causes [sic] my sink to stop up and back up.  So the only way to get it to drain was to turn on the dishwasher.  And I'll be turn -- if you can't get it to turn on, it floods the kitchen.  So --

Q    Did the electricity ever cause any issues with heat?

A    Yes.  Because the first year of me living there, I had to be put into a shelter because the radiators that



146

they gave -- the ones that don't have control over their heat -- blew the whole power in the apartment during the winter.  So it was too cold for me and my kids to stay there.

Q    What winter was that?  What year did that --

A    2023.

Q    Okay.  And you said you moved in --

A    In 2023.

Q    Okay.  You moved in in August 2023?

A    Uh-hmm.

Q    And after you --

A    And got put in a shelter by December.

Q    How long were you in the shelter?

A    The first shelter for about a year and a half. And now, they're putting -- they put me back in for this winter, too.  So -- and it affects my son's health because he has autism.  And so every time we have an instability, it causes some problems at school.  So now, he's been kicked out of the last school.  And so we're in between schools, and he's been doing school online, which is a struggle.  So --

Q    Have you had any issues with pest or mice infestations?

A    Yes.  Especially since the window in my living room was broke for -- it was completely broke for three



147

months, and for those three months, mice came in and out like they owned the place.

Q    When's the last time you had seen a mouse or a rat in your apartment?

A    Just the other day.

Q    What have you -- have you done anything to try to get rid of them?

A    I've had mice traps all through my house, and these suckers seem smart because they -- I've literally watched them jump over my traps.  And the only way they get caught is if they're babies, or they got spooked when they ran.

Q    For all these problems, whether it's the mice or the hot water or the heat --

A    And roaches.  And these roaches, I've never seen a roach jump until I moved in here.  And these roaches run fast and jump.

Q    Where do you see the roaches at?

A    All over.  And especially since I -- that one of the heaters that they did give me, I keep in the bathroom to keep my tissue on it, so that the roaches, when I go use the bathroom, aren't in my tissue when I go to use it.

Q    Can you think back to 2023 when you first started having problems with this unit -- who did you call to report the illegal conditions?



A    I called the -- they had one number that goes that to press one for the leasing office, two for maintenance, and three for -- to leave a message with maintenance.  And the number for maintenance when the person finally answered was a college student's phone number.

And they never answered the message board.  So I wound up calling the number one button in leasing, and eventually, they stopped answering that number.  So I wound up finding the number to the lady who showed me the apartment and called her.  And then that's how I was getting through.

But now, no one answers nothing.  They even put up an app -- sent the app through the email of where to report your maintenance issues.  I've reported all my maintenance issues, and none of them have been completed.

Q    You have any issues with security at any point in the building?

A    I'm sure because they changed the locks on the front door but then don't give -- or even don't give everyone in the building the key or don't give the USPS man a way to get in.  So everybody's package is being put out front.  And if it's been put out front, it's been stolen.

And then if they break open the door, then we have



149

teenagers hanging out in the hallways.  And like I said, my front door already looked like someone had tried to kick it in and break in before I moved in.  That's why they were supposed to be replacing it and never replaced it.

So that's why I try not to go too far and stay too long away from my home because I have to put a bar up behind my door.  So if there's no one home to put the bar behind my door, I'm afraid someone will kick it in and steal all my stuff.

Q    How do you remove the bar to get back in your apartment?

A    No, that's what I'm saying.  It's no one to put a bar to push -- push up against the door.  So if there's no one there to put a bar behind the door, they can just kick open the door.

Q    I see.  So when you're in your home, you have a bar that you put against the door so that it can't get kicked in?

A    Yeah.

Q    And that --

A    And at least I hope it can't be kicked in.

Q    And that's because you don't trust the front door because there's something wrong with it?

A    Yes.  It's the -- it doesn't lock well, and it



150

has a big gap in between.  So unless it's something pressed up -- and at one point before they came in and banged it back into place, if you didn't have the top lock on it, it would just open.  So --

Q    Do you have any issues with the smoke alarms?  I know you mentioned that you disconnected one, and it shocked you because there was water coming through it.  Are there other smoke alarms in your home?

A    Yes.  And all of them beep -- continuously beep, and the little -- I can be cooking some eggs and sausage, and the smoke detectors will go off.

