**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **DISTRICT OF COLUMBIA**, |
| Plaintiff, |
| v. |
| **ALI RAZJOOYAN**, *et al.*, |
| Defendants. |

Case No. 26-cv-1210 (CRC)

## <u>MEMORANDUM OPINION</u>

This case concerns an alleged large-scale illegal enterprise that has ensnared dozens of multi-family residential properties and victimized scores of tenants in the District of Columbia. Specifically, Plaintiff District of Columbia (the "District") claims that brothers Ali ("Sam") and Eimon ("Ray") Razjooyan and their mother Houri Razjooyan (collectively, "Defendants") have operated a "Ponzi-like scheme" in which they purchased dilapidated residential properties with promises to renovate them, obtained millions of dollars in housing subsidies, generated fake rental income statements to acquire new properties, and steadily grew their real estate empire while their residents endured deplorable living conditions. The District contends that through their years-long scheme, Defendants violated the civil provisions of the federal Racketeer Influenced and Corrupt Organization ("RICO") Act, the D.C. Consumer Protection Procedures Act ("DCCPPA"), and the D.C. False Claims Act ("DCFCA").

The allegations in the 87-page complaint implicate a broad swath of properties, shell companies, and financial transactions. Presently before the Court, however, is the District's motion for a preliminary injunction on more narrow grounds. According to the District, five properties currently controlled by Sam and Houri Razjooyan have racked up almost 200 unabated violations of the D.C. Housing and Property Maintenance Code, which it claims are *per*

*se* violations of the DCCPPA.  In light of these violations—which have caused animal infestations, routine flooding, and the loss of basic utilities—the District asks the Court to order both remedial and prophylactic relief.  First, the District seeks an order requiring Defendants to abate the illegal and unsafe housing conditions identified in the notices of infraction issued by the D.C. Department of Buildings.  Second, the District asks the Court to preemptively bar Defendants from executing any new leases or engaging in certain real estate transactions without prior approval while this litigation proceeds.

For the reasons described below, the Court concludes that the District is entitled to remedial relief, but it has not demonstrated that prophylactic relief is warranted at this time.  Accordingly, the Court will grant the District's motion in part and deny it in part.

## I.    Background

According to the District, Defendants are operating a "criminal enterprise" that has controlled numerous multi-family residential properties in the District of Columbia since 2015.  See Compl. ¶¶ 1, 11.  Sam Razjooyan is the purported "head" of the illegal enterprise, id. ¶ 20, Ray Razjooyan is Sam's brother and "lieutenant," id. ¶ 21, and their mother Houri Razjooyan "participates in and directs aspects of" the enterprise, id. ¶ 22.  Together, Defendants allegedly used the properties to perpetrate a "Ponzi-like scheme."  Id. ¶ 2.

The alleged scheme followed "a broadly consistent pattern."  Id. ¶ 68.  First, Defendants found a "distressed" multi-family residential property with rent-controlled apartments.  See id. ¶ 69.  Second, Defendants sought loans from various lenders, promising to use the loan proceeds to redevelop the property and secure leases from tenants with D.C.-funded housing subsidies.  See id.  Because this plan would (in theory) yield a reliable stream of recurring revenue, the lenders provided loans exceeding the purchase price of the property.  See id.  Third, Defendants

used most of the loan proceeds to enrich themselves and fund subsequent property acquisitions. See id. ¶ 70. Only a small portion of the loans were used to "improve" the property, but even then, those funds were used for "illegal, unsafe, and unpermitted construction" projects that concealed deeper structural problems. Id. Fourth, Defendants falsely reported to lenders that the capital improvements were complete, the property was fully occupied, and the investment was generating substantial income. See id. ¶ 7. Meanwhile, the properties collectively amassed over 4,000 housing code violations and millions of dollars in unpaid fines. See id. ¶ 12. Fifth, Defendants repeatedly refinanced the properties. See id. ¶ 71. They gave lenders fake documents showing inflated numbers of tenants and housing subsidy payments, which artificially increased the value of the properties. See id. This refinancing allowed Defendants to "acquire more properties and stave off threats of foreclosure for existing properties." Id.

The District alleges that through this scheme, Defendants enriched themselves by (1) hiring companies under their control to perform "dubious" work on the properties, id. ¶ 7; (2) skimming money from various bank accounts used in the scheme, id. ¶ 72; and (3) collecting subsidy payments from D.C.-funded or D.C.-administered housing programs, see id. ¶¶ 73–74. The District estimates that Defendants have obtained more than $16 million from these programs. Id. ¶ 9.

At this stage, the Court need not assess the plausibility of these allegations or definitively rule on the merits of the District's claims. Instead, the pending motion for a preliminary injunction turns on specific D.C. Housing and Property Maintenance Code violations at five properties purportedly under Defendants' control.[1] In support of its motion, the District has

---

[1] The District's motion for a preliminary injunction cited D.C. Housing and Property Maintenance Code violations at six properties. See Pl.'s Mot. for Prelim. Inj. at 3. The District later withdrew its request for relief regarding the property at 2844 Langston Place SE, as that

submitted more than 200 exhibits and presented testimony from six witnesses at a hearing in D.C. Superior Court.[2] See Pl.'s Mot. for Prelim. Inj. ("Pl.'s Mot."), Ex. List (ECF No. 9-2) at 1–2. The following facts are derived solely from the exhibits and hearing testimony.

    A.   Conditions at Properties Under Defendants' Control

As noted above, Defendants have owned or controlled more than 40 multi-family residential properties in the District of Columbia. See Pl.'s Mot., Ex. 1, Declaration of Keith Parsons ("Parsons Decl.") ¶ 9. These properties have been cited for over 4,300 violations of the D.C. Housing and Property Maintenance Code; only about 20 percent of those violations have been abated. Id. ¶¶ 9–10; Mot. Hr'g Tr. (ECF No. 9-4) 25:19–21, 26:5. For the five properties currently under Defendants' control, the D.C. Department of Buildings has identified 198 violations of the D.C. Housing and Property Maintenance Code that have not been abated. See Parsons Decl. ¶¶ 14–16, 18–20. The Court addresses each property in turn.