So the ones that -- that was right there by the kitchen, I had to take off because it kept going off when -- even after we finished cooking, saying it's a smoke, it's a fire in the house.  And that was scaring my son with autism, considering no one's cooking, we're finished cooking, and it's still going on, and he's hearing that it's telling him it's a fire in your house.  So --

Q    When's the last time you heard from anyone in management?

A    Last year, June.  And that was when I called to report one of the leaks in the bedroom.  And then that's when she asked me, oh, no -- that's when she informed me, oh, I thought you moved out.  I'm like, I've never



informed you that I moved out where you're -- you're -- you're the case people or whatever that was paying my part of rent, stopped paying your rent in January, but I'm like -- but I talked to you since January. You never informed me of anything until now. So --

Q    Do you remember who you talked to in June?

A    I'm not sure if her name was Theresa, I believe.

Q    And that's the woman who said, I thought you moved out?

A    Uh-hmm. That's the same lady that -- that showed me the apartment and everything. And I told you that's the one that I started to be in contact with after the leasing office stopped answering.

Q    So a woman named Theresa was the one for some amount of time that was answering the phone to get repairs done?

A    Uh-hmm. And also, on my case manager because, like I said, I was -- had a Rapid Re-housing voucher. So my case manager, when I was complaining about all of these, so was she. And she was sending emails and -- and calling and with no response.

Q    Is there any conditions that are in your unit that we haven't covered so far that you'd like to tell the Court about?

A    Mold, water, sink don't work. When they came



and repaired the sink in the bathroom, they didn't replace the stopper.

And almost every time they came to do the patchwork in my apartment, they've left some form of tools or trash behind. Even when the glass was broken, the window, and he replaced it with -- oh, yeah, that's what they didn't really fix the window in the living room. It's still broke. It's just plexiglass with duct tape around it.

So that's how they eventually fixed my living room window with duct tape and then left me to clean up the broken glass that day. And that was the second time that they replaced that window.

The first time they replaced it, I went to open it, and the glass fell out that they replaced. So that's why it was broke for three more months.

Q    So right now, that window has Plexiglas and duct tape in it?

A    Yeah.

Q    Instead of a pane of glass?

A    Yeah. And then at first, when he was going to replace it, he was going to replace it with the window out in the hallway. But it didn't -- it wasn't the same size. So --

MR. MEYER:  Ms. Shaw, I really appreciate you coming down and taking some time to testify.



153

Unless the Court has any other questions for you, I have no further questions.

THE COURT:  Thank you, ma'am.  I appreciate you coming in.

MS. SHAW:  Thank you.

MR. MEYER:  I'm just going walk the witness out just very quickly, Your Honor?

THE COURT:  Okay.  Yeah.

And actually, I'm going to pause this case for a minute to call another case that I have on the calendar. Should not take very long.  So you all can take a five to ten-minute break.

MS. BECKERMAN:  Your Honor, do you need to move off counsel table?

THE COURT:  I'm sorry?

MS. BECKERMAN:  Do you need us to move away from counsel?

THE COURT:  No, no.  It's online.  Sorry.

MS. BECKERMAN:  Okay.  Thank you.

MR. MEYER:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess from 2:45 p.m. until 2:53 p.m.)

THE COURT:  Okay.  We can return to our other matter if the Districts ready?

MR. MEYER:  Yes, Your Honor.



THE COURT:  Okay.

MR. MEYER:  So Your Honor, I think -- yes, we were prepared to make a closing argument.

I think, before we do, we wanted just to get clarity on where we landed on the judicial notice motion.

THE COURT:  Uh-hmm.

MR. MEYER:  I think one of the key factors here is, obviously, which defendants will be bound by this order and showing whether or not the District has shown that these defendants own and control these properties.

And the main piece of evidence that the District plan on using that were these judicial release records from the Recorder of Deeds, where defendants have signed these documents.

So I think my colleague, Kathryn, wanted to make some argument on the -- judicial notices, to make sure that we're all on the same page for what the Court is taking judicial notice of.

THE COURT:  Yes.  I mean, part of the issue is the Exhibits are 439 pages.  And so it's a little hard for me to determine, without looking at these closely, exactly what I'm taking judicial notice of.