    *1.  1035 48th Street NE*

1035 48th Street NE ("1035 48th Street") is a twelve-unit multi-family residential property. See Pl.'s Mot. at 7. The property was acquired by 1035 48th St NE DE LLC (the "1035 48th Street LLC") in December 2022. See id., Ex. 8 at 2; id., Ex. 9 at 11. According to a foreign registration form on file with the D.C. Department of Licensing and Consumer Protection, the 1035 48th Street LLC engaged in "real estate and rental and leasing management of 1035 48th St NE," and its "beneficial owner" was "1035 48th St NE DE II LLC." Id., Ex. 7 at 1; see Mot. Hr'g Tr. 85:2–23 (explaining that a foreign registration statement is filed by a foreign

---

property is now "under the control of a DC Superior Court-appointed receiver." Pl.'s Notice Withdrawing Req. for Relief (ECF No. 16) at 1.

   [2] Because of the "voluminous nature" of these exhibits, the District submitted them to the Court via a public file-sharing website. See Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 4 n.3.

entity that "want[s] to do business in the District").  Evidence before the Court indicates that the 1035 48th Street LLC is actually controlled by Sam Razjooyan.  See Pl.'s Mot., Ex. 9 at 24 (December 2022 deed of trust signed by Sam Razjooyan as the "sole member" of the 1035 48th Street LLC); id., Ex. 10 at 26–27 (July 2023 deed of trust signed by Sam Razjooyan as a "member" of the 1035 48th Street LLC); id., Ex. 11 at 33 (same for October 2024 deed of trust).  Indeed, Sam Razjooyan and his wife are signatories for a TD Bank account associated with the 1035 48th Street LLC.  See id., Ex. 12 at 1.

The D.C. Department of Buildings has cited 39 unabated violations of the D.C. Housing and Property Maintenance Code at 1035 48th Street.  See Parsons Decl. ¶ 15; Mot. Hr'g Tr. 44:9. The violations include excessive trash buildup on the property, see Pl.'s Mot., Ex. 1-E; id., Ex. 1-Q; id., Ex. 1-R, a collapsed ceiling in a bedroom area, see id., Ex. 1-F, exposed wires on the side of the building, see id., Ex. 1-J, and a lack of hot water, see id., Ex. 1-P.  An investigator from the D.C. Office of the Attorney General ("OAG") visited the property in January 2026.  See Pl.'s Mot., Ex. 2, Declaration of Cullen Hamilton ("Hamilton Decl.") ¶ 7.  The OAG inspector observed trash accumulation throughout the property, entered the building without a key, and noticed that a hallway window frame was missing.  See id.; Mot. Hr'g Tr. 53:22–23, 54:4–13, 55:15–17.  When the inspector returned to the property the following month, he discovered damage to the building walls, doors that did not close or lock, roaches, dead mice, and extensive water damage.  See Hamilton Decl. ¶¶ 8–10; Mot. Hr'g Tr. 56:22–23, 57:7–19, 58:1–11, 59:11–20.

Two residents of 1035 48th Street have described the deplorable living conditions at the property.  Tearra Dixon moved into an apartment with her four small children in June 2023.  See Pl.'s Mot., Ex. 3, Affidavit of Tearra Dixon ("Dixon Aff.") ¶¶ 2, 5.  She confirmed that the front

door of her building is broken, so "squatters and unwanted people" enter the common areas to "do[] drugs." Id. ¶ 6. Ms. Dixon also reported that her apartment did not have heat during the winter of 2024 and for three months in 2025. See id. ¶ 5. In October 2025—while her apartment lacked heat—Ms. Dixon's unit was infested with rodents and cockroaches. Id. ¶ 7. She acknowledged that the building's management would occasionally fix issues reported to the D.C. Department of Buildings, but the issues would later return and remain unresolved for months. Id. ¶ 9.

Queshonna Shaw moved to an apartment at 1035 48th Street in August 2023. See Pl.'s Mot., Ex. 43, Declaration of Queshonna Shaw ("Shaw Decl.") ¶ 2; Mot. Hr'g Tr. 139:14. Within a month after she moved in, she discovered leaks in her bathroom and bedroom; the leaks were not repaired for six months. Shaw Decl. ¶ 2. As of January 2026, she could still "see and hear the water flowing into the lighting fixtures, light switch panel, vent and door frame of the bathroom," and she found "mushroom[s] growing in the area where the water flows from . . . the ceiling in the bathroom." Id.; see Mot. Hr'g Tr. 144:4–7, 145:10–20. Like Ms. Dixon, Ms. Shaw also went several months without heat in her apartment. Shaw Decl. ¶ 6. A broken window in her living room allowed mice to come in and out of her apartment "like they owned the place." Mot. Hr'g Tr. 147:24–148:2. Her front door is broken, so she puts a bar behind it to prevent intruders from stealing her belongings. Mot. Hr'g Tr. 149:25–150:10. Because of the problems with her apartment, Ms. Shaw has moved between 1035 48th Street and a local shelter. Mot. Hr'g Tr. 147:12. This instability has harmed her son's health and caused behavioral problems at his school. Mot. Hr'g Tr. 147:14–21.