And I understand -- and this is, again, the concern that you've alleged that ownership is a mystery. And what we have here are documents that seem to purport



155

ownership, and I'm just not sure if this is something that is appropriate for judicial notice, in that there are facts that one cannot reasonably contest when the District itself has contested these types of facts.

MS. BLANCO:  And I apologize.  We understand, Your Honor, and too, I think our goal with raising the question of judicial notice again was, first, just to clarify -- and we can walk through an example if it would be helpful to do so -- that what we would be asking the Court to acknowledge in the case of these facts is not the whether, in fact -- for example, on a certain document Ali Razjooyan or Houri Razjooyan signed that document and owned that property.

But that is something we will raise in argument. Rather, we will be asking the Court to take judicial notice of the fact that there is a document in the Recorder of Deeds with a signature that reads Ali Razjooyan or Houri Razjooyan and that there is a notary seal.

And if it would be helpful to either walk through an example of one of those bullet points in the order or go through the key facts more broadly, that is something that we are prepared to do as well.

THE COURT:  Well, I mean, again, I'm just trying to figure out where we're drawing the line here of what



156

I'm taking judicial notice of.

I can certainly take judicial notice that the Recorder of Deeds has in its records various deeds and other instruments relating to the property's security agreements.  I see deeds of trust and whatnot and the names that these are held in.

And then that's sort of where we are, and that's what the records say.  And there's no one here to say, no, that entity does not own that property; I own that property, for example, and here's how.

So it's kind of uncontested that this is what the public records say.  And so I can take judicial notice of that.

MS. BLANCO:  Yes, Your Honor.  The District would appreciate that.

And to clarify, we understand that the question of the weight given to that evidence is something that would come in argument.

But yes, just taking judicial notice the way that you had stated it, Your Honor, the District would be in favor of that.  Thank you.

THE COURT:  Okay.

**CLOSING**

MR. MEYER:  Great.

Well, that clarified, Your Honor, the way the



157

District sees it based on your questioning before we kind of got started here.  The high level concerns that you linked from the outlier, I see three high level issues for the Court to direct, for the District to kind of answer here in closing.

THE COURT:  Uh-hmm.

MR. MEYER:  And the first one -- I think the easiest is whether or not we've succeeded on putting forward violations of the CPPA and satisfy this three-pronged test.  That seems eminently clear based on the evidence.

We've had Keith Parsons testify and get into evidence Exhibits 1-A through 1-HHHHH, which were primarily these

of violations for the six subject properties. It's clear that there are numerous outstanding violations at the DOB level at all six of these properties.

In addition, Keith Parsons testified to the thousands of outstanding violations across the portfolio of Razjooyan properties.

Mr. Hamilton testified that he's been to the six subject properties in January and February and documented egregious illegal housing conditions at those six properties, and those, in addition to his testimony, Exhibits 2-A through 2-OOO to support that testimony and



158

support the existence of those illegal conditions.

And then we've had three tenants with really heart-wrenching stories about what it's like to live at Razjooyan-owned properties.

And based on this evidence, certainly, the District has shown that it's likely to secede on merits of violations of the CPPA, that there's a cognizable danger of recurrent violations, and that injunction is in the public interest.

I think the harder questions are the ones that you raised before the hearing. And I think, first, I'd like to discuss who this order should go to.

Typically, in one of these cases, we have an LLC and an individual member behind the LLC that are brought before the Court, and typically, defendants show up. But here, we have three individuals, who are not present, who chose not to come and defend themselves despite making statements to the press, despite filing motions in other cases, despite the fact that they're clearly aware of the litigation.

I think at this time, Your Honor, we have been prepared to put on further evidence relating to Eimon Razjooyan on a direct or a cross if he was here today.

Without that evidence, Your Honor, I don't think the District has met its burden of showing that Eimon



"Ray" Razjooyan should be subject to this Court's order. There is very limited evidence in the Recorder of Deeds documents that we've asked you to take judicial notice of his ownership of these six specific buildings.

There's evidence in the District's complaint about his involvement in the broader scheme. But the evidence that's before you today on the CPPA claims relating to these six properties, I don't think we've met our burden regarding regarding Eimon.