### 2. *2840 Langston Place SE*

2840 Langston Place SE ("2840 Langston Place") is a fourteen-unit multi-family residential property. See Pl.'s Mot. at 10. The property was purchased by 2840 Langston Pl SE LLC (the "2840 Langston Place LLC") in February 2022. See id., Ex. 13. The 2840 Langston Place LLC's foreign registration form indicated that it engaged in "ownership and management of 2840 Langston Pl SE," and listed its beneficial owner as "2840 Langston Pl DE LLC." Id., Ex. 14; Mot. Hr'g Tr. 89:17–18. But like 1035 48th Street, Defendants were behind the scenes: Between February 2022 and July 2023, Sam and Houri Razjooyan signed four deeds of trust on behalf of the 2840 Langston Place LLC. See Pl.'s Mot., Ex. 15 at 10 (signed by Houri Razjooyan as "managing member" of the LLC); id., Ex. 16 at 25 (signed by Sam Razjooyan as "sole member" of the LLC); id., Ex. 17 at 30 (signed by Sam Razjooyan as "president" of the LLC); id., Ex. 18 at 25 (signed by Sam Razjooyan as "sole member" of the LLC).[3] Sam Razjooyan is also the signatory on a Citizens Bank account associated with the 2840 Langston Place LLC. See id., Ex. 19 at 1 (listing Sam Razjooyan as the "individual owner" of the 2840 Langston Place LLC).

There are 28 unabated violations of the D.C. Housing and Property Maintenance Code associated with 2840 Langston Place. See Parsons Decl. ¶ 16. Among other deficiencies, these violations relate to defective components of the building's fire alarm system, see Pl.'s Mot., Ex. 1-V; id., Ex. 1-W, broken windows, see id., Ex. Y, overflowing dumpsters, see id., Ex. 1-PP, and an "very strong odor of what smells like raw sewage," id., Ex. 1-QQ. The D.C. Department of Buildings now has a "danger placard[]" placed at the property. Mot. Hr'g Tr. 45:15–16. When

---

[3] Based on these deeds of trust, the District contends that Sam Razjooyan is the "sole member" of the 2840 Langston Place LLC, and Houri Razjooyan "is no longer a member." Mot. Hr'g Tr. 167:23–168:8.

an OAG investigator visited the property in January 2026, he entered the building without a key, observed drug paraphernalia on the stairwell, and heard running water in the basement. Hamilton Decl. ¶ 11; Mot. Hr'g Tr. 63:20–23, 64:13–14, 65:11–13.

Zachary Grove lives at the property with his wife and son. See Pl.'s Mot., Ex. 4, Declaration of Zachary Grove ("Grove Decl.") ¶ 2. His apartment has experienced significant water damage, and he fears that his bathroom ceiling will collapse because of the leaks. Id. ¶¶ 4–6. The apartment also lacked heating and air conditioning for several months, including a nine-month period without heat in 2023. Id. ¶¶ 7–8. His unit has gotten so cold that his family was forced to huddle in a single room next to a heater and radiator. Id. ¶ 8. The unit has lacked hot water for two months, and Mr. Grove's family boils hot water to bathe. Id. ¶ 11. He fears that cockroaches will fall on him, and mice have chewed through the walls of the apartment. Id. ¶¶ 9–10. Outside the unit, "[s]quatters and drug addicts" have "frequent[ed] the building" for over a year. Id. ¶ 15.

### 3. 2850 Langston Place SE

2850 Langston Place SE ("2850 Langston Place") is a fourteen-unit multi-family residential property. Pl.'s Mot. at 14. The property was acquired by 2850 Langston Pl SE LLC (the "2850 Langston Place LLC") in February 2022. Id., Ex. 25 at 1. The 2850 Langston Place LLC's foreign registration form states that its purpose is "ownership and management of 2850 Langston Pl SE," and it lists *itself* as its beneficial owner. Id., Ex. 26 at 1; Mot. Hr'g Tr. 89:21–22. But once again, both Sam and Houri Razjooyan have signed deeds of trust on behalf of the 2850 Langston Place LLC. See Pl.'s Mot., Ex. 27 at 10 (February 2022 commercial deed of trust signed by Houri Razjooyan as "managing member" of the LLC); id., Ex. 28 at 30 (November 2022 deed of trust signed by Sam Razjooyan as "president" of the LLC). Sam Razjooyan's

8

signature also appears on a TD Bank business account application for the 2850 Langston Place LLC.  See id., Ex. 29 at 1.

The D.C. Department of Buildings has cited 38 unabated violations of the D.C. Housing and Property Maintenance Code at 2850 Langston Place.  See Parsons Decl. ¶ 18; Mot. Hr'g Tr. 48:10–11.  The violations include trash accumulation in the common areas, see Pl.'s Mot., Ex. 1-QQQ, exposed wires, see id., Ex. 1-TTT, broken doors, see Pl.'s Mot, Ex. 1-FFFF, and water damage, see id.  An OAG investigator visited the property in January 2026.  See Hamilton Decl. ¶ 15.  The inspector observed missing windows and trash accumulation outside the building.  Id.; Mot. Hr'g Tr. 70:9–23.  He did not attempt to enter the building "due to safety precautions." Hamilton Decl. ¶ 15; see Mot. Hr'g Tr. 71:12–16 (explaining that the building's front door is secluded from the side street and the inspector "didn't know what or who might be inside"). When the inspector returned to the property the following month, accumulated snow had not been shoveled and "there was not a suitable pathway" to enter the building.  Hamilton Decl. ¶ 16; see Mot. Hr'g Tr. 71:21–23 (noting that there was "sheet of ice that hadn't been plowed").

### 4.   2908 Langston Place SE

2908 Langston Place SE ("2908 Langston Place") is a multi-family residential property. See Hamilton Decl. ¶ 17.  The property was purchased by 2908 Langston Pl SE LLC (the "2908 Langston Place LLC") in February 2022.  See Pl.'s Mot., Ex. 30 at 1.  Like the 2850 Langston Place LLC, the 2908 Langston Place LLC's foreign registration form lists itself as its own beneficial owner.  See id., Ex. 31 at 1; Mot. Hr'g Tr. 89:24–25.  In reality, both Sam and Houri Razjooyan exercised control over the 2908 Langston Place LLC.  See, e.g., Pl.'s Mot., Ex. 32 at 10 (February 2022 commercial deed of trust signed by Houri Razjooyan as "managing member" of the LLC); id., Ex. 33 at 30 (November 2022 deed of trust signed by Sam Razjooyan as

9

"president" of the LLC). Sam and Ray Razjooyan are also signatures on the TD Bank account associated with the 2908 Langston Place LLC. See id., Ex. 34 at 1.