Regarding Ali and Houri, however, we have significant evidence of their involvement at these properties. And I think what I'd like to do, Your Honor, is just kind of go through property by property, why we believe they are in ownership and control of the illegal conditions and therefore be bound by the CPPA.

Regarding 1035 48th Street, there is Exhibit D, which was part of the motion for judicial notice, is a deed which transferred the property to --

THE COURT: B as in boy?

MR. MEYER: Sorry. I don't know why I said D. Exhibit 8, Your Honor.

THE COURT: 8. Okay.

MR. MEYER: Exhibit 8 is a deed which transfer the property to 1035 48th Street NE, DE LLC.

You have in evidence before you Exhibit 7, which



is the DLCP foreign registration of 1035 NE LLC, which listed the beneficial owner of the property as 1035 48th Street NE, DE-2 LLC.  And so here, we have an example of the Razjooyans filing a notice of foreign registration and then hiding their actual involvement.

But we can get behind that by going through the Recorder of Deeds and looking at the deeds of trust because a bank doesn't let you sign a deed of trust as an anonymous Delaware entity.

So here, Sam -- Ali "Sam" Razjooyan signed the deeds of trust for the loan used to purchase this property as well as three subsequent refinances.  And those are --

THE COURT:  And I just want to make sure I have a clear record.  What exhibit number are we referring to now?

MR. MEYER:  Okay.  So for the --

THE COURT:  Because I need to be able to tie everything together.

And so I'm going to be looking at Exhibit 8, which is the deed transfer; Exhibit 7, which shows the beneficial owner and then another LLC.  And then what exhibit number ties the beneficial owner to --

MR. MEYER:  So --

THE COURT:  -- one of the defendants?

MR. MEYER:  So yes, the Exhibits 9, 10, and 11



are deeds of trust. And we can pull those up. It might just take a minute to find the signature page should be very annoying. But Exhibits 9, 10, and 11 are deeds of trust, which were all signed by Sam Razjooyan. This is 8.

Okay. So here, Your Honor -- that's the deed. So go to 9, please.

All right. So here in Exhibit 9, we have a deed of trust. If you could scroll down to a specific page.

All right. So for example, Your Honor, here at Exhibit 9 on page 24, we have Ali Razjooyan signing as the sole member of 1035 48th Street NE, DE LLC.

And so typically, Your Honor, in a case where it's a single property and the defendant is here, we would have testimony about whether or not they still own that property. And here, we're asking the Court to make a very logical leap from this document, where he's the sole member to today, where you'll see, in the motion for judicial notice, we've asked the Court to take note that there's been no further transfer of this property, and we think that's very reasonable.

It's the same thing we do in all of these cases. We never have really evidence that that day of that exact moment that someone is really still owning the property. And so we think it's a very reasonable conclusion to draw from the most recent deeds of trust, where they've been



162

signed by the defendants, that they still remain in their ownership control. If they were here to rebut that fact, they could make that argument, but they've chosen not to.

THE COURT: Well, wouldn't there also be something in the Recorder of Deeds that would indicate that there was a transfer?

MR. MEYER: Exactly. And so that's the lack --

THE COURT: -- of evidence in the -- I'm just saying the lack of documents with the Recorder of Deeds also demonstrates the current status.

MR. MEYER: That's right, Your Honor.

THE COURT: Okay.

MR. MEYER: And so that's 1035 48th Street. And I'd like to move next to 2840. And so here, at 2840 Langston Place SE, defendants acquired this property through 2840 Langston Place SE LLC in February of 2022.

THE COURT: And what exhibits are we talking about?

MR. MEYER: That's Exhibit 13 is the deed, Your Honor.

THE COURT: Okay.

MR. MEYER: And then we have in evidence that DLCP registration where the ownership -- a beneficial owner is listed as, again, a Delaware entity, 2840 Langston Place SE DE LLC.



THE COURT:  And what exhibit is that?

MR. MEYER:  That's Exhibit 14, Your Honor.

THE COURT:  14?

MR. MEYER:  So again, the DLCP exhibit is showing that the defendants are hiding their ownership of these properties through foreign LLCs.  But when we go to the Recorder of Deeds --

THE COURT:  Can I just ask a quick question?

MR. MEYER:  Oh, sure.