The D.C. Department of Buildings has identified a whopping 75 unabated violations of the D.C. Housing and Property Maintenance Code at 2908 Langston Place. See Parsons Decl. ¶ 19; Mot. Hr'g Tr. 38:7–10, 40:14–41:12. These violations include ceiling leaks, see Pl.'s Mot., Ex. 1-NNNN, defective fire alarms, see id., Ex. 1-PPPP, torn up flooring, see id., Ex. 1-CCCCC, doors with holes and missing doorknobs, see id., Ex. 1-EEEEE, and standing water in a living room and hallway, see id. During an inspection of the property in February 2026, the D.C. Department of Buildings discovered a plumbing leak that caused two feet of standing water in the basement. See Parsons Decl. ¶ 14; Mot. Hr'g Tr. 35:19–36:4; see also Hamilton Decl. ¶ 17 (noting that running water was coming from an unsecured basement room in January 2026). An OAG investigator also observed icicles forming on the overhead pipes in the basement, see Hamilton Decl. ¶ 18, broken hallway windows, see id., and multiple units with missing doors, see Mot. Hr'g Tr. 76:7–21.

### 5. 3615 B Street SE

3615 B Street NE ("3615 B Street") is the final multi-family residential property under Defendants' control. See Hamilton Decl. ¶ 19. The property was purchased by 3615 B St SE LLC (the "3615 B Street LLC") in November 2016. See Pl.'s Mot., Ex. 35. The 3615 B Street LLC's foreign registration form lists Houri Razjooyan as its beneficial owner. See id., Ex. 36 at 1; Mot. Hr'g Tr. 89:25–90:1. She also signed multiple deeds of trust on behalf of the 3615 B Street LLC. See Pl.'s Mot., Ex. 37 at 8 (November 2016 deed of trust signed by Houri Razjooyan as a "member" of the LLC); id., Ex. 38 at 15 (same); id., Ex. 39 at 11 (same for November 2020 deed of trust); id., Ex. 40 at 28 (June 2021 deed of trust signed by Houri

10

Razjooyan as "manager" of the LLC).  Sam and Houri Razjooyan are also signatories for the 3615 B Street LLC's Citizens Bank account.  See id., Ex. 41 at 1 (listing Sam and Houri Razjooyan as "individual owners" of the LLC).

The D.C. Department of Buildings has identified 18 unabated violations of the D.C. Housing and Property Maintenance Code at 3615 B Street.  See Parsons Decl. ¶ 20; Mot. Hr'g Tr. 41:25–42:1.  The violations cited evidence of rodent infestation, see Pl.'s Mot., Ex. 1-LLLLL, damaged door frames, see id., Ex. 1-MMMMM, water-damaged ceilings, see id., Ex. 1-OOOOO, and debris scattered around the property, see id., Ex. 1-RRRRR.  An OAG investigator confirmed that as of February 2026, there was trash accumulating outside the building, a missing fire extinguisher, and water damage in the basement.  See Hamilton Decl. ¶¶ 19–20.

Three residents of 3615 B Street have described the horrendous living conditions at the property.  Victoria Bruce moved into an apartment in July 2025, paying a subsidized rent of almost $1,500 per month.  See Pl.'s Mot., Ex. 42, Declaration of Victoria Bruce ("Bruce Decl.") ¶¶ 2–3.  Within a month after she moved in, she discovered mold in her bathtub; when she reported it to Sam Razjooyan, the mold was only "caulked over" and has since returned.  Id. ¶ 5.  Ms. Bruce has not had heat in her apartment since October 2025, so she relies on two electric heaters and her oven for warmth.  Id. ¶ 6.  She has also experienced rodent and roach infestations, hot water outages, and electrical sockets that spark when used.  Id. ¶¶ 7–9.  The overflowing dumpster attracts rats and racoons, causing Ms. Bruce to honk her car horn and bang on the front door to scare them away.  Id. ¶ 10.

Musa Abdul Kaliq lives in a basement apartment at the property, paying $800 per month in rent.  See Mot. Hr'g Tr. 91:19–22.  He described sewage dripping from his kitchen ceiling, a "major" leak in his windows, corroded pipes, and a bedroom ceiling that is "rotting out."  Mot.

11

Hr'g Tr. 92:24–93:2, 98:13–15, 101:20–21.  Mr. Kaliq has also experienced an unfathomable rat infestation.  He testified that rodents—which are "as big as puppies"—have run "over top of [his] head" and are "attacking" him.  Mot. Hr'g Tr. 92:20–21, 93:10; see also Mot. Hr'g Tr. 96:2–3 (describing rat feces "as big as a puppy dog's" on the drywall).  Mr. Kaliq further explained that Sam Razjooyan has made no effort to fix the leaks or the infestation.  See Mot. Hr'g Tr. 98:25–99:5.