THE COURT:  Since you've probably seen, in your practice at OAG, in this type of area, other deed transfers, have you ever seen an instance where the beneficial owner was another LLC that had a similar -- I'm just saying I don't believe I have seen this before, and I'm curious as to whether this is a thing more commonly.

MR. MEYER:  Are you referring -- sorry, Your Honor.  Can you restate your question?

THE COURT:  Well, you're saying that where there's an LLC that's set up, but the deed of trust that is -- the financial aspect is in someone else's name other than the beneficial owner, that just there's a disconnect there in that someone else is taking on the financial responsibility without having the benefit of the ownership, correct?

MR. MEYER:  Right.



164

THE COURT: And I'm just wondering if that's something that's regularly done. It doesn't seem like it would be. And I'm just trying to figure out -- because you're arguing to me that this is they're showing -- they're hiding their ownership interest. And I'm trying to think if there's some other reason why one might do that, since I'm just -- I'm looking at all of this objectively and trying to figure out what's going on here.

And quite frankly, I can't think of a reason. And I think part of it is just because it would be very unusual to take on that debt without having -- it's like you're taking on all the negative without having the positive, unless there's really no positive there or there's something else going on.

MR. MEYER: Yeah. Your Honor, I think in of all the other cases -- these housing cases, that at least I've seen, you have an LLC and then there's a person behind it.

THE COURT: Um-hum.

MR. MEYER: And they're taking advantage of the laws where you have corporate protection. I think here this is the only case that we've had where it's LLC inside of an LLC, where you really have to do some digging to figure out who owns these things. And yeah, I think the benefits for whoever is behind these things get very confusing.



165

I mean, yeah, we saw that in the Betting (phonetic) case, right, where there's these individuals that come forward and you're wondering why did they do this. And it doesn't really make sense, and we're all kind of scratching our heads.

But I think that's what the District's complaint seeks to -- endeavors to answer, because when we are left -- law-abiding citizens are left scratching their heads, the answer the District has put forward in its complaint is fraud.

THE COURT: Okay. And so then --

MR. MEYER: That was 14, Your Honor, was the DLCP.

THE COURT: Right.

MR. MEYER: And I think we're moving then to the Recorder of Deeds documents here now. We're going to pull up -- I believe it should be 15. And we'll look at the signature page of District's Exhibit 15.

So here, on page 10 of District's Exhibit 15, we see two signatures. One is Houri Razjooyan, as managing member. And the second is Oscar Padilla Portillo, member.

So again, here we have the borrower that they're signing on behalf of is 2840 Langston Place SE LLC. And Houri Razjooyan, the defendant to this motion, is the managing member of the entity. So again, we are asking



the Court to make, again, that logical conclusion, from Houri Razjooyan signing as managing member of the LLC and the lack of subsequent transfer of the property from 2840 Langston Place SE, to bring her in the case.

And I think for the interest of full disclosure, so we have a full record here, I'd like to go to deed of trust 18, which is the same property, to look at the signature page on that. So this is a subsequent deed of trust. As I'm sure Your Honor has read the complaint, there's allegations that multiple refinances continuing to refinance these properties were quite common. This is a subsequent refinance. So here, subsequently to the Exhibit 15 that we just looked at, and Exhibit 18, we have Ali Razjooyan signing as the sole member of 2840 Langston.

THE COURT: So how can he be the sole member if two other individuals previously signed as managing members, or did -- can I assume that both of these documents, Exhibits 15 and 18, were signed after Exhibit 14 was created, the formation document for the LLC?

MR. MEYER: Yes, they were all signed afterwards. Yes, Your Honor.

THE COURT: Okay.

MR. MEYER: And I think that the reason I bring up the subsequent one, because I don't want you to rule and bring in Houri as a defendant, based on Exhibit 15,



167

where she signs as a managing member, if subsequently Ali Razjooyan signed as sole member. So I want to make the record absolutely clear that, subsequent to Houri signing as managing member, Ali is now signing some time later. I'm sorry, we haven't put the dates in the record, but it is subsequent to. So behind the scenes it appears, based on these documents, that Ali then becomes the sole member and Houri Razjooyan is no longer a member of 2840.