Nihesha Browning moved to 3615 B Street with her two children in August 2025, paying almost $1,900 per month in rent.  See Pl.'s Mot., Ex. 5, Affidavit of Nihesha Browning ("Browning Aff.") ¶¶ 2–3; Mot. Hr'g Tr. 112:3–8.  Like Ms. Bruce, Ms. Browning has experienced both leaks and mold in her apartment.  See Browning Aff. ¶¶ 4, 6; Mot. Hr'g 113:12–15, 115:10–19.  She once discovered a "flood of water" pouring down from the ceiling of a neighboring apartment.  See Mot. Hr'g Tr. 127:6–12.  Ms. Browning's air conditioner unit is broken, and the apartment does not stay warm during the winter.  Browning Aff. ¶ 7.  She further noted that she occasionally loses access to hot water, has electrical outlets that do not work, and observes unknown individuals enter the building.  See id. ¶¶ 10–12; Mot. Hr'g Tr. 123:15–21 (noting that an unknown person had defecated in the basement).  Ms. Browning confirmed Mr. Kaliq's testimony that the building suffers from a "severe" infestation of rats, possums, and raccoons.  See Browning Aff. ¶ 9; Mot. Hr'g Tr. 118:10–12.  She caught six mice during her first week in the apartment, and she got a cat to deter the other mice "running through the walls." Mot. Hr'g Tr. 117:4–23.  Ms. Browning also discovered four rats in her car after she parked it near the dumpster on the property.  See Mot. Hr'g Tr. 120:13–18.  Because of the problems with her apartment, her son's asthma has flared up, requiring multiple visits to the hospital.  Mot. Hr'g

Tr. 133:15–25.  Her son's pulmonary doctor said that the apartment "is not safe for him."  Mot. Hr'g Tr. 133:23–24.

    B.  Procedural History

The District filed a detailed complaint against Defendants in the Superior Court of the District of Columbia, bringing claims under the RICO Act, the DCCPPA, and the DCFCA.  See generally Compl. ¶¶ 306–69.  On the same day, the District moved for a preliminary injunction based solely on its DCCPPA claims.  See Pl.'s Mot. at 22.  When the District's initial attempts to serve the complaint and motion on Defendants failed, it moved for alternative service.  See Pl.'s Mot. for Alt. Method of Service (ECF No. 1-7) at 2–7.  The D.C. Superior Court granted that motion, see Order (ECF No. 1-12), and the District served Defendants on March 20, 2026, see Affidavit of Willie Haynes (ECF No. 1–14) ¶¶ 3–4.  Nevertheless, Defendants failed to appear at a hearing on the District's motion five days later.  See Mot. Hr'g Tr. 4:2–24.  At the hearing, the D.C. Superior Court heard testimony from a D.C. Department of Buildings administrator, the OAG investigator, the superintendent of the D.C. Corporations Division, Mr. Khaliq, Ms. Browning, and Ms. Shaw.  The court reserved judgment on the District's motion.  See Mot. Hr'g Tr. 174:18–23.

Sixteen days later, and within 30 days after being served, Sam Razjooyan removed the case to this Court because the District's complaint raised a federal question by virtue of its RICO claim.  See Notice of Removal ¶¶ 1, 6–7.  The notice indicated that Ray and Houri Razjooyan "d[id] not consent to removal," id. ¶ 14, so the District moved to remand the case for lack of unanimity, see Mot. to Remand at 1; 28 U.S.C. § 1446(b)(2)(A).  After Defendants jointly filed a "notice of consent to removal," the District withdrew its motion.  See Notice to Withdraw Mot. to Remand (ECF No. 8) at 2.  The Court permitted Defendants additional time to respond to the

District's motion for a preliminary injunction, and Defendants filed a joint *pro se* opposition. See Defs.' Opp'n to Pl.'s Mot. for Prelim Inj. ("Opp'n"). The District filed a reply, see Pl.'s Reply in Supp. of Mot. for Prelim. Inj. ("Reply Br."), and the motion is now ripe for adjudication.[4]

## II. Legal Standards

A preliminary injunction is an "extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Postal Police Officers Ass'n v. U.S. Postal Serv., 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (Cooper, J.) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004)). The moving party must "establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Glob. Health Council v. Trump. 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting Winter v. Nat Res. Def. Council, 555 U.S. 7, 20 (2008)). The movant must show that the "four factors, taken together," support an injunction. Abdullah v. Obama, 753 F.3d 193, 197 (D.C. Cir. 2014).[5] Crafting preliminary injunctive relief is ultimately "an exercise of discretion and judgment, often dependent as much on the equities of a given case as

---

[4] Separately, one of Defendants' lenders, Velocity Commercial Capital, LLC, d/b/a New Day Commercial Capital, has moved to intervene as a plaintiff in this litigation. See Mot. to Intervene (ECF No. 14) at 1. Because that motion has no bearing on the District's motion for a preliminary injunction under the DCCPPA, the Court does not address it here.

[5] "In this circuit, it remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits." Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (quoting Sherley v. Sebelius, 644 F.3d 388, 393, 398 (D.C. Cir. 2011)).

the substance of the legal issues it presents." Kim v. FINRA, 698 F. Supp. 3d 147, 161–62 (D.D.C. 2023) (quoting Trump v. Int'l Refugee Assistance Proj., 582 U.S. 571, 579 (2017)).

The District submits that this "4-part common law test" should not apply to its request for an injunction under the DCCPPA. See Pl.'s Mot. at 22. Instead, the District says, it need only show that "(1) the injunction is in the public interest, (2) there exists some cognizable danger of recurrent violation, and (3) the District is likely to succeed on the merits in proving these violations." Id. (citations and internal quotation marks omitted). As the District correctly notes, the D.C. Superior Court has applied this three-part standard when evaluating the District's motion for preliminary injunctive relief in other DCCPPA cases. See, e.g., Pl.'s Mot., Ex. 46 at 3 (Oral Ruling in District of Columbia v. Padilla, No. 2024-CAB-5590 (D.C. Super. Ct. Sep. 19, 2024)) (recognizing that "irreparable harm need not be established when the District of Columbia seeks injunctive relief under the [D.C.] Consumer Protection Procedures Act"); District of Columbia v. Town Sports Intern., LLC, No. 2020-CA-003691-B, 2020 WL 12772522, at *4 (D.C. Super. Ct. Oct. 8, 2020) (same).