Okay. Let's move to 2844, Your Honor. So the defendants acquired the property at 2844 Place SE through 2844 Place SE LLC in February 2022. That's Exhibit 20 is the deed.

THE COURT: 20?

MR. MEYER: Um-hum. Exhibit 21 is the DLCP registration for that entity, 2844 Place SE LLC, and it lists its beneficial owner as 2844 Langston Place DE LLC. Again, hiding ownership. So the deeds of trust which were subsequently used to finance the property -- let's look at Exhibit 22, please. Here, at page 10 of Exhibit 22, we again have the signatures of Houri Razjooyan, as managing member, with Oscar Padilla Portillo as member. This is of 2844 Langston Place SE LLC.

So then let's look at Exhibit 23 for a fulsome record. Subsequently, there is another deed of trust for a refinance of 2844 Langston Place. And here, on behalf



168

of 2844 Langston Place SE LLC, we have Ali Razjooyan signing as president.  And then, in the Recorder of Deeds, there's no subsequent transfers.  And I believe that we can make an inference based on the lack of subsequent deeds or deeds of trust that would indicate any transfer of ownership.

Moving on to 2850, defendants acquired the property through 2850 Langston Place SE LLC in February 2022.  That's Exhibit 25, Your Honor.  That's the deed. For this property, the DLCP registration for 2850 Langston Place SE LLC, the DLCP registration lists itself as the beneficial owner.  So 2850 Langston Place SE LLC lists 2850 Langston Place SE LLC as a beneficial owner.

THE COURT:  And what's that exhibit number?

MR. MEYER:  That is Exhibit 26.

So turning to Exhibit 27, which would be the deed of trust, here, at Exhibit 27, on page 10, we have Houri Razjooyan signing as managing member of 2850 Langston Place SE LLC, Oscar Padilla Portillo also signing as a member of that LLC.

And then finally, subsequently, at Exhibit 28, Exhibit 28, page 30, signing on behalf of 2850 Langston Place SE LLC, Ali Razjooyan, president.

Turning to 2908 Langston Place SE, defendants acquired this property through 2908 Langston Place SE LLC



169

in February 2022.  That's Exhibit 30, Your Honor.  On its DLCP registration, again, the ownership entity is listing itself as the beneficial owner.  So 2908 Langston Place SE LLC is listing itself somehow as the beneficial owner.  That's Exhibit 31, Your Honor.

Okay.  So here, at Exhibit 32 for the deed, we have Houri Razjooyan signing as the managing member and Oscar Padilla Portillo signing as the member.

Subsequently, Exhibit 33, on page 30 of Exhibit 33, Ali Razjooyan is now signing as the president of 2908 Langston Place SE LLC.  Subsequently, the Recorder of Deeds shows that there's been no further deeds of trust or deeds which would indicate a transfer of ownership.

Finally, 3615 B Street SE, defendants acquired this property through 3615 B Street SE DE LLC, in November of 2016.  That's Exhibit 35.  In the DLCP registration, the ownership entity listed, actually, Houri Razjooyan as the beneficial owner.  That's Exhibit 36.

Turning to the deed of trust, Exhibit 37, here, page 8 of Exhibit 37 shows Houri Razjooyan as a member of 3615 B Street SE LLC.

So then we'll look at Exhibit 40, which is the final refinancing that was done at the property.  Here, in Exhibit 40, on page 28, Houri Razjooyan signing as manager of 3615 B Street SE DE LLC.



170

So as we were discussing before, Your Honor, again, Eimon does not appear on any of those recorder of deed documents.  However, Ali Razjooyan and Houri Razjooyan do.  And we believe that, based on those documents, which are in the Recorder of Deeds, there are strong evidence that these individuals own and control these properties.

And really, you've seen testimony today also that gives, while not definitive answers, really colors these Recorder of Deeds documents, which I think are dispositive.  The tenants testified that Theresa Fowler is this property manager.  Ms. Fowler is a common element in the Razjooyan cases that you've had in front of you.

We've had Mr. Parsons testify that there are a number of Razjooyan contacts.  The Razjooyan emails come up over and over again in the NOIs that are in evidence in this case.  DOB is sending these documents to the Razjooyans to get them abated, throughout, over the course of years.  And the properties bear all of the hallmarks of a Razjooyan-owned property.  They've been not maintained, tenants have been abandoned to their own devices, and are in general disorder as far as property conditions.