But the District has not identified a case in which a *federal* court issued a preliminary injunction under the DCCPPA using this modified standard, and the Court's independent research has not unearthed such a case. The lack of authority supporting the District's view is not surprising: Other circuits apply the traditional four-part standard when evaluating a motion for a preliminary injunction, even when the underlying claims are grounded in state law. See, e.g., Beber v. NavSav Holdings, LLC, 140 F.4th 453, 462 (8th Cir. 2025) ("Although the federal standard for preliminary injunctive relief often requires a federal court to examine state law . . . the standard itself remains federal."); Flood v. ClearOne Commc'ns, Inc., 618 F.3d 1110, 1117 (10th Cir. 2010) (noting that "federal law governs the procedural questions when a preliminary

15

injunction may issue and what standards of review we apply"); S. Milk Sales, Inc. v. Martin, 924 F.2d 98, 102 (6th Cir. 1991) (recognizing that a preliminary injunction is "essentially procedural" and therefore governed by federal law). The District's citations to the contrary are inapposite, as they involved motions for a *permanent* injunction, not a *preliminary* injunction. See, e.g., Midland Funding LLC v. Brent, No. 08-cv-1434, 2009 WL 3086560, at *2 (N.D. Ohio Sep. 23, 2009) ("[T]his Court was not required to consider the Rule 65 factors in determining whether a permanent injunction (as opposed to a preliminary injunction) should issue."); Cap. Tool & Mfg. Co. v. Maschinenfabrik Herkules, 837 F.2d 171, 172 (4th Cir. 1988) ("There is no reason to exclude from Erie state substantive law regarding the issuance of *final* injunctions." (emphasis added)).

The Court need not definitively rule on the proper standard, however, because it concludes that the District is entitled to preliminary injunctive relief under either standard, as explained below.

## III. Analysis

The District seeks two forms of preliminary relief. First, it seeks an order requiring Defendants to "abate the illegal and inhumane conditions at the [five] properties that remain under their control." Pl.'s Mot. at 3. Second, it seeks relief that "extends beyond the abatement of the [five] properties" because, according to the District, there is ample reason to believe that "Defendants *will*, if they have the opportunity, continue to violate the [DCCPPA]." Id. at 29–30. The District submits that this latter form of relief—which would bar Defendants from entering new leases, acquiring new properties, refinancing, or transferring of funds without the Court's approval—is "narrowly targeted to restrain the horrific Housing and Property Maintenance Code

16

violations and consumer protection violations" described above. Id. at 30–31. The Court addresses each form of relief in turn.

A. Remedial Injunctive Relief

The District first seeks an order requiring Sam and Houri Razjooyan to abate the D.C. Housing and Property Maintenance Code violations at 1035 48th Street, 2840 Langston Place, 2850 Langston Place, 2908 Langston Place, and 3615 B Street. See id. at 3–4. The D.C. Superior Court has granted similar relief in comparable cases. This Court will follow suit.

1. Likelihood of Success on the Merits

The District is likely to succeed on the merits of its DCCPPA claims. The complaint alleges that Defendants violated the DCCPPA by, among other things, "[f]ailing to maintain the multi-family residential properties in accordance with the District's Property Maintenance and Housing Codes." Compl. ¶ 363(e)–(f). The District further notes—and Defendants do not contest—that violations of the D.C. Housing and Property Maintenance Code are *per se* violations of the DCCPPA. See D.C. Code § 28–3904(dd) ("It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice . . . including to . . . violate any provision of title 16 of the District of Columbia Municipal Regulations."); D.C. Mun. Regs. tit. 16, §§ 3305 (incorporating provisions of the Housing Code), 3309 (incorporating provisions of the Property Maintenance Code).

As described above, the D.C. Department of Buildings has identified 198 unabated violations of the D.C. Housing and Property Maintenance Code at the five properties in question. See Parsons Decl. ¶¶ 15–16, 18–20. Serious ones at that. The violations include defective (and missing) fire alarm systems, see, e.g., Pl.'s Mot., Ex. 1-V; id., Ex. 1-PPPP, excessive trash accumulation, see, e.g., id., Ex. 1-QQQ, id., Ex. 1-RRRRR, countless broken doors and

17

windows, see, e.g., id., Ex. 1-FFFF; id., Ex. 1-EEEEE, water damage, see, e.g., id. Ex. 1-FFFF; id., Ex. 1-OOOOO, and infestations, see, e.g., id., Ex. 1-LLLLL.  Standing alone, each violation warrants prompt remediation by the property owner.  But left unabated, these violations have created unconscionable living conditions that no person—let alone a resident of our nation's capital—should be forced to endure.

Defendants do not meaningfully dispute that these code violations constitute violations of the DCCPPA.  See Opp'n at 2 ("Defendants do not dispute that tenants are entitled to safe and habitable housing."), 7 ("Defendants do not deny that housing providers must comply with applicable housing laws.").  They instead contend that the District has failed to "make a property-by-property showing that Houri or [Ray Razjooyan] personally controlled the alleged conditions at the [five] properties."  Id. at 6.  In Defendant's telling, there is insufficient evidence that Ray or Houri Razjooyan had "day-to-day operational control, authority over repairs, direct communications with tenants, or direct involvement in the alleged [DCCPPA] violations."  Id.