So we believe the Court is on solid ground in ordering Mr. Razjooyan and Houri Razjooyan as violating the CPPA for having the authority to control these LLCs



and are therefore in control of these properties where the illegal conditions are occurring.

I think the other big bucket, Your Honor, is the scope of this order. You rightfully pointed out that it may be awkward if you are ordering -- the D.C. government is ordering itself not to do something or asking you to order the D.C. government not to issue vouchers to Mr. Razjooyan.

And I think you rightfully pointed out, Your Honor, that this goes beyond the scope of your typical housing case where we're asking you just to order the defendants to fix up the property. And I don't think we've hidden the ball that we're asking this Court to go out further than other judges have done on the CPPA in ordering Mr. Ali Razjooyan and Houri Razjooyan to be prohibited from selling these properties without prior court approval. That's something we've not gotten in a preliminary injunction order before.

But we think that the CPPA is a broad remedial statute, and it's the tool that can be used to finally bring this property into compliance with the housing code and bring the Razjooyans into compliance with District law. These tenants have been in these awful conditions for years. And Mr. Razjooyan -- Ali Razjooyan and Houri Razjooyan cannot be allowed to continue to put these



tenants in these horrible conditions.

A stronger order, an order that tries to do something that we have not done before, is exactly what we need to do here.  The attempts, over the last several years to simply order him to make corrective actions, have not gotten the results that these tenants are entitled to, that the District has sought, that this Court has sought to bring about.

And so I think the Court is on solid ground under the CPPA because it is a broad remedial statute that allows this Court to craft an order that actually addresses these underlying illegal conditions.

THE COURT:  No, I agree that the CPPA does have room for movement.  And I guess, sort of, as I sit here looking at all of this and listening to all of this, and sort of contemplating the breadth of what's been happening here over the past couple of years, I mean, one question that I have, and I think many people do, is how -- how did this happen?  How is someone constantly getting financing to continue to buy and refinance properties?

It's the experience that this Court has, in seeing foreclosure cases and seeing many cases involving real property, over the last seven years and prior to that, in my time as a magistrate judge, it's not easy to get a mortgage for many people.  And there are



regulations, there are background checks, there are -- there should be a lot more safeguards.

And it's sort of frustrating, I guess, to sort of see what's happened, how money has been used. Now there are many banks before the Court seeking their own receivers concerned about the investments made. And eventually this all gets passed on to consumers.

And again, I do believe that there is room for movement under the CPPA. I would hope that this is sort of a sign that perhaps, beyond this case, more needs to be done because, at the end of the day, the people that are suffering are not the banks. They're not the individuals who are involved as defendants here. There are the people that have appeared before the Court in this case, and in so many other cases I've seen over the past years, living in deplorable conditions that are, quite frankly, just not fit for humans to live in.

And so I am going to look very closely at all of this. I am going to try to move as quickly as I can in drafting a decision. And I may issue an order. If I have further questions, I may ask for additional briefing on certain issues. But I think I need to think before I know what those questions are. So there's the stuff that you know, the stuff you know you don't know, and then there's this weird place of the stuff you don't know you don't



174

know.  And I suspect, because some of this is a bit unchartered, I might fall within that latter category.

But I appreciate the Government's diligence in putting all of this together.  I appreciate that there's been a lot of investigation, and I appreciate that there is an effort to try to resolve what are, quite frankly, very serious issues.  So thank you.

MR. MEYER:  Nothing further from District, Your Honor.  Thank you so much.

MS. PULTRO:  Thank you very much, Your Honor.

(Thereupon, the proceedings were concluded.)

* * * * *



175

CERTIFICATE OF TRANSCRIBER

I, Karissa Metcalf, transcriber, do hereby certify that I have transcribed the proceedings had and the testimony adduced in the case of DISTRICT OF COLUMBIA v. ALI RAZJOOYAN, ET AL., Docket Number: 2026 CAB 000985, in said Court, on the 25th day of March, 2026.

I further certify that the foregoing 175 pages constitute the official transcript of said proceedings as transcribed from audio recording to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 4 day of May, 2026.

_____

TRANSCRIBER



176