This argument falls short.  First, the District does not argue that Ray Razjooyan owns or controls any of the properties in question.  See Reply Br. at 5; Mot. Hr'g Tr. 159:24–160:4 (conceding that the District has not "met its burden of showing that Eimon 'Ray' Razjooyan should be subject to th[e] Court's order" because "[t]here is very limited evidence in the Record of Deed documents" establishing his ownership of the properties).  The parties therefore agree that Ray Razjooyan should not be subject to the Court's remedial order.  Second, the District has presented evidence that Houri Razjooyan has exercised control over one of the properties—3615 B Street—as recently as February 2026.  See Pl.'s Mot., Ex. 36 (foreign registration form listing Houri Razjooyan as the beneficial owner of the 3615 B Street LLC); Mot. Hr'g Tr. 108:3–110:2 (e-mail indicating that Defendants were attempting to refinance their interest in 3615 B Street

18

shortly before the District moved for a preliminary injunction).  Moreover, Defendants do not dispute that Sam Razjooyan still exercises control over the remaining four properties.  See Pl.'s Mot., Ex. 9 at 24 (listing Sam Razjooyan as the "sole member" of the 1035 48th Street LLC); id., Ex. 16 at 25 (same for the 2840 Langston Place LLC); id., Ex. 28 at 30 (listing Sam Razjooyan as "president" of the 2850 Langston Place LLC); id., Ex. 33 at 30 (same for the 2908 Langston Place LLC).  Nor do they dispute that they received notice of the code violations.  See Childs v. Purll, 882 A.2d 227, 235–36 (D.C. 2005) (noting that the housing regulations "contemplate sanctions only if repairs are not effected after actual or constructive notice of the defect reaches the landlord" (citation omitted)).

In short, there is ample evidence before the Court that Sam and/or Houri Razjooyan control the five properties that received the D.C. Housing and Property Maintenance Code violations identified by the District.  Because those violations remain unabated, the District is likely to succeed on the merits of its DCCPPA claim.  See Hettinger v. Bozzuto Mgmt. Co., No. 23-cv-3687 (JEB), 2025 WL 2029747, at *2 (D.D.C. July 21, 2025) ("As courts have explained, violating another law or regulation in the context of a consumer transaction constitutes a *per se* violation of the [DCCPPA]" (collecting cases)); District of Columbia v. 76 M Inc., No. 2020-CA-1080-B, 2021 WL 12164762, at *6 (D.C. Super. Ct. Dec. 2, 2021) (concluding that defendants had engaged in an "unlawful trade practice" under the DCCPPA by "repeatedly and continuously violat[ing] provisions of the D.C. Housing Code"); District of Columbia v. MP PPH, LLC, No. 2021-CA-2209-B, 2024 WL 4981456, at *7 (D.C. Super. Ct. Nov. 27, 2024) (finding that the defendant's "commission of extensive habitability violations" established its liability under the DCCPPA).

19

##### 2. *Irreparable Harm*

The District has also established that D.C. consumers—that is, the residents of the five properties in question—will suffer irreparable harm unless the Court orders interim remedial relief.  To obtain a preliminary injunction, the moving party "must demonstrate at least some injury," as "the basis of injunctive relief in the federal courts has always been irreparable harm." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations and internal quotation marks omitted).  The movant's failure to show irreparable harm is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."  Id.

To be sure, the District does not claim that *it* would directly suffer irreparable harm absent an injunction.  It instead alleges that the unabated code violations "are a present danger to the health and safety of both tenants and the surrounding community[.]"  Pl.'s Mot. at 28; see also Reply Br. at 10 (noting that tenants "have been forced into housing shelters due to lack of heat, face recurring sewage leaks, and are subject to massive rats that destroy their belongings and threaten their health").  It further contends that "it will be difficult to provide adequate post-judgment remedies to any new tenants that [Defendants] might ensnare before a final and permanent injunction is in place."  Pl.'s Mot. at 28.  In other words, the District is exercising its authority under the DCCPPA to seek a preliminary injunction that is "in the public interest."  D.C. Code § 28-3909(a).  It may therefore obtain an injunction by showing irreparable harm to D.C. residents.  Cf. District of Columbia v. Exxon Mobil Corp., 640 F. Supp. 3d 95, 110 (D.D.C. 2022) (recognizing that the DCCPPA "authorizes the District to sue 'in the public interest' generally, not on behalf of individual or discrete groups of citizens"), aff'd, 89 F.4th 144 (D.C. Cir. 2023).  Defendants do not dispute that the District may establish irreparable harm by

20

presenting evidence of the appalling living conditions at the five properties under their control. See Opp'n at 8 ("If the Court finds verified life-safety conditions at a specific property, the proper remedy is targeted property-specific relief.").

The District has clearly demonstrated that the residents of the five properties still under Defendants' control have suffered—and will continue to suffer—irreparable harm without the Court's intervention. For example, Ms. Dixon does not feel safe in her apartment at 1035 48th Street because the broken front door allows "squatters and unwanted people com[e] into the building doing drugs." Dixon Aff. ¶ 6. Ms. Shaw, her neighbor, has been forced to move back and forth from a shelter because of a lack of heat in her apartment. See Mot. Hr'g Tr. 146:24–147:14. Her son has experienced health and behavioral issues in light of this instability. Mot. Hr'g Tr. 147:16–21. At 2840 Langston Place, Mr. Grove is unable to bathe his three-year-old son in the bathtub because it appears that water damage may cause his ceiling to collapse. See Grove Decl. ¶ 6. Ms. Bruce fears being bitten by the rats and raccoons that frequent the overflowing dumpster outside of 3615 B Street. See Bruce Decl. ¶ 10. A resident of the same property, Ms. Browning's son has visited the hospital multiple times because their apartment has exacerbated his asthma and allergies. See Mot. Hr'g Tr. 133:8–25.

The conditions at these properties should have been remedied long ago. As the D.C. Superior Court observed at the motion hearing, the tenants are "living in deplorable conditions that are, quite frankly, just not fit for humans to live in." Mot. Hr'g Tr. 174:15–17. And unless the Court orders preliminary injunctive relief, the tenants will likely continue to suffer the consequences of Defendants' numerous housing and property maintenance code violations. Accordingly, the District has established irreparable harm.

### 3. Remaining Preliminary Injunction Factors

Finally, the District has shown that both the balance of the equities and the public interest weigh in favor of a preliminary injunction. As described above, the District has a strong interest in remedying the myriad D.C. Housing and Property Maintenance Code violations at the five properties under Defendants' control. By contrast, Defendants do not (and cannot) claim that they have an interest in failing to abide by the municipal regulations governing the properties. See Opp'n at 11 ("The District argues that Defendants have no legitimate interest in violating the housing code. Defendants agree."). So, as the D.C. Superior Court stated in another case brought by the District against Sam Razjooyan, "it is undeniably in the public interest that these defendants be enjoined from violating the [DCCPPA]." Pl.'s Mot., Ex. 46 at 9; see also id. at 10 (recognizing that the defendants "have no legitimate interest in imposing the Housing Code violations they've been imposing on their tenants").

* * *

The District has thus established that all four preliminary injunction factors weigh in its favor. As noted above, the Court would reach the same conclusion based on the modified three-part standard used by D.C. courts. In addition to demonstrating that it is likely to succeed on the merits and that relief is in the public interest, the District has identified a cognizable danger that Defendants will continue to violate the DCCPPA. During a six-year period, Defendants amassed 198 unabated violations of the D.C. Housing and Property Maintenance Code at only five properties. They have abated only about 20 percent of the over 4,300 violations across their real estate portfolio. See Parsons Decl. ¶¶ 9–10; Mot. Hr'g Tr. 25:19–21, 26:5. Defendants are clearly undeterred by the District's notices of infraction and threats of fines, so the Court's intervention is warranted. The Court will therefore order Sam and Houri Razjooyan to abate the

22

outstanding D.C. Housing and Property Maintenance Code violations at the five properties under their control.

Neither party has addressed whether the District must provide a bond if the Court orders preliminary injunctive relief.  Federal Rule of Civil Procedure 65(c) requires the moving party to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  This rule gives the Court "broad discretion to determine the appropriate amount of an injunction bond," including "the discretion to require no bond at all."  N. Am.'s Bldg. Trades Unions v. DOD, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (citations omitted).  Because Sam and Houri Razjooyan have an independent obligation to abate violations of the D.C. Housing and Property Maintenance Code, see D.C. Mun. Regs. tit. 16, §§ 3305, 3309, the Court concludes that imposing a bond on the District based on the Court's separate order of injunctive relief would serve no purpose.  Accordingly, no bond will be required.  Cf. D.C. Code § 28–3909(a) (providing that a preliminary injunction in an action brought by the District "shall be issued without bond").

B.  Prophylactic Relief

In addition to remedial relief addressing the housing and property maintenance code violations, the District seeks broader prophylactic relief.  It asserts that in light of Defendants' exceptionally poor "track record," any new properties they may acquire "will inevitably lead to the degradation of those properties, abandonment of duties to tenants, and the outlay of District resources to clean up the mess."  Pl.'s Mot. at 29–30.  The District therefore seeks an injunction that would bar Defendants from (1) purchasing, refinancing, or selling any multi-family real property in the District of Columbia without the Court's approval (or modifying any secured

interest in such property); (2) executing any lease agreement with tenants in the District of Columbia; and (3) entering into any Housing Assistance Payment contracts with the District of Columbia.  See Proposed Order (ECF No. 9-1).

There is no denying that the DCCPPA is a broad remedial statute.  See D.C. Code § 28–3901 (providing that the DCCPPA "shall be construed and applied liberally to promote its purpose"); Grayson v. AT&T Corp., 15 A.3d 219, 244–45 (D.C. 2011) (recognizing the Council of the District of Columbia's intent that the DCCPPA be "considered a remedial statute").  The DCCPPA provision authorizing the District to seek preliminary injunctive relief contemplates both retroactive and prospective relief:  It provides that the D.C. Attorney General may bring an action if he "has reason to believe that any person is using or intends to use any method, act or practice" in violation of the DCCPPA.  D.C. Code § 28–3909(a) (emphasis added).  As the D.C. Superior Court acknowledged at the motion hearing, "there is room for movement under the [DCCPPA]."  Mot. Hr'g Tr. 174:8–9.

But the District's request to proactively bar Defendants from engaging in certain real estate transactions or executing leases without the Court's approval seems a step too far.  Recall that in federal court, a preliminary injunction is an "extraordinary form[] of judicial relief," and "any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown."  Beacon Assocs., Inc. v. Apprio, Inc., 308 F. Supp. 3d 277, 284 (D.D.C. 2018) (quoting Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D.D.C. 2001)).  The District submits that "the only way to prevent the continued infliction of irreparable harm on [the tenants at the five properties] and any future tenants is to address the means by which Defendants violate the [DCCPPA], not just the illegal conditions that result."  Reply Br. at 10 (emphasis added).  But the District has not identified any instance in which a court has ordered such sweeping

24

prophylactic relief based on repeated violations of the housing and property maintenance codes. Indeed, the District concedes that its request is "asking this Court to go out further than other judges have done on the [DCCPPA]." Mot. Hr'g Tr. 172:13–14; see also Mot. Hr'g Tr. 17:17–19 ("And so Your Honor, I don't have a case that goes beyond . . . a single property and would prevent them from buying a new one."), 172:17–18 (acknowledging that the requested relief is "something we've not gotten in a preliminary injunction order before"). The District has failed to establish why an order requiring Defendants to preclear any real estate transactions or lease agreements with the Court—which has never been ordered before—is "tailored to remedy the harm shown by the facts." Beatty v. Trump, No. 25-cv-4480 (CRC), 2026 WL 1505646, at *43 (D.D.C. May 29, 2026) (quoting N. Am.'s Bldg. Trades Unions, 783 F. Supp. 3d at 301).

In short, the remedial relief described above—an order requiring Sam and Houri Razjooyan to abate the housing and property maintenance code violations—is narrowly crafted to address the irreparable harm that the tenants at the five properties currently face. If these properties continue to deteriorate or if Defendants should be so bold as to accumulate additional violations at any newly-acquired properties, the Court may reconsider the scope of its preliminary injunction order. For now, however, the Court will limit its order to targeted injunctive relief.

25

## IV.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff's [1-16] Motion for Preliminary Injunction.  A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>July 16, 2026</u>

26